**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TMC THE METALS COMPANY INC. SECURITIES LITIGATION | Master File No. 21-CV-5991-EK-SJB<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION** |

**POMERANTZ LLP**
Joshua B. Silverman
Louis C. Ludwig
10 South LaSalle St., Ste. 3505
Chicago, IL 60603
Telephone: (312) 377-1181
jbsilverman@pomlaw.com
lcludwig@pomlaw.com

*Lead Counsel*

Co-Lead Plaintiffs Point12 Diversified Fund, LP and Kyle Autry ("Plaintiffs"), individually and on behalf of all other persons similarly situated, through their undersigned attorneys, allege the following based upon personal knowledge, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by TMC the metals company Inc. f/k/a Sustainable Opportunities Acquisition Corp. ("TMC" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiffs believe that substantial additional evidentiary support exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who purchased or otherwise acquired the publicly traded securities of TMC between March 4, 2021 and October 5, 2021, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      TMC went public in late 2021 when DeepGreen, Inc. ("DeepGreen") merged with blank check company Sustainable Opportunities Acquisition Corp. ("SOAC"), a special purpose acquisition company ("SPAC") claiming to focus on Environmental, Social, and Governance ("ESG"). The deal valuedthe ocean mining concept at a staggering $2.9 billion.

3.       The merger agreement envisioned raising $570 million in gross proceeds, including a $330 million private investment in public equity ("PIPE").

4.      Upon closing of the merger, the combined company was renamed TMC the metals

company Inc.

5.     TMC is a Canadian deep-sea minerals exploration company focused on the collection, processing, and refining of polymetallic nodules found on the seafloor of the Clarion Clipperton Zone of the Pacific Ocean (the "CCZ"). To attract the attention of ESG investors, TMC called these nodules "EV Batteries in a Rock."

6.     The Company's purported mission is to supply metals for electric vehicle batteries with the least possible negative environmental and social impact.

7.     TMC drew investor interest based on both its sky-high valuation and the in-demand nature of the metals in question.

8.     TMC's primary assets are three exploration licenses granted by the International Seabed Authority ("ISA"), an intergovernmental body that oversees t he development of mineral related operations in the international seabed. These licenses, which are held via three subsidiaries, are: (i) Nauru Ocean Resources Inc. ("NORI"); (ii) Marawa Research and Exploration Limited ("Marawa"); and (iii) Tongo Offshore Mining Limited ("TOML").

9.     TMC stock began trading publicly on Friday, September 10, 2021.

10.     Throughout the Class Period, the Company misrepresented or omitted that it had:

- significantly overpaid for the TOML acquisition to undisclosed insiders;

- significantly overvalued the TOML license;

- artificially inflated its NORI exploration expenditures to give investors a false scale of its operations;

- significantly downplayed the environmental risks of deep-sea mining polymetallic nodules and failed to adequately warn investors of the risks faced by the Company's environmentally reckless exploitation plans;

- failed to ensure that its prospective PIPE financing – necessary for large sale

commercial production – was fully committed; and

- significantly overvalued TMC.

11.    The following trading day – Monday, September 13, 2021 – *Bloomberg* published an article revealing that investors had not provided $330 million as part of the PIPE component of TMC's go-public deal that Defendants had claimed was "fully committed."

12.    The article also questioned TMC's "green credentials," revealing that "[e]nvironmentalists claim that TMC's activities will damage sensitive ecosystems and destroy vital biodiversity" and that "[s]ince the SPAC deal was announced in March, more than 500 scientists have signed a letter calling for a moratorium on deep-sea mining until the environmental risks are better understood."

13.    On this news, TMC's shares fell $2.45, or over 20%, over the next two trading days to close at $10.00 on September 15, 2021, damaging investors.

14.    Then, on October 6, 2021, before market hours, market research firm Bonitas Research released a report detailing multiple issues plaguing TMC, including that: (i) the Company had overpaid on licenses to potential undisclosed insiders; and (ii) the Company had artificially inflated exploration expenses by more than 100% in order to mislead investors about the scale of its operations.

15.     On this news, TMC shares fell $0.32 per share, or over 7%, to close at $4.14 per share on October 6, 2021, further damaging investors.

16.    Shares have traded below $4.00 at all times since early October 2021, cementing a long-term trend of underperformance.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the

SEC (17 C.F.R. §240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C.
§1331 and §27 of the Exchange Act.

19.    This Court has jurisdiction over each defendant named herein because each
defendant has sufficient minimum contacts with this judicial district so as to render the exercise of
jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.    Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15
U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent
damages took place within this judicial district. Substantial acts in furtherance of the alleged fraud
and/or the effects of the fraud have occurred in this Judicial District. Many of the acts charged
herein, including the dissemination of materially false and/or misleading information and the
solicitation of purchasers of TMC securities, occurred in substantial part in this District.

21.    In connection with the acts, conduct and other wrongs alleged in this Complaint,
Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,
including but not limited to, the United States mail, interstate telephone communications and the
facilities of the NASDAQ, a national securities exchange.

## PARTIES

22.    Plaintiffs, as set forth in their previously-filed Certifications (ECF No. 11-4),
purchased the Company's securities at artificially inflated prices during the Class Period and was
economically damaged thereby. Defendant TMC purports to be a deep-sea minerals exploration
company focused on the collection, processing, and refining of polymetallic nodules found on the
seafloor of the CCZ of the Eastern Pacific Ocean. The Company was formerly known as
DeepGreen Inc. and changed its name to TMC the metals company Inc. in September 2021.

