**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TMC THE METALS COMPANY INC. SECURITIES LITIGATION | Master file No. 21-CV-5991-EK-SJB<br><br>Hon. Eric R. Komitee<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**Served On August 26, 2022** |

**POMERANTZ LLP**
Joshua B. Silverman
Louis C. Ludwig
10 South LaSalle St., Ste. 3505
Chicago, IL 60603
Telephone: (312) 377-1181
jbsilverman@pomlaw.com
lcludwig@pomlaw.com

*Lead Counsel*

## TABLE OF CONTENTS

Page

INTRODUCTION......................................................................................................... 1

STATEMENT OF FACTS............................................................................................. 2

I.     TMC's Creation, Core Business Model, and Overvaluation............................... 2

II.    Defendants' March 2021 Misleading Statements ............................................... 5

III.   TMC's Plan with Nauru ..................................................................................... 5

IV.    TMC's Continued Misrepresentations Throughout the Spring and
       Summer of 2021 .................................................................................................. 6

V.     The Truth Emerges in a Series of Partial Disclosures........................................ 7

LEGAL STANDARD .................................................................................................... 8

ARGUMENT ................................................................................................................. 9

I.     Plaintiffs Have Standing to Plead the Alleged Misrepresentations and Omissions ............ 9

II.    Defendants' Reliance on External Documents Invokes Factual  Disputes That Can
       Only Be Resolved at Summary Judgment or Tria............................................. 11

III.   The Complaint Adequately Alleges Material Misrepresentations and Omissions .......... 13

       A.  Defendants Misrepresented PIPE Financing As Being "Fully Committed"......... 13

       B.  Defendants' Environmental Impact Statements Were False and/or
           Misleading ................................................................................................. 15

       C.  Defendants' Statements About TOML Valuation Were False and/or
           Misleading ................................................................................................. 16

IV.    The Complaint Raises a Strong and Compelling Inference of Scienter............. 16

       A.  Defendants' knowledge and access to contradictory information.......... 16

       B.  Motive and opportunity ............................................................................ 17

       C.  False SEC certifications ........................................................................... 18

       D.  Core operations ........................................................................................ 18

V.     The Complaint Adequately Alleges Loss Causation......................................... 19

VI.     The Complaint Adequately Alleges a Control Person Claim............................................. 21

CONCLUSION ......................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (209) ................................................................................................ 8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................. 8

*Bernstein v. Seeman*,
    601 F. Supp. 2d 555 (S.D.N.Y. 2009) ................................................................ 12

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014) ............................................................................... 19

*City of Pontiac Gen. Employees' Ret. Sys* v. Lockheed Martin Corp.,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ................................................................ 18

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................ 19

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ............................................................................... 13

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011) ............................................................................... 16

*Fonte v. Bd. of Managers of Cont'l Towers Condo.*,
    848 F.2d 24 (2d Cir. 1988) ................................................................................. 12

*Francisco v. Abengoa, S.A.*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020) ................................................................ 11

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................................ 14

*GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*,
    838 F.3d 214 (2d Cir. 2016) ................................................................................. 9

*Green v. Wolf Corporation*,
    406 F.2d 291 (2d Cir. 1968) ........................................................................... 9, 10

*Green v. Wolf Corporation*,
    395 U.S. 977 (1969) ............................................................................................ 10

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004) ................................................................................. 11

iii

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
 529 F. Supp. 3d 111 (S.D.N.Y. 2021) ............................................................................... 18

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
 741 F. Supp. 2d 511 (S.D.N.Y. 2010) ............................................................................... 22

*In re Avon Sec. Litig.*,
 2019 WL 6115349 (S.D.N.Y., 2019) ........................................................................... 18, 19

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
 No. 20CV2706ARRPK, 2022 WL 541891 (E.D.N.Y. Feb. 23, 2022) ................................. 13

*In re Cannavest Corp. Sec. Litig.*,
 307 F. Supp. 3d 222 (S.D.N.Y. 2018) ............................................................................... 21

*In re Fannie Mae 2008 Sec. Litig.*,
 891 F. Supp. 2d 458 (S.D.N.Y. 2012) ............................................................................... 14

*In re Fannie Mae 2008 Sec. Litig.*,
 525 F. App'x 16 (2d Cir. 2013) ......................................................................................... 14

*In re Henry Schein, Inc. Sec. Litig.*,
 2019 WL 8638851(E.D.N.Y. 2019) ............................................................................. 19, 22

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
 251 F. Supp. 3d 596 (S.D.N.Y. 2017) ............................................................................... 15

*In re MF Global Holdings Ltd. Sec. Litig.*,
 982 F. Supp. 2d 277 (S.D.N.Y. 2013) ............................................................................... 15

*In re OSI Pharms., Inc. Sec. Litig.*,
 No. 04-CV-5505 (JS)(WDW), 2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007) ...................... 12

*In re Salix Pharms. Ltd.,*
 2016 WL 1629341(S.D.N.Y. 2016) ............................................................................. 15, 18

*In re Symbol Techs. Inc. Sec. Litig.,*
 2013 WL 6330665 (E.D.N.Y. 2013) .................................................................................. 17

*In re Scholastic Corp. Sec. Litig.*,
 252 F.3d 63 (2d Cir. 2001) ............................................................................................... 16

*.In re Vale S.A. Sec. Litig.*,
 No. 19CV526RJDSJB, 2020 WL 2610979 (E.D.N.Y. May 20, 2020) ................................. 14

*In re Vale S.A. Sec. Litig.*,
 No. 15-cv-9539, 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) .......................................... 20

*In re Vivendi Universal, S.A. Sec. Litig.*,
 242 F.R.D. 76 (S.D.N.Y. 2007) .................................................................................... 10, 11

*In re Wells Fargo & Co. Sec. Litig.*,
  No. 1:20- CV-04494-GHW, 2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) .......................... 21

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ....................................................................................................... 8

*Mazuma Holding Corp. v. Bethke,*
  21 F. Supp. 3d 221 (E.D.N.Y. 2014) ........................................................................ 19

