# EXHIBIT 1

2023 WL 2744064
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE CARLOTZ, INC. SECURITIES LITIGATION

No. 21-cv-5906 (RA)
|
Signed March 31, 2023

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

**\*1**  This is a securities class action brought against CarLotz, Inc. ("CarLotz") and Acamar Partners Acquisition Corporation ("Acamar"), as well as various related entities and individuals (collectively, "Defendants"), for violations of the Securities Exchange Act of 1934 ("Exchange Act") and Securities Act of 1933 ("Securities Act"). CarLotz is a purported consignment-to-retail used car marketplace that became a publicly traded company in January 2021 following a de-SPAC transaction with Acamar. Plaintiffs allege that, in the months leading up to the consummation of the merger, Defendants made materially false and misleading statements regarding key aspects of CarLotz's business model. Defendants now move to dismiss the Second Amended Complaint ("SAC"), arguing that Plaintiffs lack standing to challenge pre-merger statements under Section 10(b) of the Exchange Act or to bring claims under Sections 11 and 12(a)(2) of the Securities Act, and that Plaintiffs otherwise fail to state a claim. For the reasons that follow, Defendants' motion is granted, albeit without prejudice.

## BACKGROUND

The following facts are drawn from the Second Amended Complaint, which, on a motion to dismiss, the Court must assume to be true. See *Lynch v. United States*, 952 F.3d 67, 74-75 (2d Cir. 2020). CarLotz "purports to be a consignment-to-retail used vehicle marketplace." SAC ¶ 50. Under this business model, CarLotz provided the necessary services to sell used vehicles at retail—i.e., directly to individual consumers, rather than at auction—and the original owner retained the title until CarLotz could sell the vehicle. *Id.* CarLotz obtained its inventory from individuals trying to sell used cars, as well as corporate sourcing partners such as

rental car companies. *Id.* If the vehicle could not be sold, it would purportedly be returned to the individual or sourcing partner who owned it. *Id.* According to Plaintiffs, CarLotz claimed that this business model would net the seller "several thousand dollars more" profit than if they sold their car to a dealership, and it also allowed CarLotz to operate with "virtually no dollars at risk." *Id.*

In November 2018—when CarLotz was still a privately held company ("Pre-Merger CarLotz")—Acamar was incorporated as a Special Purpose Acquisition Company ("SPAC"). *Id.* ¶ 81. SPACs are shell companies incorporated for the sole purpose of "effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination." *Id.* They "typically raise capital for an acquisition through an Initial Public Offering ('IPO'), and that capital is held in trust for a specific period of time, usually 24 months, until a merger can be completed." *Id.* ¶ 82. Acamar accordingly had no operations or business activities of its own, but rather was formed "specifically to acquire an existing operating company," also known as a "de-SPAC" business combination. *Id.* ¶ 81.

On February 26, 2019, Acamar completed its IPO for a total of $300 million to be held in trust until it could complete an acquisition. *Id.* ¶ 84. Meanwhile, in November 2019, Pre-Merger CarLotz began exploring a possible sale to a third party. *Id.* ¶ 85. Pre-Merger CarLotz and Acamar entered into negotiations in September 2020, and on October 21, 2020, the two companies executed a merger agreement. *Id.* ¶¶ 89-91. The next day, Pre-Merger CarLotz issued a press release publicly announcing the proposed transaction. On December 30, 2020, Acamar published a Form 424B3 Prospectus with the Securities and Exchange Commission ("SEC") containing details about the merger, and that same day, the Form S-4 registration statement became effective.[1] *Id.* ¶¶ 98-99. Acamar shareholders voted to approve the merger on January 20, 2021, and on January 21, 2021, the merger was effectuated. *Id.* ¶ 101. CarLotz became a public entity ("Post-Merger CarLotz"), trading on the NASDAQ exchange under the symbol "LOTZ." *Id.*

[1]  Form S-4 is the registration statement that is filed with the SEC in order to publicly offer new securities pursuant to a merger or acquisition. *See* https://www.sec.gov/files/forms-4.pdf.