23.    Defendant TMC is incorporated in the Cayman Islands its head office at 595 Howe

Street, Vancouver, BC, Canada. TMC shares are listed on the NASDAQ under the ticker symbol "TMC."

24.    Defendant Gerard Barron ("Barron") served as DeepGreen's Chairman and Chief Executive Officer since 2018. Following the merger, Defendant Barron has served as TMC's Chief Executive Officer and Chairman of the Board.

25.    Defendant Scott Leonard ("Leonard") is and was at all pertinent times the Chief Executive Officer of SOAC. Following the merger, Defendant Leonard has served as a Director of TMC.

26.    Defendants Barron and Leonard are collectively referred to herein as the "Individual Defendants."

27.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations; was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

(d)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f)    approved or ratified these statements in violation of the federal securities laws.

28.    The Company is liable for the acts of the Individual Defendants and its employees

under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

29.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

30.    The Company and the Individual Defendants are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Facts

**A.**    **TMC is Created In Order to Exploit the Seabed for Precious Metals**

31.    DeepGreen was a Canada-based mining company founded in 2011.

32.    The SOAC was a blank check company that targeted projects with substantial ESG impact.

33.    Vast swaths of the seabed are covered with mineable—and potentially extremely valuable—metals, in the form of blackened lumps called polymetallic nodules. Polymetallic nodules (also called manganese nodules) hold the four primary battery metals: cobalt, nickel, copper, and manganese, in a single ore

34.    For decades, private companies have sought to develop the technical ability to mine these nodules, despite the environmental risks inherent in altering an ecologically sensitive environment about which little is known.  TMC falsely claimed it is capable of mining the seabed; in reality, it had not developed extraction capabilities beyond the exploratory phase.

35.    TMC was founded in 2021 under a SPAC by the merger of DeepGreen and the SOAC to merge their alleged seabed nodule collecting and processing capabilities. The deal valued TMC at $2.9 billion.

36.    TMC has represented that it will extract metals used in electric vehicle batteries

from polymetallic rocks found on the seabed, even though neither it nor any other company has demonstrated an ability to actually accomplish this extraction.

37.     To prevent investors from appreciating the serious technological impediments it then faced, TMC claimed to have successfully finalized a breakthrough metallurgical process to extract the primary metals used in electric vehicle batteries from these polymetallic rocks. Defendants have further claimed that the proposed extraction will generate no solid processing waste.

38.     TMC has held itself out as being able to mine these nodules undersea and process them through onshore processing systems to supply essential battery metals to the surging global electric vehicle industry. Specifically, TMC told the investing public that DeepGreen has explored and finalized a process for extracting critical battery metals from the seabed with allegedly minimal environmental damage.

39.     TMC refers to the nodules as "EV batteries in a rock" and says mining them will help decarbonize the transport sector and thereby help solve the climate crisis, all while causing less ecological damage, and at less cost, than extracting the same materials on land. TMC says these minerals are sufficient to electrify 280 million vehicles.

40.     TMC's core venture is highly-lucrative given the growing demand for battery metals.  For example, nickel prices are at a 7-year high. More generally, the metals stand to be used in cathodes and wiring for electric car batteries and other types of energy storage.

41.     Defendants have claimed that the scarcity of these metals is the main impediment to broad adoption of clean energy sources and electric vehicles, and that polymetallic nodules represent the purest source of these metals with the least damage to the environment.

42.     However, TMC admits that its proposed venture will require substantial infusions of cash, hence the importance of the PIPE investment TMC touted to the market as a certainty.



**B.**    **TMC Conceals Its Overpayment for the TOML License**

43.    The TOML exploration license held by TMC is an ISA-approved license which permits mineral prospecting on the seafloor. TOML's previous owner, Nautilus Minerals Inc. ("NMI") valued the TOML exploration license in its historical annual reports at zero.

44.    NMI carried the TOML license at zero on its financial statements up until bankruptcy.

45.    In 2019, PricewaterhouseCoopers ("PwC"), in its capacity as monitor in NMI's restructuring process, attempted to find a buyer for NMI's assets through a court-approved sale and investment solicitation plan ("SISP").

46.    Even though the TOML license was shopped around to approximately 300 prospective investors as part of NMI's SISP, there was almost no interest from independent parties.

47.    Ultimately, the only interested party was NMI's Senior Secured Creditor, Deep Sea Mining Finance Limited ("DSMF"), the undisclosed related party beneficiary of TMC's overpayment for TOML.

48.     In the transfer of the TOML license to DSMF, affected NMI creditors received 10 cents on the dollar and NMI common shareholders received nothing.

49.     In March 2020 DeepGreen acquired the TOML licenses from DSMF for **$4 million USD plus 7.8 million TMC shares**, even though the going price for a CCZ exploration license is $250,000 USD.

50.     Lockheed Martin has two comparable exploration licenses and holds them at $0 value at its UK subsidiary.

51.     The NORI and Marawa licenses are valued at US $250,000 each, and there is no indication as to why the TOML license was valued at many times more than that amount, plus TMC stock.

52.     For example, a consulting report commissioned by DeepGreen and dated March 26, 2021 states, in pertinent part, that:

- "*[t]he polymetallic nodule deposits in NORI Area D are very similar to those in TOML Areas A to F*";

- "*[t]he mechanism of formation of the nodules is interpreted to be essentially identical across the entire CCZ*, with only minor local variations. Consequently, *there is relatively little difference between the size, shape or metal content of the nodules from one area to another*"; and

- "*[t]he commonality between the polymetallic nodule deposits in NORI Area D and the TOML Areas indicates that the methods proposed for the development of NORI Area D can reasonably be assumed to be equally relevant for future development in the TOML Areas*."[1]

---

[1] *See* https://www.sec.gov/Archives/edgar/data/1798562/000121390021020731/fs42021ex96-2_sustainable.htm at iv.