*McIntire v. China MediaExpress Holdings, Inc*.,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013) ....................................................................... 12

*Meyer v. Concordia Int'l Corp.*,
  2017 WL 4083603(S.D.N.Y. 2017) ............................................................................ 15

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012) ................................................................................... 9, 10

*Nicholas v. Poughkeepsie Sav. Bank/FSB*,
  No. 90 Civ. 1607 (RWS), 1990 U.S. Dist. LEXIS 12677 (S.D.N.Y. Sep. 26, 1990) .............. 9

*Norton v. Sam's Club*,
  145 F.3d 114 (2d Cir. 1998) .................................................................................... 10

*Nutriband, Inc. v. Kalmar*,
  No. 19CV2511NGGSJB, 2020 WL 4059657 (E.D.N.Y. July 20, 2020) ................................ 8

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ............................................................................................. 15, 16

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  No. 17 Civ. 558 (SRU), 2020 U.S. Dist. LEXIS 42686, 2020 WL 1181366 (D. Conn. Mar. 10, 2020)........................................................................................................... 10

*Pearlstein v. BlackBerry Ltd*.,
  No. 13 CIV. 7060 (CM), 2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ........................... 19, 20

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) .................................................................................... 9

*Shanawaz v. Intellipharmaceutics Intl. Inc. et al.,*
  348 F. Supp. 3d 313 (S.D.N.Y. 2018) ....................................................................... 17

*Strougo v. Barclays PLC*,
  No. 14-cv-5797 (SAS), 2015 WL 1883201 (S.D.N.Y. Apr. 24, 2015) ................................. 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .................................................................................... 8, 9, 13, 17

*Tolbert v. Queens College*,
 242 F.3d 58 (2d Cir. 2001) ........................................................................................... 10

*Van Dongen v. CNinsure Inc,*
 951 F. Supp. 2d 457 (S.D.N.Y. 2013) ...................................................................... 19, 20

*Yannes v. SCWorx Corp.*,
 No. 20-CV-03349 (JGK), 2021 WL 2555437 (S.D.N.Y. June 21, 2021) .............................. 14

**Rules**

Fed. R. Civ.  P. 9(b) ................................................................................................... 13

Fed. R. Civ.  P. 12(b)(6) ...................................................................................... 8, 13, 22

Fed. R. Civ.  P. 56(d) ................................................................................................. 12

**Statutes**

15 U.S.C. § 78t(a) ..................................................................................................... 21

15 U.S.C. § 78u–4(b)(1)(B) ......................................................................................... 13

Securities Exchange Act of 1934 ....................................................................... 9, 10, 11, 21

Private Securities Litigation Reform Act ...................................................................... 13

Co-Lead Plaintiffs Point12 Diversified Fund, LP and Kyle Autry ("Plaintiffs") respectfully submit this memorandum in opposition to the motion to dismiss the Complaint[1] filed by TMC The Metals Company Inc. f/k/a Sustainable Opportunities Acquisition Corp. ("TMC" or the "Company"), Gerard Barron ("Barron"), and Scott Leonard ("Leonard") (collectively, "Defendants").

## INTRODUCTION

Plaintiffs plead a straightforward case of securities fraud.  As the Complaint alleges in detail, Defendants made a series of misrepresentations, omissions, and outright falsehoods to bring TMC public via a  special purpose acquisition company ("SPAC") transaction giving it a staggering $2.9 billion valuation and to attempt to prop up its inflated stock price.

Specifically, during the Class Period (March 4, 2021 and October 5, 2021, both dates inclusive), Defendants: (i) concealed transfers of corporate funds to insiders by overpaying the undisclosed insiders to acquire subsidiaries; (ii) reported artificially inflated values for the three deep sea mining licenses TMC possessed, (iii) inflated exploration expenditures for purposes of overstating the scope of TMC's operations; (iv) significantly misrepresented the substantial environmental risks of TMC's planned operations; and (v) falsely stated that the much-needed $330 million private investment in public equity ("PIPE") financing was "fully committed," when it was not.

Shortly after the Company went public, *Bloomberg* blew the whistle on TMC's vaunted $330 million in funding, which was actually *not* fully committed, and was no longer expected to materialize at all. Even worse, even after a court rejected TMC's attempt to enforce a PIPE deal despite a less-than-full commitment, Defendants continued to misrepresent to investors that they would be able to obtain the funds. The *Bloomberg* piece also revealed Defendants' green credentials to be the inverse of what they claimed – deep sea mining, in the form to be utilized by TMC, is actually devastating

---

[1] All "¶__" references are to the Amended Consolidated Class Action Complaint (the "Complaint") (ECF No. 43). All "DM" references refer to the Memorandum of Law in Support of Defendants' Motion to Dismiss.

environmentally, so much so that before even a single nodule was scooped from the ocean floor, a worldwide protest movement coalesced in opposition to the practice. Not surprisingly, the market reacted harshly in response to these disclosures, causing TMC shares to fall by more than 20%.

Three weeks later, TMC took another deserved hit when a market researcher shed light on the massive overvaluation, inflated operational scope, and other chicanery concocted by Defendants to obscure the actual, unproved and dangerous nature of TMC's activities. In response, shares tumbled again, this time by more than 7%, inflicting more pain on the Company's investors and ushering in a long-term trend of underperformance.

Defendants' motion to dismiss, which relies on alternative facts in a manner prohibited at the pleading stage, incorrectly argues that they are insulated from liability because they did foresee not precisely how consequences of their deception would materialize. That Defendants misrepresented known facts is sufficient for Plaintiffs to state a claim. Nor can Defendants claim that mere "belief" excuses their turning a blind eye to environmental risks that prompted scientists to mobilize against TMC, when those risks were evidentiarily-grounded and known to Defendants.

For pleading purposes, the Complaint does all that the law requires. It identifies in detail each misrepresentation and specifies exactly what is false and/or misleading, pleads facts leaving no doubt that the TMC's executives and directors knew (or recklessly disregarded) the adverse information concealed from investors during the Class Period, and plausibly alleges that the materialization of the risks concealed by Defendants' misrepresentations proximately caused investors' losses. For all these reasons, Defendants' motion to dismiss should be denied.