**\*2**  Between the public announcement of the proposed merger and the shareholder vote approving the transaction,

officers of Pre-Merger CarLotz made a series of investor presentations that, according to Plaintiffs, included materially false and misleading statements. Pre-Merger CarLotz claimed, for example, that as the "industry's only consignment-to-retail model ... we don't own the inventory that we're selling" and "any reconditioning dollars are passed through to our seller," which allowed the company to operate with "limited capital risk." *Id.* ¶¶ 93, 118. It also said that most of its clients were paid on a flat-fee basis, which boosted the company's gross profit per unit ("GPU"). *Id.* ¶ 175. The company "repeatedly stated" that its business model had "superior unit economics" compared to industry competitors. *Id.* ¶ 93. Pre-Merger CarLotz further asserted that it had a "deep pool of sourcing partners," and that 60% of its inventory was consigned from corporate partners. *Id.* ¶¶ 93, 168. Michael Bor, the Chief Executive Officer of CarLotz during the relevant time frame, explained that "it's important to have a wide pool of inventory because frankly, any one of these clients, if they were our only client, would have very homogenous inventory." *Id.* ¶ 168. Finally, in describing the impact of the COVID-19 pandemic, Pre-Merger CarLotz stated that the increased demand for used cars created inventories of "historically high levels," which was overall "positive" for the company. *Id.* ¶ 74.

According to Plaintiffs, in the months following the merger, Post-Merger CarLotz then made a series of disclosures that revealed the misstatements made prior to the merger. First, on March 15, 2021, Bor disclosed that "CarLotz had acquired so much excess inventory that it was unable to effectively process all of the vehicles," creating a "log jam" in inventory that negatively impacted the company's GPU. *Id.* ¶ 102. Regarding the company's corporate sourcing partners, Bor also stated that, "[f]or the fourth quarter of 2020 and continuing during the first quarter of 2021 to date, one of our corporate vehicle sourcing partners has accounted for over 60% of our vehicles sourced." *Id.* ¶ 103. On this news, the company's stock price fell $0.79, or 8.5%. *Id.* ¶ 104. Then, on May 10, 2021, Post-Merger CarLotz disclosed that "it had cleared the aforementioned 'log jam' of inventory by selling the units with 'aggressive pricing' 'rather than absorbing shipping and reconditioning costs on vehicles returned to the client.' " *Id.* ¶ 105. According to Plaintiffs, "[t]his statement revealed that CarLotz, not the sourcing partner, had paid for the reconditioning costs on these vehicles, and therefore had much more capital tied up in inventory than previously represented." *Id.* The company's stock price then fell another $0.94, or 14%. *Id.* ¶ 106.

Finally, on May 26, 2021, Post-Merger CarLotz announced that the one corporate sourcing partner who accounted for 60% of its inventory had "paused" its relationship with the company. *Id.* ¶ 107. Upon this disclosure, the company's stock price fell $0.70, or 13.4%. *Id.* ¶ 108. Plaintiffs allege that these risks had already materialized "in the fourth quarter of 2020," but that none of it was properly disclosed to investors. *Id.* ¶ 95.

Plaintiff Daniel Erdman first initiated a putative securities fraud class action against CarLotz and its officers on July 8, 2021. Several related actions were subsequently filed. On August 31, 2021, the parties stipulated to consolidating the actions before this Court. Pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Court appointed a lead plaintiff and lead counsel for the consolidated action. Lead Plaintiff David Berger purchased shares of Post-Merger CarLotz after the merger closed. *Id.* ¶ 24; *see* ECF No. 47-1. The other named Plaintiff, Craig Bailey, purchased shares of Acamar before the merger. *Id.* ¶ 25. The class period is defined as October 22, 2020—the day Pre-Merger CarLotz publicly announced the proposed merger —to May 25, 2021, the day before Post-Merger CarLotz announced that its one corporate sourcing partner had paused its relationship with the company. *Id.* ¶ 2.

Plaintiffs filed a Consolidated Amended Complaint on December 14, 2021, and a Second Amended Complaint on March 4, 2022. Defendants now move to dismiss the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The Court must accept as true all factual allegations and draw all reasonable inferences in Plaintiffs' favor, *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008), but it need not credit "mere conclusory statements," *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds

of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged —but not 'shown'—'that the pleader is entitled to relief,' " and the complaint must be dismissed. *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## DISCUSSION

**\*3** Defendants argue that Plaintiffs lack statutory standing, under Section 10(b) of the Exchange Act, to challenge any statements made by Pre-Merger CarLotz or its officers about Pre-Merger CarLotz. [2] Defendants further argue that Plaintiffs lack statutory standing to bring claims under Sections 11 and 12(a)(2) of the Securities Act. The Court agrees, and dismisses the case without prejudice on those grounds.