10

(Emphasis added.)

53.     Adding to the baffling nature of the TOML transaction, Canadian court documents revealed an existing ongoing relationship between NMI and DeepGreen since 2013 via a "Minerals Royalty Deed" which included TOML, NORI & DeepGreen.   DeepGreen's preexisting relationship with NMI, which was never disclosed to investors, renders its purchase of the TOML license at an exorbitant price from a third party (DSMF) even more inexplicable.

54.     Finally, and without any basis for doing so given the aforementioned $250,000 price for CCZ licenses, TMC valued the TOML license in its public filing at nearly ***$43 million USD***, around 10 times more than the 2020 purchase price, itself substantially inflated.

**Reconciliation — Exploration Licenses**

A reconciliation of the Company's exploration licenses is as follows:

| | NORI License $ | Marawa Option $ | TOML License $ | Total $ |
|---|---|---|---|---|
| Balance at December 31, 2018 and 2019 | 250,000 | 198,855 | — | 448,855 |
| TOML Acquisition (*Note 3*) | — | — | 42,701,464 | 42,701,464 |
| **Balance at December 31, 2020** | **250,000** | **198,855** | **42,701,464** | **43,150,319** |

F-60

55.     TMC's overvaluation of its TOML license was a blatant ploy to deceive investors and buttress the overvaluation of TMC writ large.

56.      Nor was the TOML license valuation a reflection of the scarcity of CCZ parcels available for license.  The below graphic shows many CCZ parcels remain available as of 2021:



### C.    TMC Overstates Exploration Investment

57.    The ISA maintains records of actual expenditures towards the exploration and development of each of the CCZ parcels it licenses.  ISA records reveal that TMC overstated the amount that had been invested to date in the exploring the NORI.  Specifically, ISA's records disclosed actual 2019 exploration expenditures for NORI of only $15 million USD.

58.    By contrast, TMC's told U.S. investors (via its SEC filings) that the same NORI exploration expenses were more than double that figure, or $33.5 million USD:

**Exploration Expenses  for CY2019**

| USD | NORI | Marawa |
|---|---|---|
| **Disclosed by TMC** | | |
| Exploration labour | 1,635,858 | 895,165 |
| Marine cruise | 27,039,041 | 1,120,737 |
| External consulting | 4,834,170 | 563,210 |
| **Total disclosed by TMC** | **33,509,069** | **2,579,112** |

| | | |
|---|---|---|
| **Total disclosed by ISA** | 14,956,072 | 2,650,946 |
| | | |
| **Overstatement by TMC** | 18,552,997 | (71,834) |
| *Overstatement %* | *124%* | *(3%)* |

*Source: TMC S-4, ISA NORI Public Information, ISA Marawa Public Information*
*https://isa.org.jm/files/files/documents/Public%20information%20on%20contracts%20NORI.pdf*
*https://isa.org.jm/files/files/documents/Public%20information%20on%20contracts%20Marawa.pdf*

59.     By inflating its NORI exploration expenditures, TMC was able to overstate the status of its exploration efforts to investors.  This was particularly significant because as noted above at ¶36, Defendants claim to already have the ability to mine deep sea nodules, a feat of engineering that TMC has yet to demonstrate.

**D.     TMC Seeks to Mine the Seabed via Cash-Strapped Country of Nauru**

60.     TMC seeks to mine the CCZ, a metal-rich region of the Pacific Ocean floor between Hawaii and Mexico.

61.     In general, the seabed—an area encompassing roughly a hundred million square miles—is considered the "common heritage of mankind" under the United Nations Convention on the Law of the Sea ("UNCLOS").

62.     Since 1994, the ISA has been authorized by the United Nations to administer and regulate deep sea exploration and mining in international waters. Based on its collectively-held status as the "common heritage of all mankind," however, most of the seabed is not open to private resource exploration or extraction.

63.     Further complicating matters, permits for actual mining cannot be granted until the ISA promulgates a set of regulations governing the process, a task more than twenty years in the making.

64.     Finally, to apply for a mining permit, companies need to team up with a country

13

that is a party to UNCLOS.  Thus, any organization sponsored by any of the 167 ISA Member countries or the European Union can apply for a CCZ exploration license from the ISA for US $250,000.

65.     Despite these hurdles, TMC has latched onto an obscure rule annexed to UNCLOS, which provides that "if a request [for a mining permit] is made by a State," the ISA "shall" finalize the long-languishing regulations within two years. This provision has become known as the "two-year rule."

66.     Around April 2021, Nauru, a tiny country (and UNCLOS party) which is home to ten thousand people and occupies an eight-square-mile island northeast of Papua New Guinea, announced that it was invoking the two-year rule on behalf of NORI, a subsidiary of TMC.

67.     Other UNCLOS member states objected to the two-year timetable, on the ground that it cannot responsibly be met.  Nevertheless, the ISA, which expects to receive a percentage of the profits from seabed mining if it moves forward, pressed forward with Nauru's request. Environmental author Elizabeth Kolbert has observed that given the ISA's current, dual role of regulator and expected beneficiary, "[t]he potential for a conflict of interest would seem to be pretty basic."[2]

68.     Based on Nauru/TMC's invocation of the two-year rule, the ISA is expected to begin issuing deep-sea mining permits by the summer of 2023.