## STATEMENT OF FACTS

### I.    TMC's Creation, Core Business Model, and Overvaluation

TMC was founded in 2021 under a SPAC through the merger of DeepGreen, a Canada-based mining company, and the SOAC, a SPAC entity that claimed to target projects with positive

2

environment. ¶¶31-35. TMC represented that its core business concerned extracting metals used in electric vehicle batteries from polymetallic rocks found on the seabed. ¶36. TMC held itself out as able to mine these nodules undersea and process them onshore in a way that would not only be highly lucrative, but also environmentally friendly. ¶¶37-41. According to TMC, its process would cause less ecological damage than extracting the same materials on land and spur the broad adoption of clean energy sources and electric vehicles. *Id.* TMC's representations purported to support a valuation of $2.9 billion. ¶35. However, this valuation, as well as the underlying premises upon which it was based, was flawed.

TMC's $2.9 billion valuation left little leeway for the operational complexity of commercializing an untested strategy and assumed that TMC's critically-important PIPE funding was a sure thing. ¶¶71-73. In fact, there were no safeguards in place. Further, the failure to account for capital flight occurred at a time when the withdrawal of capital became increasingly prevalent with SPAC mergers. ¶74.

TMC, at all relevant times, reported artificially inflated values for its primary asset: an exploration license granted by the International Seabed Authority ("ISA") that permit mineral prospecting on the seafloor known as the Tonga Offshore Mining Limited ("TOML") exploration license. ¶¶8, 43. The TOML license was acquired in March 2020 by DeepGreen from DeepSea Mining Finance Limited ("DSMF"), after being shopped around to approximately 300 prospective investors with no interest, for $4 million plus an equity stake. ¶¶44-49. That no other company would pay anywhere near that amount indicates that the TOML license was not acquired at fair market value, which is also demonstrated by the fact that, at the time, the going price for an exploration license was $250,000. ¶¶44-49. That the actual fair market value of the TOML license was close to $250,000 rather than the massively inflated value reported to investors is also bolstered by the fact that two other similar licenses owned by TMC, the Nauru Ocean Resources Inc. ("NORI") exploration license

and the Marawa Research and Exploration Limited ("Marawa") exploration license, were each valued at $250,000. ¶¶51-52. Moreover, the TOML license's previous owner, Nautilus Minerals Inc. ("NMI") – which sold the TOML license to DSMF in 2019 – had valued the license at *zero* in its financial reports. ¶¶43-44. Further, Canadian court documents revealed that the relationship between NMI and DeepGreen (the name used by TMC prior to the SPAC merger) was not at arms' length, which was never disclosed to investors, making the extremely inflated purchase price for the TOML license even more suspect. ¶¶47-48, 53. As a ploy to deceive investors and buttress the overvaluation of TMC itself, TMC subsequently valued the TOML license in its public filing at *nearly $43 million*, or much more the already-inflated 2020 purchase price, despite many licenses available for purchase at much lower prices. ¶¶54-56.[2]

To give a false impression that its exploration efforts were more advanced than they actually were, TMC also reported to investors that it had expended more than twice as much funds on exploration than the actual expenditures it reported to the ISA.  For example, in calendar year 2019, TMC (then DeepGreen) reported to the ISA that it had spent less than $15 million in total exploration expenditures for the NORI exploration license. ¶57. However, TMC told investors in its SEC filings that its total exploration expenditures for the NORI exploration license during the same period were $33.5 million – more than double the expenditures reported to ISA.  ¶¶58-59.

TMC also claimed (nonexistent) environmental benefits of its technology and extraction processes. ¶¶75-83. TMC's core business of undersea mining actually harmed ocean biodiversity and ecosystems by disturbing the sea floor, creating sediment plumes of suspended particles and causing noise, light, and toxic pollution. ¶¶76-78. In a direct rebuke of TMC's claims that deep-sea mining was environmentally neutral, the International Union for Conservation of Nature has determined that

---

[2] Defendants' claim that their exorbitant valuation of the TOML license is based on amorphous "resource quality" concerns, DM15, is far too vague to be credited by this Court.

4

the practice causes "inevitable" biodiversity loss. ¶79. More than 600 marine science and policy experts also signed The Marine Expert Statement petition against deep-sea mining, emphasizing the environmental and ecological threats posed by the practice. ¶80. Furthermore, numerous corporations that would otherwise use the mined minerals in their businesses, like BMW, Volvo, Google, and Samsung, have called for a moratorium on deep-sea mining due to its potentially irreversible environmental effects, and many banks have promised to exclude deep-sea mining from their financing. ¶¶81-83.

## II.      Defendants' March 2021 Misleading Statements

A.      On March 4, 2021, TMC issued a press release announcing the merger between DeepGreen and the SPAC entity known as SOAC, touting TMC's business model, its focus on environmental sustainability, and the "US$330 million fully committed common stock Private Investment in Public Equity ('PIPE') at US$10.00 per share," essential to the success of the transaction. ¶¶84-87. The March 4th press release failed to inform investors that the Company had overpaid for the TOML license and significantly inflated the value of the TOML license on its books, and that it inflated its NORI expenditures. ¶88. The press release further misrepresented the environmental impact of its core business model and the fact that the $330 million PIPE financing was not, in fact, "fully committed." *Id.* These misrepresentations were used to justify an inflated $2.9 billion valuation for the merged company. *Id.* the same day as the press release, TMC filed its Form 8-K, signed by Defendant Leonard, which overstated both the committed financing and the Company's valuation to investors. ¶¶89-90.

## III.     TMC's Plan with Nauru

As part of its deep-sea mining plans, TMC seeks to mine the CCZ – a metal-rich region of the Pacific Ocean floor between Hawaii and Mexico. ¶60. Mining this area is extremely complicated, as most of the seabed is not open to private resource exploration or extraction, and permits for mining

5

require not just a license, but cooperation with a country that is a party to the United Nations Conventions on the Law of the Sea ("UNCLOS"). ¶¶61-64. To avoid these complications, TMC latched onto an obscure rule that allowed for a mining permit to be issued within two years if requested by a country that is a party to UNCLOS. ¶65. In April 2021, TMC partnered with Nauru – a tiny country home to 10,000 people – to obtain a mining permit through the two-year exception for NORI, a subsidiary of TMC. ¶66. Despite the objections of other UNCLOS member states, the mining permit should be issued to NORI by the summer of 2023. ¶¶67-70.