[2] The Court "recognize[s] that, to ensure that the right to sue is not confused with Article III standing, the Supreme Court has discouraged the use of the term 'statutory standing.' " *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 402 n.4 (2d Cir. 2018) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)). It will nonetheless "use the phrase 'statutory standing' here for historical reasons, to refer to a plaintiff's right to pursue a cause of action under the [Exchange Act and Securities Act]," *id.*, and "notes that 'lack of *statutory* standing requires dismissal for failure to state a claim, while lack of Article III standing requires dismissal for lack of subject matter jurisdiction,' " *Whistleblower Prods., LLC v. St8cked Media LLC*, 2019 WL 3082482, at \*4 n.4 (E.D.N.Y. July 15, 2019) (emphasis in original) (quoting *Naruto v. Slater*, 888 F.3d 418, 425 n.7 (9th Cir. 2018)).

### I. Pre-Merger Statements under Section 10(b)

Section 10(b) of the Exchange Act provides, in relevant part:

> It shall be unlawful for any person, ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). The SEC thus promulgated Rule 10b-5, which makes it unlawful, "in connection with the purchase or sale of any security," "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5.

Although "[t]he language of Section 10(b) and Rule 10b-5 does not explicitly create a private right of action ... courts long have held that a private right of action was indeed created." *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 30-31 (2d Cir. 2004) (citing *Superintendent of Ins. v. Banker's Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971)). "[T]he private right of action is not unlimited," however, and "[w]hile courts were quick to recognize a private right of action under Rule 10b-5, they were equally quick to set limits on it." *Id.* at 31. In *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952), the Second Circuit first articulated the "purchaser-seller rule," which limits the class of plaintiffs under Section 10(b) to "actual purchasers or sellers of securities." *Id.* at 463. In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), the Supreme Court expressed its approval of *Birnbaum*, and refused to make an exception for individuals who chose *not* to purchase a company's stock due to the company's alleged misrepresentations of the stock's value. *Id.* at 750-55.

**\*4** The Second Circuit again addressed the purchaser-seller rule in *Nortel*. There, the plaintiffs were shareholders of a publicly traded company called JDS Uniphase Corporation, and they brought a claim under Section 10(b) for allegedly misleading statements made by another publicly traded

company, Nortel Networks Corporation. *See* 369 F.3d at 29. While JDS and Nortel did not "shar[e] any management structures," the two companies "had been involved in a number of business relationships," including the sale of JDS's laser business for $2.5 billion in Nortel stock. *Id.* In affirming the district court's dismissal of the case, the Second Circuit held that, although the *Nortel* plaintiffs purchased securities, they still lacked standing because "the company whose stock they purchased [was] negatively impacted by the material misstatement of *another* company, whose stock they [did] not purchase." *Id.* at 34 (emphasis added). In so doing, the Circuit noted that "a potential merger might require a different outcome," because in the context of a merger, one company's representations "ha[ve] a much more direct relationship to the value of [the other company's] stock." *Id.* The Circuit, however, declined to decide how the purchaser-seller rule would apply to a potential merger, leaving that question "for another day." *Id.*

That question was ultimately answered in *Menora Mivtachim Insurance Ltd. v. Frutarom Industries Ltd.*, 54 F.4th 82 (2d Cir. 2022). *Frutarom* involved a merger between a U.S.-based seller of fragrance products, International Flavors & Fragrances Inc. ("IFF"), and an Israeli firm, Frutarom Industries Ltd. After the acquisition closed, Frutarom became a wholly-owned subsidiary of IFF. The plaintiffs were purchasers of IFF securities who alleged that, "leading up to the consummation of the merger, Frutarom made materially misleading statements about its compliance with anti-bribery laws and the source of its business growth, most of which were incorporated into IFF's Form S-4 Registration Statement." *Id.* at 84. Relying on *Nortel*, the district court concluded that the plaintiffs "lack standing to sue the Frutarom Defendants for statements relating to Frutarom," because they "ha[d] never purchased or sold Frutarom securities." *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *30 (S.D.N.Y. Mar. 30, 2021).