69.     For its part, Nauru has long borne the brunt of disastrous business dealings. Starting in the early twentieth century, the island was stripped of most of its phosphate deposits, a process that reduced a good part of it to a wasteland.

70.     Following independence in 1968, Nauru's phosphate-derived wealth, which was gradually depleted by a series of money-losing ventures. Now it has turned to deep-sea mining.

---

[2] https://www.newyorker.com/magazine/2022/01/03/mining-the-bottom-of-the-sea

**D.    Defendants Issue Spurious Projections to Generate Investor Interest**

71.    TMC's valuation was based was on 2024 revenue and EBITDA estimates. TMC projects deep ocean mining to yield a positive EBITDA from commercial production in 2024. TMC's highly ambitious valuation leaves scant leeway for the operational complexity of commercializing a novel and hitherto untested idea.



72.    To cite one example, TMC only received its first mining ship in September 2021.

73.    TMC's initial valuation failed to factor in the possibility of the Company's initial investors withdrawing their capital, leaving the Company with significantly overvalued stock. This puts all the company's projections and valuations into question, as its capital assumptions were overstated.

74.    As the *Bloomberg* article explained, "[w]ith many blank-check firms trading below $10, investors (often hedge funds) are increasingly exercising their right to demand their money back rather than seeing through SPAC mergers. In this instance, these so-called redemptions exceeded 90%, and accounted for $270 million of TMC's cash shortfall."

**E.    The True Nature of TMC's Practices Are Environmentally Devastating**

75.    The use of technology and extraction processes is not as green as TMC has touted. TMC has recklessly failed address the true environmental impact of their proposed seabed mining, which would take place in complete darkness, thousands of feet under water, and would be almost impossible to monitor.

76.    Although Defendants artificially understated the environmental impact of their business model to attract ESG investors, undersea mining activities adversely affect ocean biodiversity and ecosystems:

- **Disturbance of the seafloor**: The scraping of the ocean floor by machines can alter or destroy deep-sea habitats, leading to the loss of species and fragmentation or loss of ecosystem structure and function. Many species living in the deep sea are endemic – meaning they do not occur anywhere else on the planet – and physical disturbances in just one mining site can possibly wipe out an entire species. This is one of the biggest potential impacts from deep-sea mining.

- **Sediment plumes**: Some forms of deep-sea mining will stir up fine sediments on the seafloor consisting of silt, clay and the remains of microorganisms, creating plumes of suspended particles. It is unclear how far these particles may disperse beyond the mining area, how long it would take for them to resettle on the seafloor, and to what extent they may affect ecosystems and species, for instance by smothering animals or harming filter-feeding species that depend on clear, clean water to feed, such as krill and whale sharks.

- **Pollution**: Species such as whales, tuna and sharks could be affected by noise, vibrations and light pollution caused by mining equipment and surface vessels, as well as potential leaks and spills of fuel and toxic products:



77.     The noted oceanographer Sylvia Earle has called the attempt to carve up the ocean floor into mining claims, embodied by TMC, the "biggest land grab in the history of humankind."

78.     Duncan Currie, an international lawyer advising the Deep Sea Conservation Coalition, an advocacy group that has called for a moratorium on seabed mining, has characterized TMC's proposed venture as "a very one-way street toward deep-sea mining at the enormous expense of the marine environment[.]"

79.     Moreover, and in stark contrast to the Company's rose-colored claims about the environmental neutrality of deep-sea mining, the International Union for Conservation of Nature, which compiles the "red list" of endangered species, has called for a global moratorium on the

practice, warning that "bio diversity loss will be inevitable if deep-sea mining is permitted to occur," and "that the consequences for ocean ecosystem function are unknown."

80.    TMC's assertions that its planned mining venture was environmentally harmless, if not beneficial, are belied by The Marine Expert Statement, a petition against the type of deep-sea mining TMC was set to engage in, ***signed by over 600 marine science and policy experts***.[3]

81.    Adding to the chorus of concerned voices, corporations, including BMW, Volvo, Google and Samsung, have lent their weight to calls for a moratorium on the proposals.[4]

82.    Claudia Becker, a senior BMW expert in sustainable supply chains, explained that the automaker's opposition is based on "the fear that everything we do down there could have irreversible consequences," as well as the fact that "[t]hose nodules grew over millions of years and if we take them out now, we don't understand how many species depend on them - what does this mean for the beginning of our food chain?"

83.    Likewise, banks such as Triodos have promised to exclude deep-sea mining from their financing.[5]

## Defendants Make Materially False and Misleading Statements During The Class Period

84.    On March 4, 2021, the Company issued a press release, attached to SOAC's form 8-K filing with the SEC that same day, entitled "DeepGreen, Developer of the World's Largest Estimated Resource of Battery Metals for EVs, to Combine with Sustainable Opportunities Acquisition Corporation." The press release announced that DeepGreen had entered into a definitive business combination agreement with SOAC, a SPAC "with a dedicated ESG focus and deep operational and capital market capabilities in the energy and resource sectors." The press

---

[3] https://www.seabedminingsciencestatement.org/
[4] https://www.bbc.com/news/science-environment-56607700
[5] https://www.triodos-im.com/articles/2021/news---triodos-bank-supports-moratorium-on-deep-sea-mining

release also stated that the "transaction represents a pro forma equity value of US$2.9 billion" for the combined company, which will be renamed and operate under the name TMC upon closing.