**IV.    TMC's Continued Misrepresentations Throughout the Spring and Summer of 2021**

B.      On April 22, 2020, Defendant Barron was interviewed by Kitco News and again misrepresented the environmental impact of TMC's deep-sea mining plans, falsely stating that "[TMC] generate[s] zero tailing and zero waste." ¶¶91-92.  In fact, deep sea mining is destructive of deep-sea habitats and species; will stir up sedimentary plumes, smothering animals or harming filter-feeding species that depend on clear, clean water to feed; will introduce noise, vibrations and light pollution caused via mining equipment and surface vessels, as well as potential leaks and spills of fuel and toxic products; and will lead to inevitable biodiversity loss.  ¶¶76, 79.

On April 8, 2021, SOAC filed a prospectus Form S-4 with the Securities and Exchange Commission, signed by Defendants Leonard and Barron. ¶93. SOAC filed revised versions of the prospectus on May 27, 2021, June 23, 2021, July 14, 2021, July 29, 2021, and August 5, 2021, on Forms S-4/A, before the merger was declared effective on August 12, 2021. *Id.* On August 13, 2021, SOAC issued a Proxy Statement with the SEC, signed by Defendants Leonard and Barron, announcing the acquisition of the TOML license for $32 million. *Id.*

Defendants' misrepresentations were taken at face value by the market, and influenced the market's perception of TMC. For example, on June 9, 2021, Northland Capital Markets issued an "outperform" rating for SOAC, citing Defendants' claims of low environmental impact as a

significant factor in its determination. ¶94. Into the late Summer of 2021, TMC continued to misrepresent its value and investments to the market. In its August 5, 2021 Form S-4, signed by Defendants Barron and Leonard, Defendants inaccurately valued its TOML license at nearly $43 million and falsely claimed that the Company's exploration expenditures for the NORI exploration license were over $35 million. ¶¶95-97.

## V.     The Truth Emerges in a Series of Partial Disclosures

On September 13, 2021, TMC filed suit against two funders who had withdrawn their contributions, claiming that the funders had failed to put up the agreed-upon funds and that TMC was entitled to an aggregate of $220 million in damages. ¶98. That same day, *Bloomberg* published an article about TMC that revealed that the $330 million funding that Defendants had been touting to investors, and was needed for large-scale production, was not "fully committed," as the Company had claimed. ¶99. The *Bloomberg* article also put a lie to Defendants' claims that TMC's deep-sea mining plans were environmentally friendly, revealing the criticism leveled by environmentalists and scientists. ¶100. On this news, TMC's shares fell $2.45, or over 20%, over the next two trading days to close at $10.00 on September 15, 2021. ¶101. TMC's bad news compounded on September 20, 2021, when TMC's lawsuits against funders who had withdrawn their contributions were dismissed ¶102.

On September 23, 2021, TMC presented at the Sidoti Fall Small Cap Conference where Defendant Barron made several misrepresentations to investors about the current state of TMC's business model and the recently-dismissed lawsuits, including falsely portraying the dismissed lawsuits as a still-viable avenue to recover missing capital. ¶¶103-105.

On October 6, 2021, before market hours, Bonitas Research released a report detailing many issues that Defendants had been hiding from investors, including the overpayment for the TOML exploration license and the inflated NORI exploration expenditures, as well as questioning the validity

of TMC's ownership claim of the NORI exploration license. ¶¶106-109. That same day, an analyst report by Northlands Capital Markets concurred with the Bonitas Research report and informed investors that, "[w]e are valuing TOML at zero …." ¶111. On this news, TMC shares fell $0.32, or over 7%, to close at $4.14 on October 6, 2021. ¶110.

On March 24, 2022, TMC provided financial results for the fourth quarter and full year ending December 31, 2021, announcing that the Company incurred a net loss of $141.3 million for the year, and incurred a fourth-quarter loss of $19.8 million. ¶114. On this news, TMC shares fell by 11.3%. ¶115.  After the Class Period, on March 25, 2022, TMC admitted in its annual report that it was not actually seeking to establish legal liability against the purported PIPE counterparties, as it previously claimed, effectively admitting to the market that the funding was never "fully committed" as Defendants had represented during the Class Period. ¶116.

## LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 n.12 (2011) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (209). On a 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007).

A complaint need only contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the claims. *Id*. at 545. "In resolving a Rule 12(b)(6) motion, the court's task is merely to assess the legal feasibility of the complaint, not to assay the weight of the

8

evidence which might be offered in support thereof." *Nutriband, Inc. v. Kalmar*, No. 19CV2511NGGSJB, 2020 WL 4059657, at *6 (E.D.N.Y. July 20, 2020).

To state a claim under Section 10(b) of the Exchange Act, a complaint must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (citation omitted). Misrepresentations are adequately pled where the complaint "specif[ies] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Complaint allegations must also raise a strong inference of scienter, but it "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 322-23 (internal citations and quotations omitted). Instead, scienter is adequately alleged where the inference of reckless or intentional misrepresentation is cogent and at least as compelling as any identified competing inference. *Id*.

## ARGUMENT

### I.  Plaintiffs Have Standing to Plead the Alleged Misrepresentations and Omissions

Defendants' standing argument is thoroughly rejected by controlling authority.  In the Second Circuit, a lead plaintiff in a putative class action has "class standing" to assert claims on behalf of other putative class members "if he plausibly alleges (1) that he 'personally has suffered some actual . . . injury as a resu)lt of the putatively illegal conduct of the defendant,' and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012). "Whether plaintiff and other class members bought early in the Class Period or late, they are all alleged to have been injured by the inter-related misstatement

and omissions." *Nicholas v. Poughkeepsie Sav. Bank/FSB*, No. 90 Civ. 1607 (RWS), 1990 U.S. Dist. LEXIS 12677, at *15 (S.D.N.Y. Sep. 26, 1990) (citing *Green v. Wolf Corporation*, 406 F.2d 291, 299-300 (2d Cir. 1968), cert. denied, 395 U.S. 977 (1969)); *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, No. 17 Civ. 558 (SRU), 2020 U.S. Dist. LEXIS 42686, 2020 WL 1181366, at *13 (D. Conn. Mar. 10, 2020) (same).