A panel majority affirmed. Observing that "judicially created private rights of action should be construed narrowly," 54 F.4th at 86, the majority interpreted the purchaser-seller rule as "requir[ing] plaintiffs to have bought or sold the security *about which* a misstatement was made in order to have standing to sue under Section 10(b)." *Id.* at 86 (emphasis added). The majority rejected the plaintiffs' argument that, where plaintiffs are purchasers of one company's stock but seek to challenge statements about a related company, courts should consider whether there was a "sufficiently 'direct

relationship' between" the two companies for purposes of standing. *Id.* at 88 ("In short, Section 10(b) standing does not depend on the significance or directness of the relationship between two companies."). Rather, the majority emphasized, "the question is whether the plaintiff bought or sold the securities about which the misstatements were made." *Id.* Therefore, in the context of mergers and acquisitions, the majority held: "[P]urchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger between the two companies." *Id.*; *see also In re Alibaba Grp. Holding Ltd. Sec. Litig.*, 2023 WL 2601472, at *5 (S.D.N.Y. Mar. 22, 2023) (dismissing a Section 10(b) claim under *Frutarom* where plaintiffs were not purchasers of the company's stock that they sought to challenge).

The Court agrees with Defendants that *Frutarom* forecloses Plaintiffs' challenge to any statements made by Pre-Merger CarLotz about Pre-Merger CarLotz. As in *Frutarom*, neither of the named Plaintiffs purchased shares of Pre-Merger CarLotz—a privately held entity. The only pre-merger shares purchased by a named plaintiff in this case were those of Acamar. All of the challenged pre-merger statements, however, were made by Pre-Merger CarLotz about itself, not Acamar. Plaintiffs attempt to avoid this problem by equating Pre-Merger CarLotz with Post-Merger CarLotz, pointing to Lead Plaintiff Berger's purchase of post-merger shares and arguing that "Plaintiffs in this case are shareholders of *both* the target (CarLotz) *and* the acquiror (Acamar)." Pl. Sur-Reply 3 (emphasis in original). But Plaintiffs provide no explanation as to why, as a legal matter, the post-merger entity can be considered interchangeable with the pre-merger, privately held company. Accordingly, Plaintiffs fail to establish that they "bought or sold securities about which the misstatements were made." *Frutarom*, 54 F.4th at 88.

**\*5** Plaintiffs also argue that *Frutarom* creates a "loophole" for SPAC transactions, in that "parties to SPAC transactions [can] lie with impunity in all public statements leading up to the merger, including the proxy and offering documents." Pl. Sur-Reply 4. While the Court appreciates the policy concerns implicated by *Frutarom*, the Court is bound by its holding. Indeed, the *Frutarom* majority considered similar policy arguments and rejected them,[3] reasoning, among other things, that target companies pursuing a potential merger could still be held accountable for material misstatements through SEC enforcement actions, shareholder derivative suits, or under state law. *Id.* at 89 n.9. In her concurring

opinion, Judge Pérez explicitly noted that the majority's holding "reflects a policy choice." *Id.* at 94 (Pérez, J., concurring). She wrote: "Congress can choose to ratify the majority's opinion if it has the inclination and occasion to do so.... And Congress also can amend the Exchange Act, if in its view, [the Circuit] erred today." *Id.* at 95.

> 3      *See* Amicus Brief of Professor James Cox, et al. Supporting Plaintiffs-Appellants for *En Banc* Review, *Menora Mivtachim Ins. Ltd. v. Frutarom Industries Ltd.*, 49 F.4th 790 (2d Cir. 2022) (No. 21-1076) (explaining that "[t]he [*Frutarom*] panel's rule could ... exempt special purpose acquisition companies ('SPACs')" from Section 10(b) liability, because "the value of [a SPAC's] shares is solely a function of its prospect of merging with a company that investors expect to be profitable," so a SPAC's shares would "plainly not [be] a security ... about which a misstatement was made").