85.     The March 4, 2021 Press Release also stated that "[t]he transaction includes an upsized **US$330 million fully committed** common stock Private Investment in Public Equity ("PIPE") at US$10.00 per share, anchored by an international consortium of strategic and institutional investors, including Allseas, adding to the list of existing strategic investors such as Maersk Supply Service and Glencore." (Emphasis added)

86.     In the March 4, 2021 Press Release, Defendant Leonard stated the following about DeepGreen:

> We looked at over 100 companies, many of them in the EV and renewable energy space. DeepGreen stands above the rest. ***It offers a real, scalable solution to the raw materials problem, at a low production cost and with a significant reduction in the ESG footprint of metals*** We are convinced that The Metals Company is the ultimate answer to our thorough search for meaningful ESG impacts combined with tremendous financial upside.

> (Emphasis added).

87.     In the March 4, 2021 Press Release, Defendant Barron stated the following about the environmental impacts of TMC's deep sea mining: "The reality is that the clean energy transition is not possible without taking billions of tons of metal from the planet. ***Seafloor nodules offer a way to dramatically reduce the environmental bill of this extraction***. We are getting into this industry with a deep commitment to ocean health and a clear stop date in mind." (Emphasis added).

88.     The statements referenced in ¶¶84-87 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational, and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statement and/or failed to disclose that: (1) the Company had significantly overpaid for

the TOML acquisition to undisclosed insiders; (2) the Company had significantly overvalued its TOML license; (3) the Company had artificially inflated its NORI exploration expenditures to give investors a false scale of its operations; (4) Defendants had significantly downplayed the environmental risks of deep-sea mining polymetallic nodules and failed to adequately warn investors of the regulatory risks faced by the Company's environmentally reckless exploitation plans; (5) the Company's PIPE financing was not fully committed and, therefore, the Company would not have the cash necessary for large sale commercial production; (6) as a result of the foregoing, the Company's valuation was significantly less than Defendants disclosed to investors; and (7) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

89.     The March 4, 2021 Form 8-K, which was signed by Defendant Leonard, further elaborated on the PIPE Financing, stating in pertinent part:

> Concurrently with the execution of the Business Combination Agreement, SOAC entered into subscription agreements (the "*Subscription Agreements*") with certain institutional and accredited investors, pursuant to which such investors agreed to subscribe for and purchase, and SOAC agreed to issue and sell to such investors, substantially concurrently with the Closing (as defined in the Business Combination Agreement), an aggregate of 33,030,000 shares of SOAC Common Shares for $10.00 per share, for aggregate gross proceeds of $330,300,000 (the "*PIPE Financing*"). The closing of the PIPE Financing is contingent upon, among other things, the substantially concurrent consummation of the Business Combination. The Subscription Agreements provide that SOAC will grant the investors in the PIPE Financing certain customary registration rights. The PIPE Financing is contingent upon, among other things, the substantially concurrent closing of the Business Combination.

90.     The statements referenced in ¶89 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational, and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statement and/or failed to disclose that: (1) the Company's PIPE financing was not fully committed and,

therefore, the Company would not have the cash necessary for large sale commercial production; (2) as a result of the foregoing, the Company's valuation was significantly less than Defendants disclosed to investors; and (3) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

91.    On April 22, 2021, in an interview with Kitco News, a metals and business news organization, Defendant Barron discussed the environmental impact of TMC's process of collecting polymetallic nodules from the ocean floors, stating "when we bring them to shore and we turn them into metals, we *generate zero tailings and zero waste*." (Emphasis added).

92.    The statements referenced in ¶91 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational, and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statement and/or failed to disclose that: (1) Defendants had significantly downplayed the environmental risks of deep-sea mining polymetallic nodules and failed to adequately warn investors of the risks faced by the Company's environmentally reckless exploitation plans; and (2) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

93.    On April 8, 2021, SOAC filed with the SEC a prospectus on Form S-4 signed by Defendants Leonard and Barron. On May 27, 2021, June 23, 2021, July 14, 2021, July 29, 2021, and August 5, 2021, SOAC filed revised versions of the prospectus for the merger on Forms S-4/A, which was declared effective on August 12, 2021. On August 13, 2021, SOAC issued a Proxy Statement with the SEC on Form 424(b)(3) which was signed by Defendants Leonard and Barron. The Proxy Statement stated the following about the TOML exploration license:

On March 31, 2020, DeepGreen entered into an acquisition agreement to acquire the polymetallic nodules business unit from Deep Sea Mining (the "TOML Acquisition"). As part of this acquisition, DeepGreen acquired various subsidiaries in the TOML group for a total purchase price of $32 million. TOML holds the

21

TOML Exploration Contract with the ISA. The TOML Acquisition includes the exclusive rights held by TOML to explore for polymetallic nodules in an area covering 74,713 km$^2$, a priority right to apply for an exploitation contract to collect polymetallic nodules in the same area, and some exploration related equipment. The TOML group also holds various patents and an application right with respect to a prospecting exploration license in the Republic of Kiribati.

***The purchase price of $32 million was settled through initial cash payments of $0.5 million in two tranches, the issuance of 7.8 million DeepGreen Common Shares at the mutually agreed price of $3.60 per share between both parties for a total amount of $28 million, $0.06 million payment to ISA on behalf of Deep Sea Mining and a deferred consideration of $3.44 million to be paid in tranches by June 30, 2021.***

(Emphasis added).

94.     On June 9, 2021, Northland Capital Markets issued an "outperform" rating for SOAC, and credulously accepting that "[l]ow biomass density, lack of toxic tailings, surface collection instead of excavation, low GHG emissions are all in TMC's favor as long as the total costs of extraction and processing are adequately tallied."