In *NECA*, the plaintiff sued under the Securities Act on behalf of a putative class consisting of all persons who acquired certain mortgage-backed certificates underwritten by the defendants there. *Id.*, 693 F.3d at 149. The certificates were sold in seventeen separate offerings which were all based on common shelf registration statements but which also all had unique offering documents. *Id.* at 162-63. The court held that the plaintiff—which had bought certificates from only two of the offerings—could assert claims on behalf of certificate-holders from other offerings that were backed by loans originated by originators common to those backing the two offerings in which the plaintiff itself had purchased certificates. *Id.* at 164-65.

The Complaint is on all fours with *NECA* because the facts required to prove Plaintiffs' own claims will be substantially similar to the facts required to prove the injuries suffered by other Class members. Defendants do not address, much less contest – and therefore concede – this point. *See Tolbert v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001) (undeveloped argumentation, are deemed waived) (internal quotations omitted); *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("[i]ssues not sufficiently argued in the briefs are considered waived"). Thus, whether Plaintiffs purchased their shares prior to every disclosure pled in the Complaint is irrelevant to whether they possess class standing.

It is "well established that where, as here, plaintiffs allege that their losses were the result of a sustained course of conduct that propped up defendant's stock price throughout the class period, the class may be represented by an individual who purchased his shares prior to the close of the class

period." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 87 (S.D.N.Y. 2007). "[C]lass representatives [are] entitled to assert Section 10(b) claims arising from statements made both before and after the purchase date if the statements allegedly were made in furtherance of a common scheme to defraud." *Id.* (citation and internal quotation marks omitted). Here, Plaintiffs allege only one scheme to defraud involving the same generalized course of conduct. ¶¶10, 130-131.

Nevertheless, in direct conflict with *NECA, Nicholas* and *Vivendi*, Defendants argue that Plaintiffs lack standing to assert certain misrepresentations and omissions alleged in the Complaint, based on nothing more than the timing of Plaintiffs' purchases. DM 8. Defendants base their argument on a single, inapposite district court decision which, unlike here, involved two substantively different sets of misrepresentations during different parts of the class period. *Francisco v. Abengoa*, *S.A.*, 481 F. Supp. 3d 179, 206-07 (S.D.N.Y. 2020) (cited at DM 8-9) (lacking-of-standing determination turned on plaintiffs' own bifurcation of theories of liability).[3] In *Francisco*, the plaintiffs had all purchased in the latter part of the class period, after the initial misstatements were fully corrected, and admitted that the latter misrepresentations did not "'implicate[] the "same set of concerns" as' Abengoa's other alleged fraudulent conduct." Here, Defendants' misrepresentations were not fully corrected until the end of the Class Period and there was only one scheme to defraud. Just as crucially, *Francisco* recognized that class standing ***could*** be established by allegation of partial disclosures, as the Complaint here alleges. *Id.*, 481 F. Supp. 3d at 207; *see* ¶¶101, 110.[4] Defendants' standing arguments

---

[3] In any event, class representative inquiries are premature at the pleading stage, and are best reserved for Plaintiffs' eventual motion to certify the proposed class. At that time, if necessary, Plaintiffs may add other plaintiffs to resolve any questions the Court may have regarding standing, an approach expressly endorsed by the Court of Appeals. *See Hevesi v. Citigroup Inc.*, 366 F.3d 70 (2d Cir. 2004) (lead plaintiff resolved standing concerns by inviting additional class representatives to join that lead plaintiff's case).

[4] Defendants also cite to a few out-of-circuit district court opinions that should be disregarded to the extent that they conflict with Second Circuit precedent directly governing the issue of class standing. *See* DM 8.

lack any factual or legal basis, and should be rejected.

## II.  Defendants' Reliance on External Documents Invokes Factual Disputes That Can Only Be Resolved at Summary Judgment or Trial

As a general matter, "[i]n deciding a motion to dismiss, the Court may only consider the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *In re OSI Pharms., Inc. Sec. Litig.*, No. 04-CV-5505 (JS)(WDW), 2007 WL 9672541, at *3 (E.D.N.Y. Mar. 31, 2007) (internal citations and quotations omitted). The Second Circuit prohibits the consideration of other matters without first converting the motion into one for summary judgment. *Id.* (citing *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988)).[5] Unable to show any defect in the well-pleaded facts alleged, Defendants attempt a counternarrative premised on external documents and alternative facts. Such references have no place in a motion to dismiss. *See McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) ("at this stage of the proceedings, the Court must accept the factual allegations contained in the [short reports] as sufficiently reliable as a factual source for Plaintiffs' allegations.") (citing *Bernstein v. Seeman*, 601 F. Supp. 2d 555, 556 (S.D.N.Y. 2009) ("[A] motion to dismiss is not the proper stage at which to resolve factual disputes.")).

Almost half of the exhibits Defendants submit are not cited in the Complaint at all. *See* Declaration of Colleen C. Smith ("Smith Decl."), Exs. 7-8, 10-13; *see also* Request for Judicial Notice in Support of Defendants' Motion to Dismiss the Amended Complaint ("RJN").[6] Accordingly, it cannot be argued that these documents are "integral to or explicitly relied upon" by Plaintiffs. Instead,

---

[5] If converted, Plaintiffs request expedited paper and deposition discovery pursuant to Fed. R. Civ. P. 56(d), and upon conversion Plaintiffs will submit a declaration specifying precisely the discovery required.