Plaintiffs thus lack standing to challenge any statements made by Pre-Merger CarLotz about Pre-Merger CarLotz. Because nearly all the challenged misstatements are from the pre-merger period, the Court grants Plaintiffs leave to amend their Section 10(b) claim, after which Defendants may renew their motion to dismiss.[4] The Court will not reach the merits of Plaintiffs' Section 10(b) claim at this time.[5]

> 4      In both their sur-reply and at oral argument, Plaintiffs requested leave to amend their Section 10(b) claim in the event the Court finds *Frutarom* to control. On March 29, 2023, however, Plaintiffs filed a letter withdrawing that request. In that letter, Plaintiffs contend that, "[i]n light of Defendants' position [at oral argument] that there is no distinction between new CarLotz and Acamar, Plaintiffs' Complaint already brings a 10(b) claim against Acamar via its claim against new CarLotz." ECF No. 86 at 2. Thus, Plaintiffs argue, their "10(b) claims against CarLotz satisfy the *Frutarom* standing test, because Plaintiffs have 'standing to sue based on alleged misstatements about [Acamar/new CarLotz] because they bought or sold shares of [Acamar/new CarLotz].' " *Id.* (alterations in original) (quoting *Frutarom*, 54 F.4th at 84). The Court disagrees with Plaintiffs' analysis. Equating Post-Merger CarLotz with Acamar— whether Defendants were right or wrong to do so— does not solve Plaintiffs' standing problem, because

all of the challenged pre-merger statements were still about *Pre*-Merger CarLotz—not Acamar, and not Post-Merger CarLotz. Regardless, the Court will still grant Plaintiffs an opportunity to amend their Section 10(b) claim, if they choose to do so, in light of Plaintiffs' assertion that "a number of events have occurred after the filing of the Second Amended Complaint which would further strengthen the allegations pled within." Pl. Opp. 49; *see In re Tribune Co. Fraudulent Conveyance Litig.*, 10 F.4th 147, 175 (2d Cir. 2021) ("Leave to amend shall be freely given when justice so requires.").

> 5      Because the Court is not reaching the merits of Plaintiffs' Section 10(b) claim—the primary violation—before granting leave to amend, the Court will not reach Plaintiffs' Section 20(a) claim either.

## II. Sections 11 and 12(a)(2)

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). The relevant statutory provision provides:

> **\*6** In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security ... may, either at law or in equity, in any court of competent jurisdiction, sue ....

15 U.S.C. § 77k(a). "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.' " *In re Morgan*

*Stanley*, 592 F.3d at 358-59 (quoting 15 U.S.C. § 77k(a)). In contrast to claims brought under Section 10(b) of the Exchange Act, claims brought under Sections 11 and 12(a)(2) of the Securities Act do not need to allege scienter, reliance, or loss causation. *Id.* at 359.

However, "to have standing to assert a section 11 claim, plaintiffs must be able to 'trace their shares to an allegedly misleading registration statement.' " *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003)). "[P]laintiffs bear the burden of proving securities are traceable." *Id.* As one court in this district previously explained, "[t]he cause of action [under section 11] inheres in the faulty registration statement that put the shares in question on the market; it is on the basis of the flaw in the underlying registration that section 11 dispenses with the requirements of scienter." *Id.* at 207-08; *see also In re Morgan Stanley*, 592 F.3d at 359 (observing that Sections 11 and 12(a)(2) are "notable both for the limitations on their scope as well as the *interrorem* nature of the liability they create"). Furthermore, "it is not enough that plaintiffs seek damages only for a class that has standing; at least one named plaintiff must be a member of that class—that is, a named plaintiff must have purchased shares traceable to the challenged offering." *In re Glob. Crossing*, 313 F. Supp. 2d at 207.

Plaintiffs challenge the Form S-4 registration statement that became effective on December 30, 2020. *See* SAC ¶¶ 2, 25. The SAC makes no attempt to allege that Berger can trace his shares to that registration statement. It merely alleges that Berger "purchased CarLotz securities during the Class Period," *id.* ¶ 24, which is insufficient to establish standing. *See In re Glob. Crossing*, 313 F. Supp. 2d at 207 (dismissing a section 11 claim for lack of standing where plaintiffs simply alleged that "various named plaintiffs purchased securities during the class period," because although "[t]he Second Circuit has not directly addressed whether plaintiffs asserting a section 11 claim must explicitly plead that they purchased shares traceable to the flawed registration statement ... those district courts that have considered the question have required plaintiffs to plead as well as prove that their shares were issued pursuant to the misleading registration statement"); *City of Omaha Police & Fire Retirement Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 403 (S.D.N.Y. 2020) ("To establish standing under § 11 at the motion-to-dismiss stage ... Plaintiffs need [to] assert that they purchased shares issued pursuant to, or traceable to the public offerings."). [6]