95.     In the August 5, 2021 Form S-4, which was signed by Defendants Barron and Leonard, Defendants valued the TOML license at nearly $43 million:

**Reconciliation — Exploration Licenses**

A reconciliation of the Company's exploration licenses is as follows:

|  | NORI License $ | Marawa Option $ | TOML License $ | Total $ |
|---|---|---|---|---|
| Balance at December 31, 2018 and 2019 | 250,000 | 198,855 | — | 448,855 |
| TOML Acquisition (*Note 3*) | — | — | 42,701,464 | 42,701,464 |
| **Balance at December 31, 2020** | **250,000** | **198,855** | **42,701,464** | **43,150,319** |

F-60

96.     The August 5, 2021 Form S-4 also stated that the Company's exploration expenditures for NORI were over $35 million:

| For the year ended December 31, 2019 | General $ | NORI License $ | Marawa Option $ | Total $ |
|---|---|---|---|---|
| **Exploration expenses** | | | | |
| Exploration labour | — | 1,635,858 | 895,165 | 2,531,023 |
| Marine cruise | — | 27,039,041 | 1,120,737 | 28,159,778 |
| Common Share options-based payments *(Note 10)* | — | 769,175 | 508,385 | 1,277,560 |
| Amortization *(Note 7)* | — | 336,990 | — | 336,990 |
| External consulting | 19,578 | 4,834,170 | 563,210 | 5,416,958 |
| Travel, workshop and other | — | 785,638 | 322,281 | 1,107,919 |
| | 19,578 | 35,400,872 | 3,409,778 | 38,830,228 |

97.    The statements referenced in ¶¶95-96 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational, and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statement and/or failed to disclose that: (1) the Company had significantly overpaid for the TOML acquisition to undisclosed insiders; (2) the Company had significantly overvalued its TOML license; (3) the Company had artificially inflated its NORI exploration expenditures to give investors a false scale of its operations; and (4) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

**The Truth Emerges in a Series of Partial Disclosures**

98.    On September 13, 2021, TMC filed suit in New York federal court against (i) Ethos Fund I, LP, Ethos GP, LLC, and Ethos DeepGreen PIPE, LLC and (ii) Ramas Capital Management, LLC, Ramas Energy Opportunities I GP, LLC, Ramas Energy Opportunities I, L.P., the PIPE funders who had allegedly withdrawn their contributions (the "lawsuits"). The lawsuits claimed that the Ethos and Ramas entities had simply failed to put up the agreed-to funds, and claimed an aggregate of $220 million in damages.

99.    Also on September 13, 2021, *Bloomberg* published an article entitled "$500 Million of SPAC Vanishes Under the Sea: The Metal Company's controversial plan to mine the seafloor is a tale of questionable green credentials and SPAC disappointment." The article revealed that

23

"two unidentified investors [failed] to provide funds comprising two-thirds of TMC's $330 million PIPE (private investment in public equity)." The article explained that PIPEs are "supposed to provide a guaranteed financial backstop so the target receives at least some cash" and "also help validate the value the SPAC has ascribed to the target." The failure of some of TMC's PIPE investors was "embarrassing" and problematic because TMC "estimates that $7 billion is needed for large-scale production." Moreover, according to the article, "the scale of TMC's cash shortfall suggests it has yet to convince capital markets that its multi-billion valuation is justified, given the risks."

100.    The *Bloomberg* article also revealed that TMC had overstated its "green credentials" To investors.  In stark contrast to Defendants' false claims that their undersea mining would help solve the climate crisis, the Bloomberg article revealed that "[e]nvironmentalists claim that TMC's activities will damage sensitive ecosystems and destroy vital biodiversity." The article also revealed that "[s]ince the SPAC deal was announced in March, more than 500 scientists have signed a letter calling for a moratorium on deep-sea mining until the environmental risks are better understood. Large companies like BMW AG, Samsung Electronics Co. and Google have leant their support to a temporary ban."

101.    On this news, TMC's shares fell $2.45, or over 20%, over the next two trading days to close at $10.00 on September 15, 2021, damaging investors.

102.    On September 20, 2021, the Judge overseeing the lawsuits in the U.S. District Court for the Southern District of New York, the Honorable Gregory H. Woods, dismissed both for failure to properly allege diversity jurisdiction.

103.    On September 23, 2021, TMC presented at the Sidoti Fall Small Cap Conference. During the presentation, Defendant Barron stated, in pertinent part:

Let me share a few investment highlights with you. We've exploration rights to the world's largest estimated source of battery metals with enough estimated resource on the C4 to

24

electrify about one quarter of the global passenger fleet, 280 million electric vehicles and in our view, the size of this resource can move the needle. It's an unusually high grade resource with four EV metals, tapped into the single rock and on a nickel equivalent basis, their nodules are two to 10 times higher grade than the world's largest undeveloped nickel projects and the high grade, **makes it possible for us and become one of the lowest cost nickel producers on the planet.**

And this resource comes with many advantages for the land ores that allow us to dramatically compress the ESG footprint, including what we believe could be a 90% reduction in climate change impacts and elimination of toxic tenants and importantly we are fortunate to have attracted several quality strategic investors and partners like Glencore, Maersk, Allseas and we have technology development partnership with Hatch.