[6] While Defendants argue that the slide presentation attached as Ex. 12 to the Smith Declaration was cited in the Complaint, *see* RJN at 3, this is straightforwardly false: the Complaint cites only statements made orally at TMC's September 23, 2021 presentation, and not any purported ancillary written materials.

12

Defendants misuse these documents to advance alternative facts. *See*, *e.g.*, DM 19 (citing Ex. 7 – stock purchases by the Individual Defendants – to collaterally attack the Complaint's scienter allegations); DM 23 (citing Ex. 8, which was not cited in the Complaint, to rebut alleged false statements); DM 24-25 (unauthenticated stock chart (Ex. 13) used to contest loss causation). Such tactics are improper on a Rule 12(b)(6) motion. *Tellabs*, 551 U.S. at 322.

Plaintiffs take no position on Defendants' submission of documents relied upon as part of the moving allegations of the Complaint (Smith Decl. Exs. 1-6 & 9), so long as the Court considers them only to "determine what statements the documents contain, not for the truth of the matters asserted." *In re Chembio Diagnostics, Inc. Sec. Litig.*, No. 20CV2706ARRPK, 2022 WL 541891, at *6 (E.D.N.Y. Feb. 23, 2022).

## III.     The Complaint Adequately Alleges Material Misrepresentations and Omissions

Plaintiffs' Complaint easily satisfies the particularity requirements of Rule 9(b) and the PSLRA. These hurdles are slightly higher than the plain statement required under Rule 8, but not particularly onerous. "To satisfy the pleading standard for a misleading statement or omission under Rule 9(b), a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). "The PSLRA's requirements are similar, stating that the complaint must specify 'the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)(B)).

### A.  Defendants Misrepresented PIPE Financing as Being "Fully Committed"

As discussed above, *see* p. 5, the Complaint identifies each statement about TMC's putative PIPE financing that is alleged to be misleading, who made such statement, when and where such

13

statements were disseminated, and why Plaintiffs contends each is misleading. No more is required. *In re Vale S.A. Sec. Litig.*, No. 19CV526RJDSJB, 2020 WL 2610979, at *18–19 (E.D.N.Y. May 20, 2020). *See also* ¶¶84-88, 89-90.

Defendants seek to evade accountability for their PIPE misrepresentations by invoking the mantra of "fraud-by-hindsight." *See* DM 10-11. The defense does not apply here. "The incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made." *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 476 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013). The Complaint alleges facts plausibly demonstrating that the statements were misleading and false when made because (as subsequent events confirmed) ***the PIPE financing was never "fully committed."*** Indeed, the Complaint demonstrates that, when pressed by analysts, Defendant Barron could not identify ***any*** aspect of the so-called "defaulting funders" ability to fund that was not known to Defendants ***at the time*** they misrepresented the funding commitment to investors. ¶104. Moreover, besides raising a factual dispute inappropriate for resolution at this stage, Defendants' position is implausible—if their statements were honest and the PIPE financing was fully committed, it would have been secured and available (or the Company would have a viable claim for damages it would have pursued to recovery against the PIPE counterparties).

None of that is "fraud-by-hindsight." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) (holding that plaintiffs did not plead fraud-by-hindsight because contemporaneous facts showed that the omitted risks associated with defendants' business existed at the time of the statements). Nor does the fact that the risks known at the time of the statements manifested at a later date "make this a fraud-by-hindsight case." *See Yannes v. SCWorx Corp.*, No. 20-CV-03349 (JGK), 2021 WL 2555437, at *7 (S.D.N.Y. June 21, 2021). Quite simply, this is not

14

what that term means. *Id.*[7]

Defendants also continued, after the merger, to misrepresent the status of their ability to recover against TMC's erstwhile funders. Try as they may to distort the factual record, Defendants' federal lawsuits *were* dismissed, ¶102, and Defendant Barron only referenced a single, supposedly ongoing lawsuit in his unprompted statements to analysts on the topic. ¶104. When Defendants chose to tout the purported $330 million PIPE to investors, they assumed "an obligation to ensure [their] statements were both accurate and complete." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 612 (S.D.N.Y. 2017). They did not do so, but instead chose to hide material risks from investors. Such conduct is actionable.

## B.  Defendants' Environmental Impact Statements Were False and/or Misleading

Plaintiffs also identifies with particularity each misrepresentation concerning TMC's environmental impact. *See* pp. 4-5, *supra*. During the Class Period, Defendants regaled their investors with claims that deep sea mining portended "a significant reduction in the ESG footprint of metals" and would "dramatically reduce the environmental bill" of a planetary transition to green energy. ¶¶86-87.  These claims were upended by the Bloomberg article. ¶100.  And though Defendants claim that they warned of certain potential future risks, "[v]ague disclosures of general risks will not protect defendants from liability." *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013). Even "warnings of specific risks ... do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *See Meyer Concordia Int'l Corp.*, 2017 WL 4083603, at *5 (S.D.N.Y. 2017) (internal quotation omitted). The cited disclosures here were neither meaningful nor cautionary.

Even if some misstatements about environmental impact were opinions, as Defendants

---

[7] Similarly, Defendants' "projections" do not qualify for the protections of the PSLRA safe harbor, *see* DM18, insofar as they were predicated on funding that Defendants knew to be precarious. *See Salix Pharm.* 2016 WL 1629341, at *9("[S]afe harbor also does not protect material omissions.").

contend (they are not), *see* DM13, Defendants remain liable because: (1) the statements embedded facts that were untrue; and (2) the statements omitted material adverse information that "conflict[s] with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015) (emphasis added). Even honestly held but irrational beliefs are actionable if they do not fairly align with the information in a defendant's possession. *Id.* at 188-189.