6   Defendants argue that, in any event, Berger would not be able to allege tracing because "by the time he made his first purchase, shares issued pursuant to Acamar's 2019 S-1 IPO would have already inextricably intermingled with shares from the January 21, 2021 S-4 offering in the secondary market." Def. Br. 48 n.60 (citing *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 118 n.396 (S.D.N.Y. 2004); *Klein v. Computer Devices, Inc.*, 591 F. Supp. 270, 273 n.7 (S.D.N.Y. 1984)). The Court need not reach this argument at this time.

**\*7** With respect to Bailey, the SAC alleges that he "purchased Acamar securities during the Class Period, after the filing of the proxy statement/prospectus/registration, but before the consummation of the merger." SAC ¶ 25. The SAC continues:

> Pursuant to the Acamar charter, Mr. Bailey had a right to redeem his shares for cash equal to his pro rata share of the aggregate amount on deposit in the Trust Account, which held the proceeds of the Acamar Partners' IPO, as of two business days prior to the consummation of the CarLotz merger upon the closing of the transaction.

*Id.* Thus, according to the SAC,

> where Plaintiff Bailey purchased Acamar common stock on January 7, 2021, after the filing of the Proxy/ Prospectus/Registration Statement of December 30, 2020, [and] did not redeem those shares, which became CarLotz shares after the merger was consummated, Plaintiff Bailey's CarLotz shares were purchased pursuant to and/or traceable to the applicable prospectus/registration for the 'real IPO,' which was the de-SPAC transaction.

*Id.* ¶ 233. In other words, Plaintiffs admit that Bailey did not purchase his Acamar shares pursuant to the S-4 registration statement being challenged—he purchased them *before* any securities were offered pursuant to the merger. [7] But Plaintiffs argue that Bailey's shares are still traceable to the S-4 registration statement for the purposes of a Section 11 claim, because the merger functionally transformed Bailey's Acamar shares into the new CarLotz shares.

[7]     Bailey could only have purchased his Acamar shares pursuant to the 2019 Form S-1 registration statement, when Acamar held its IPO. Plaintiffs do not allege that Acamar's S-1 registration statement contained any material misstatements.

Plaintiffs' theory, while creative, is foreclosed in this Circuit. In *DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003), the Second Circuit held—based on the clear meaning of the statutory language—that a Section 11 plaintiff can only challenge the same registration statement under which her securities were issued. *Id.* at 176 (quoting *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 976-77 (8th Cir. 2002)) ("[W]e read § 11's plain language to state unambiguously that a cause of action exists for any person who purchased a security that was originally registered under the allegedly defective registration statement—so long as the security was indeed issued under *that* registration statement and not another." (emphasis in original)); *see also Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 214 (S.D.N.Y. 2021) (applying *DeMaria*); *In re Glob. Crossing*, 313 F. Supp. 2d at 206 (same); *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 339 (S.D.N.Y. 2012) ("[B]ecause Plaintiff purchased shares *before* the challenged offerings, it cannot possibly 'trace' its stock purchases to an offering or registration statement." (emphasis in original)); *Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967) ("[A]n action under § 11 may be maintained only by one who comes within a narrow class of persons, i.e., those who purchase securities that are the direct subject of the prospectus and registration statement."). While *DeMaria* did not involve a de-SPAC transaction, the Second Circuit did not include any limiting language in the opinion that would indicate a narrow application to only traditional IPOs.

**\*8** Indeed, Plaintiffs acknowledge that "the Second Circuit has not squarely addressed the application of Sections 11 and 12 to SPACs," while at the same time arguing that "the current legal landscape supports it." Pl. Opp. 15. They point to a public statement made in April 2021 by the former Acting Director of the Division of Corporate Finance for the SEC, John Coates, where he expressed his opinion that "any material misstatement in or omission from an effective Securities Act registration statement as part of a de-SPAC business combination is subject to Securities Act Section 11." ECF No. 71, Miller Decl., Ex. 2. [8] Plaintiffs also cite to a proposed SEC rule that, if promulgated, would subject registration statements for de-SPAC transactions to Section 11 liability. Special Purpose Acquisition Companies, Shell Companies, and Projections, 87 Fed. Reg. 29458, 29462 (proposed May 13, 2022). Neither Coates' statement nor the proposed agency rule, however, creates controlling legal authority for this Court. *See Sweet v. Sheahan*, 235 F.3d 80, 87-88 (2d Cir. 2000) ("[A legal] duty cannot come from the proposed regulations because proposed regulations do not have binding legal effect."). Coates' statement said as much: "This statement does not alter or amend applicable law and has no legal force or effect." ECF No. 71, Miller Decl., Ex 2 at n.1.