**So on the transaction we received around $138 million in cash by the fees and with the cash in bank today, we expect to fully fund our operations through Q3 of 2023 and this is a sufficient level of cash to reach the key milestone of submitting our application for an exploitation contract to the ISA.**

We've already made significant progress to develop this resource and **we expect to achieve the following milestones by the end of the third quarter 2023, completion of our module processing and refining pilot plant, the completion and submission of our environmental impact assessment, construction and deployment of our pilot module collection system, working together with Allseas, and finally, submission of an application with the exploitation contract of the NORI area.**

(Emphasis added).

104.    During the same presentation, Defendant Barron responded to a pointed question from analyst John Franzreb regarding the PIPE status by falsely stating that the reason why funders it previously told investors were committed had not in fact funded was due to impossibility not choice.  Barron could not identify any aspect of the so-called "defaulting funders" ability to fund that was not known to Defendants at the time they touted the funding commitment to investors::

Well, you know the pipe, we have two defaulters, **and it wasn't that they chose not to fund. They couldn't fund.** And so we are pretty unhappy with that of course, and so we filed -- **we filed an action against both of those and we'll be pursuing all our remedies to recover it**. But look, on the positive side, and I can't help it, look at it from a positive perspective, **it means that we can take this money and put it to very good use and add a lot more value with it**.

(Emphasis added).

105.    The statements referenced in ¶¶103-104 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining

to the Company's business, operational, and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statement and/or failed to disclose that: (1) the Company would not have the cash necessary for large sale commercial production; (2) the "action[s]" that TMC had filed in relation to PIPE funding had already been dismissed on September 20, 2021, and therefore did not present an avenue to recover the missing capital, as Defendant Barron suggested;  and (3) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

106.    On October 6, 2021, before market hours, market research firm Bonitas Research released a report (the "Report") detailing multiple issues plaguing TMC, including that: (i) the Company had overpaid on licenses to potential undisclosed insiders; and (ii) the Company had artificially inflated exploration expenses by more than 100% in order to mislead investors about the scale of its operations.

107.    The Report stated that "TMC siphoned US$43 million in cash and stock to undisclosed insiders by overpaying for Tong Offshore Mining Limited ('TOML')." According  to the Report, the TOML should be valued similarly to the licenses of NORI and Marawa at US$250,000 each. The Report explained that NORI's previous owner, NMI, valued the TOML exploration license in its historical annual reports at zero. The Report also stated, in pertinent part, that:

> In 2019, PwC was the Monitor for NMI's restructuring process and tried to find a buyer for NMI's assets through a court-approved sale and investment solicitation plan ("SISP"). PwC Monitor's Second Report to Court dated June 12, 2019 ("PwC's 2nd Report") included results from the SISP which disclosed ***that none of the approximately 300 potential bidders valued the entirety of NMI's assets above US$ 23 million*** (the amount NMI owed DSMF) and that at least three final qualified buyers had "little to no interest in intellectual property, resource licenses, or contracts."

> \*       \*       \*

> PwC Monitor's Third Report to Court dated July 23, 2019 ("PwC's 3rd Report") included  the  acquisition  agreement  between  DSMF  and  NMI  which  clearly

disclosed that NMI's assets were thought of as two separate but technologically complementary deep sea mining businesses (CCZ and Papua New Guinea).

PwC's 3rd Report also revealed an existing ongoing relationship between NMI and DeepGreen since 2013 via a "Minerals Royalty Deed" which included TOML, NORI & Deepgreen Resources Inc.

***TMC failed to disclose to investors its pre-existing relationship with TOML dated back to 2013.***

***NMI carried the TOML license at zero on its financial statements up until bankruptcy.***

*     *     *

TMC is pre-revenue so it relies on its CCZ exploration licenses to entice investor interest. We think TMC's TOML exploration license should be valued similarly to the NORI and Marawa licenses at ~US$250,000 each, if not at zero like Lockheed Martin.

Instead, TMC valued the TOML license at US$ 43 million.

*     *     *

So why would DeepGreen pay US$ 4 million cash and 7.8 million TMC shares to acquire a license if it could just fill out another application with any one of the 167 ISA member nations or the European Union and pay US$ 250,000?

***We believe the TOML license acquisition was a payout to undisclosed insiders at the expense of misled minority TMC shareholders.***

(Emphasis added).

108.    The Report also alleged that TMC artificially inflated its 2019 exploration expenses to "giv[e] investors a false scale of its operations." The Report stated, in pertinent part:

TMC's SEC filings disclosed historical exploration expenses for its NORI and Marawa projects.

As part of its reporting requirements, the ISA maintains public records of exploration expenses towards each license. ISA public records matched TMC's SEC-reported figures for Marawa's 2019 exploration expenditures ***but were significantly lower for NORI.***

***ISA public records disclosed actual 2019 exploration expenditures for NORI was only US$ 15 million, significantly lower than the US$ 34 million disclosed to investors in TMC's SEC filings. To us, the evidence suggests TMC overstated its NORI exploration expenditures in its SEC filings to give investors a false scale of its operations.***

27

(Emphasis added).

109.    Finally, the Report questioned the validity of TMC's ownership claim of NORI. The Report stated, in pertinent part:

> There are also reasons to question TMC's ownership claim of NORI.
>
> TMC claimed in its S-4 that it owns 100% interest in NORI.
>
> ***However, NORI's exploration license application to the ISA disclosed that NORI was wholly owned by two Nauruan foundations and that all future income from NORI would be used in Nauru.***
>
> (Emphasis added).

110.    On this news, TMC shares fell $0.32 per share, or over 7%, to close at $4.14 per share on October 6, 2021, further damaging investors.

111.    An analyst report issued by Northlands Capital Markets on October 6, 2021 concurred with the Report's valuation of TOML: "[w]e are valuing TOML at zero …."