### C. Defendants' Statements About TOML Valuation Were False and/or Misleading

TMC also reported artificially inflated values for its TOML license, to which it ascribed an absurd value of ***nearly $43 million***, more than 10 times the already-inflated 2020 purchase price, despite the fact that the same license's previous owner had valued the license at ***zero*** in its financial reports. ¶¶43-44. Furthermore, the Complaint alleges that many licenses were available for purchase at much lower prices, and even though the going price for a comparable license was a mere $250,000. ¶¶51, 54, 107. Defendants' blatant overvaluation of the TOML license was part of a larger scheme to overvalue TMC itself, and thereby deceive investors. And though Defendants argue that their wildly off-base TOML valuation was merely their opinion, Plaintiffs have alleged falsity based on *objective measures* – including the documented value of the same license – that were known to Defendants, thus rendering these statements actionable. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (accounting judgments actionable where both subjective and objective falsity alleged).[8]

### IV. The Complaint Raises a Strong and Compelling Inference of Scienter

#### A. Defendants' knowledge and access to contradictory information

Defendants' knowledge of and access to information directly contradicting their public

---

[8] Likewise, Defendants' explanation that their inflation of expeditionary expenses was a mere accounting adjusting does not hold water because it is undermined by objective facts. *See* DM16-17. The ISA figure is half of what TMC reported elsewhere, and Defendants only claimed an accounting true-up after being called out in the Bonitas report. ¶112.

statements establishes scienter. "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001). Here, Defendants were in positions to have access to information that would have alerted them to the falsity of their statements, and actually obtained that information through their work for DeepGreen and later TMC (the Company and Barron), and through claimed due diligence about TMC that was represented to investors as confirming that TMC satisfied the SPAC's environmental goals (Leonard). ¶86; *see also In re Symbol Techs. Inc. Sec. Litig.,* 2013 WL 6330665, *10 (E.D.N.Y. 2013). Specifically, the Individual Defendants were intricately involved in (or in the case of Leonard, oversaw extensive due diligence about) the overvalued acquisitions, the inflation of expenses, the likely environmental impact of deep sea mining, the merger with SOAC, and the securing of supposedly irrevocable funding. Finally, the Individual Defendants signed TMC's SEC filings, demonstrating that they either had familiarized themselves with, or recklessly ignored, the underlying facts. ¶¶89, 93, 95.

### B.  Motive and opportunity

Though not required, *see Tellabs*, 551 U.S. at 325, the Complaint alleges that Defendants had a specific motive and opportunity to conceal the truth from investors. During the Class Period, TMC itself said that it needed $7 billion is needed for large-scale production." ¶99. As a result, TMC was dependent on serial capital raises (including three during the Class Period) and was motivated to downplay or hide any negative information that would undermine those efforts. ¶¶130-136. This specific motive has been recognized as relevant to scienter. *See Shanawaz v. Intellipharmaceutics Intl. Inc. et al.*, 348 F. Supp. 3d 313, 326 (S.D.N.Y. 2018) (plaintiffs made "a strong showing that the defendants had both motive and opportunity to commit the fraud" by detailing how the company was dependent on stock sales to cover operating losses).

Defendants' motive is a far cry from the general corporate ambition they now reference. DM 19-20. None of the cases Defendants hold otherwise. None state that the motivation to sell stock to continue as a going concern cannot plead motive, but instead simply provide that a general desire for corporate success, without more, cannot establish motive or scienter. But Plaintiffs here do not rely on a general motive of corporate profitability. Rather, they plead that TMC was existentially threatened by its loss of funding and the public revelation of same. Defendants' cases are inapplicable.

Nor do stock purchases undermine scienter for the Individual Defendants. As an initial matter, the introduction of such evidence has no place in a motion to dismiss. *See supra*, pp. 12-13. More importantly, Defendants' competing inference actually supports rather than undercuts scienter. That these executives were willing to purchase shares ***before*** artificially inflating the stock price via Class Period misrepresentations, but were unwilling to purchase such shares after they juiced share prices, shows in fact that they were aware of the artificial inflation. At any rate, Defendants' competing inference is neither cogent nor compelling. *See City of Pontiac Gen. Employees' Ret. Sys.*, 875 F. Supp. 2d at 372 (S.D.N.Y. 2012) (emphasizing that "at the motion to dismiss stage, a tie on scienter goes to the plaintiff.").

### C. False SEC certifications

The already strong inference of scienter is further supported by the Individual Defendants' signing TMC's filings with the SEC. In so doing, the Individual Defendants avowed that they had familiarized themselves with the filings and the underlying operations of TMC and that the filings in question fairly presented, in all material respects, the financial condition and operations of TMC. ¶89, 93, 95. Such allegations, even if not independently sufficient, can contribute to a finding of scienter. *See In re Avon Sec. Litig.*, 2019 WL 6115349, at *19 (S.D.N.Y. 2019).

### D. Core operations

"Under the core operations theory, a court may infer that a company and its senior executives

18

have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 174 (S.D.N.Y. 2021). This is especially the case where, as here, the magnitude of the alleged fraud is large enough to substantially impact a defendant's business. *See Salix Pharms.*, 2016 WL 1629341, at *16 (holding that scienter was sufficiently pled where the magnitude of the alleged fraud was large enough to encompass critical factors of the defendant's business). Defendants' misleading statements and omissions plainly concern TMC's core operations, namely its most important business initiative during the Class Period, which Defendants envisioned would define the Company going forward. All of these efforts were touted by Defendants as crucial to TMC's expansion, and it would be absurd to suggest that Defendants were unaware of the actual state of these operations. *See Avon*, 2019 WL 6115349, at *20 (would be "absurd to suggest that [the company's] senior management was unaware" of problems in a segment accounting for 21% of revenue).

## V.       The Complaint Adequately Alleges Loss Causation

The Supreme Court has made clear that alleging loss causation "should not prove burdensome" and a complaint need only "provide a defendant with some indication of the loss and causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Courts in the Second Circuit regularly hold that loss causation is subject only to Rule 8's notice pleading standard. *See In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *25 (collecting cases). Thus, all that is required is "[a] short, plain statement that provides defendants with notice of the loss and some notion of the causal connection to the alleged misconduct is sufficient." *Mazuma Holding Corp. v. Bethke,* 21 F. Supp. 3d 221, 233 (E.D.N.Y. 2014). The Complaint provides such allegations. ¶¶101, 110.