[8]     Coates explained that "it is the de-SPAC—and not the initial offering by the SPAC—that is the transaction in which a private operating company itself 'goes public,' i.e., engages in its initial public offering," and de-SPAC transactions should therefore be treated "as the 'real IPO.' " ECF No. 71, Miller Decl., Ex. 2, https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws#_ftn11.

Plaintiffs nevertheless argue that "[t]he SEC's position makes both legal and economic sense," Pl. Opp. 14, and that, according to the Supreme Court, "it is proper for a court to consider policy considerations in construing terms in the federal securities Acts," *id.* at 15 (quoting *Pinter v. Dahl*, 486 U.S. 622, 653 (1988)). The *Pinter* Court cautioned, however, that "[t]he ultimate question is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law." 486 U.S. at 653 (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979)). Thus, *Pinter* explained, "[t]he broad remedial goals of the Securities Act are insufficient justification for interpreting a specific provision 'more broadly than its language and statutory scheme reasonably permit.' " *Id.* (quoting *Touche Ross & Co.*, 442 U.S. at 578). While the Court again appreciates the policy arguments that Plaintiffs make regarding the liability of SPACs, those considerations

cannot overcome the plain language of Section 11, as interpreted by the Second Circuit in *DeMaria*. *See* 318 F.3d at 176.

Plaintiffs also rely on *In re Pareteum Securities Litigation*, 2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021), which they argue is similar to the instant case in that "plaintiffs purchased stock of an acquired company, iPass, which then turned into Pareteum [the acquiring company] stock after the merger." Pl. Opp. 15. But *In re Pareteum* does not help Plaintiffs here. In that case, the traceability question centered on whether the plaintiff's purchase of Pareteum shares on the same day that Pareteum closed a direct public offering could be traced to that offering, rather than a separate pool of issued and outstanding shares. *See* 2021 WL 3540779, at *20. *In re Pareteum* does not provide insight on the question of whether a plaintiff's purchase of shares *before* the challenged offering can be traced to that offering, due to the nature of the de-SPAC transaction. Again, given the precedent set in *DeMaria*, and without any legal authority to the contrary, this Court cannot answer that question in the affirmative. Plaintiffs thus lack standing to bring their Section 11 claim.

"Section 12(a)(2) provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *In re Morgan Stanley*, 592 F.3d at 359. "[A] plaintiff may maintain a section 12(a)(2) claim only where the plaintiff purchased securities directly in the initial public offering; so-called 'aftermarket' or 'secondary market' purchasers do not have standing to maintain a section 12(a)(2) claim." *In re Smart Techs. Inc. S'holder Litig.*, 295 F.R.D. 50, 57 (S.D.N.Y. 2013) (citing *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 445 (S.D.N.Y. 2009)); *see also Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 578 (1995). Plaintiffs do not allege that either Berger or Bailey purchased their shares

in an initial public offering, and they thus lack standing to bring a Section 12(a)(2) claim as well. *See In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005) (collecting cases) ("[B]ecause the plaintiffs have not alleged that they have purchased their shares in the IPO, they have failed to allege that they have standing to bring a claim under § 12(a)(2).").

**\*9** Plaintiffs Section 11 and 12 claims are dismissed, but also without prejudice, to the extent Plaintiffs can plead any additional facts that would cure the deficiencies identified herein.[9]

[9]   Section 15 of the Securities Act, like Section 20(a) of the Exchange Act, governs control-person liability. Because "control-person liability exists only where there is a primary violation," *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007), Plaintiffs' Section 15 claim is also dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted. As discussed, Plaintiffs shall have one opportunity to amend the Second Amended Complaint within thirty days. The Clerk of Court is respectfully requested to terminate the motion pending at docket number 67.

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 2744064

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.