112.    On November 11, 2021, TMC held an earnings call for the third quarter of 2021 ("2021 Q3 Earnings Call").  During the 2021 Q3 Earnings Call, Defendant Barron attempted to soften the blow of the Report's revelations by falsely pushing back against the Report as follows:

> Clearly this report was written by someone who doesn't know much about resource economics. **Resource quality drives the value of exploration contract, not the fee you paid or apply for the contract. We acquired the TOML assets of $32 million from a third-party who had no relation to any of the shareholders or executives of TMC or DeepGreen.** And by the time of the acquisition in 2020, TOML finishing campaigns and had a 43-101 compliant resource of 750 -- wet nodules. For comparison, NORI-D has a 43-101 compliant resource of 356 million tons. So less than half of the TOML resource. It also has an SEC S-K 1300 compliant initial assessment with an NPV of $6.8 billion. And if we use today's commodity prices, that NPV would exceed $12 billion. **So I think $32 million acquisition of the TOML asset was an outstanding deal by any measure.**
>
> **It's also worth noting that in our opinion that nearly all of the good ground has already been claimed in the CCZ.** So if the Shortseller believes getting an exploration contract for an area with high quality resource and sponsorship from a sovereign nation as easy as paying $250,000 contract application fee, well we should go ahead and try.
>
> The report also suggests that we NORI and that is also incorrect. **Apart of the business combination, we were required to adjust our accounting from IFRS to U.S. GAAP,**

28

**and that meant we needed to fair value this shares we paid to Maersk, resulting in the increase from $14.9 million to $35.4 million.**

(Emphasis added).

113. The statements referenced in ¶112 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational, and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statement and/or failed to disclose that the Report: (1) correctly noted that TMC massively overpaid for the TOML license in comparison to other, comparable licenses, ***including two licenses held by TMC***; (2) demonstrated the widespread availability of exploration contracts in the CCZ, making Defendant Barron's claim about "good ground" a hollow non-sequitur; and (3) revealed a material discrepancy in TMC's reporting of its alleged NORI exploration expenditures, which gave investors a false scale of the Company's operations, and which valued common share-based options payments, the item Defendant Barron claimed was at the root of the discrepancy, at less than $1 million (*see* ¶96, above). As a result of (1)-(3), Defendants' public statements were materially false and/or misleading at all relevant times.

114. On March 24, 2022, TMC provided financial results for the fourth quarter and full year ending December 31, 2021 and announced a corporate update. The Company incurred net loss of -$141.3M, or -$0.69 per share, in 2021 compared with -$56.6M, or -$0.32 per share in 2020. Further, fourth quarter net loss came to $19.8M, or $0.09 per share.

115. On the news of these losses, TMC shares fell by 11.3%.

116. Confirming that the Company was not actually seeking to establish legal liability for the PIPE funders who had allegedly withdrawn their contributions, TMC admitted, in its annual report filed on March 25, 2022, that, with the exception of the instant securities class action, "we

are not currently a party to any material legal proceedings."[6]

117.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

118.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of TMC during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

119.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

120.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of

---

[6] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/1798562/000110465922038029/tmc-20211231x10k.htm at 91.

federal law that is complained of herein.

121.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

122.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

123.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

124.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)    the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)    the Company traded on the NASDAQ, and was covered by market analysts;

(f)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)    Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)    Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

125.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

*126.*    Alternatively, Plaintiffs and the members of the Class are entitled to the

presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Plaintiffs primarily allege that Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Against All Defendants**

127.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

128.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

129.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

131.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the

investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

132.    Defendants Barron and Leonard, who are a senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

133.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

134.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

135.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

136.     By reason of the foregoing,  Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

137.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

138.     During the Class Period, Defendants Barron and Leonard participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

139.     As officers and directors of a publicly owned company, Defendants Barron and Leonard had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

140.     Because of their positions of control and authority as senior officers, Defendants Barron and Leonard were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, Defendants Barron and Leonard exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Defendants Barron and Leonard, therefore, were each a "controlling person[]" of the Company within the meaning of

Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

141.    Defendants Barron and Leonard, therefore, acted as controlling persons of the Company. By reason of their senior management positions and being a director of the Company, Defendants Barron and Leonard had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Defendants Barron and Leonard exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

142.    By reason of the above conduct, Defendants Barron and Leonard are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: May 13, 2022

Respectfully submitted,

**POMERANTZ LLP**
/s/ *Louis C. Ludwig*
Louis C. Ludwig
Joshua B. Silverman (*pro hac vice*
forthcoming)
10 South LaSalle St., Ste. 3505
Chicago, IL 60603
Telephone: (312) 377-1181
lcludwig@pomlaw.com
jpsilverman@pomlaw.com

*Counsel for Co-Lead Plaintiffs*

**BRONSTEIN, GEWIRTZ**
**& GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com
        eitank@bgandg.com

**Appendix**
**(Glossary of Defined Terms)**

CCZ - Clarion Clipperton Zone

DSMF - Deep Sea Mining Finance Limited

ESG - Environmental, Social, and Governance

ISA - International Seabed Authority

NORI - Nauru Ocean Resources Inc.

NMI - Nautilus Minerals Inc.

PIPE - private investment in public equity

PwC - PricewaterhouseCoopers

SEC - U.S. Securities and Exchange Commission

SISP - sale and investment solicitation plan

SOAC - Sustainable Opportunities Acquisition Corp

SPAC - special purpose acquisition company

TMC - TMC the metals company Inc.

TOML - Tongo Offshore Mining Limited