A plaintiff may adequately plead loss causation "either by alleging (a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b)

19

that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232–33 (2d Cir. 2014) (internal quotations and citations omitted). Instead, loss causation is pled where the disclosures are within the "zone of risk" concealed by misrepresentations and omissions. *Van Dongen v. CNinsure Inc*, 951 F. Supp. 2d 457, 477 (S.D.N.Y. 2013). In other words, a plaintiff need only allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Id.* "[T]here is no requirement that the corrective disclosure take a particular form or be of a particular quality," such that it be a "mirror image tantamount to a confession of fraud." *Pearlstein v. BlackBerry Ltd.*, No. 13 CIV. 7060 (CM), 2021 WL 253453, at *18 (S.D.N.Y. Jan. 26, 2021) (quoting *In re Vale S.A. Sec. Litig.*, No. 15-cv-9539, 2017 WL 1102666, at *29 (S.D.N.Y. Mar. 23, 2017)). Nor must a disclosure be a "flashing neon light," or explicitly state that it is intended to cure an earlier fraudulent statement. *Id.*; *see also Van Dongen*, 951 F. Supp. 2d at 477.

Plaintiffs allege that previously-concealed problems were disclosed to the market by the *Bloomberg* article on September 13, 2021. ¶¶11, 74, 99, 100. These partial disclosures caused TMC's shares to fall $2.45, or over 20%, over the next two trading days to close at $10.00 on September 15, 2021. ¶101. Similarly, the Bonitas report, which informed the market of the previously-omitted deficiencies, caused TMC shares to plunge $0.32, or over 7%, to close at $4.14 on October 6, 2021. ¶¶106-110. *See In re Vale S.A. Sec. Litig.,* 2017 WL 1102666, at *27 (finding loss causation adequately pled where "disclosure to the market ... revealed new information" followed by a "decline in the price" of the company's securities).

Defendants incorrectly argue that the *Bloomberg* article "simply repeats already public information" (DM 23). They are factually wrong: neither the September 7, 2021 Form 8-K nor the August 13, 2021 Proxy Statement that Defendants reference transmitted the same information to the market as the *Bloomberg* article. *Id.* at 23-24. The 8-K, for example, provided no context for the

20

absence of the promised funds, while the *Bloomberg* article made it clear just how critical the pledge was to TMC's operations. *Id.* The proxy statement furthered misrepresentations by dismissively mentioning "[e]nvironmentalist claim[s]," whereas the *Bloomberg* article detailed and validated the coalition of informed scientific opinion in opposition to TMC, something completely absent from the August 2021 Proxy Statement. *Id.*

Defendants' attempt to argue factual disputes regarding loss causation is also implausible and will be disproved at trial. Defendants cannot explain why, if the *Bloomberg* article simply addressed previously disclosed information as they now contend, the stock price plummeted in reaction. As many courts have recognized, a significant stock price drop following a disclosure provides evidence that the disclosure is indeed new, material information. *Strougo v. Barclays PLC*, No. 14-cv-5797 (SAS), 2015 WL 1883201, at *10 (S.D.N.Y. Apr. 24, 2015). At any rate, Plaintiffs have sufficiently alleged their theory of loss causation consistent with *Dura*, and it is for a jury to determine whether or not it accepts that theory. *See In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 247–48 (S.D.N.Y. 2018) (refusing to determine if the plaintiffs' stock losses were caused solely by the corrective disclosures or broader market forces at the motion to dismiss stage).

Defendants' assertion that the Bonitas report did not prompt a reaction on par with how TMC had reacted prior to its publication is equally baseless. DM 24. For one, the stock was still reeling from the *Bloomberg* report published just a few weeks earlier. Second, the Bonitas report's revelations were cumulative to the prior disclosures of the Company's lack of trustworthiness, and so did not have the same impact as the *Bloomberg* article. Third, as noted above, *see* pp. 12-13, *supra*, Defendants' use of unauthenticated evidence of share price fluctuations not alleged in the Complaint in order to contest loss causation allegations is improper.

## VI.    The Complaint Adequately Alleges a Control Person Claim

The Complaint sufficiently pleads that the Individual Defendants are secondarily liable to

investors for the primary violations of TMC under Section 20(a) of the Exchange Act, in addition to their own primary liability. *See* 15 U.S.C. § 78t(a). The Complaint establishes that the Individual Defendants wielded actual power or influence over TMC, signed and certified TMC's SEC filings, communicated with analysts on behalf of TMC, and were personally involved in the concealment of adverse information relating to TMC. *See* ¶¶26, 89, 93, 95, 132. The law requires no more. *See*, *e.g.*, *In re Wells Fargo & Co. Sec. Litig.*, No. 1:20- CV-04494-GHW, 2021 WL 4482102, at \*30 (S.D.N.Y. Sept. 30, 2021).

Defendants erroneously argue that Plaintiffs have failed to allege culpable participation (DM, 44). However, as Plaintiffs have adequately alleged scienter for the Individual Defendants, *see supra* at 16-18, so too have Plaintiffs adequately alleged the Individual Defendants' culpable participation. *See In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 535 (S.D.N.Y. 2010). Whether Plaintiffs can ultimately prove culpable participation, but at this juncture it "is a fact-intensive inquiry" that should be resolved by the jury, and not on a Rule 12(b)(6) motion. *See In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at \*29 (collecting cases).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in full. If, however, the Court finds any deficiency in Plaintiffs' claims, Plaintiffs respectfully respect leave to amend, particularly as no prior complaint has been dismissed.

Dated:  August 26, 2022                          Respectfully submitted,

                                        **POMERANTZ LLP**

                                        */s/ Louis C. Ludwig*
                                        Louis C. Ludwig
                                        Joshua B. Silverman (*pro hac vice*)
                                        10 South LaSalle St., Ste. 3505
                                        Chicago, IL 60603
                                        Telephone: (312) 377-1181
                                          lcludwig@pomlaw.com
                                          jbsilverman@pomlaw.com

22

*Lead Counsel for Co-Lead Plaintiffs*

**BRONSTEIN, GEWIRTZ, & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone (212) 697-6484
Email: peretz@bgandg.com
        eitank@bgandg.com

23