```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

------------------------------X Docket#
BRUCE CARPER,                 : 21-cv-05991(EK)(SJB)
                              :
              Plaintiff,      :
                              :
     - versus -               : U.S. Courthouse
                              : Brooklyn, New York
TMC THE METALS COMPANY, INC., :
ET AL.,                       :
                              : July 12, 2023
              Defendants      : 10:47 a.m.
------------------------------X
```

        TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
          BEFORE THE HONORABLE ERIC R. KOMITEE
             UNITED STATES DISTRICT JUDGE


**A   P   P   E   A   R   A   N   C   E   S:**


**For the Plaintiff**:          **Louis C. Ludwig, Esq.**
                                **Joshua B. Silverman, Esq.**
                                Pomerantz
                                10 South LaSalle, Suite 3505
                                Chicago, IL 60603


**For the Defendant**:          **Jeff G. Hammel, Esq.**
                                Latham & Watkins LLP
                                1271 Avenue of the Americas
                                New York, NY 10020




**Transcription Service**:      **Transcriptions Plus II, Inc.**
                                61 Beatrice Avenue
                                West Islip, New York 11795
                                RL.Transcriptions2@gmail.com




Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1        THE COURT:  Please be seated.

2        THE CLERK:  Civil Cause for Oral Argument, *In
3 re TMC the metals company, Inc.* securities litigation,
4 docket number 21-cv-5991.

5        Would you all please state your appearances for
6 the record starting with the plaintiffs?

7        MR. LUDWIG:  Good morning, your Honor.  Louis
8 Ludwig on behalf of co-lead plaintiffs Point12
9 Diversified Fund and Kyle Autry.  I'm here with my co-
10 counsel, Joshua Silverman.

11        MR. SILVERMAN:  Good morning.

12        THE COURT:  Good morning.

13        MR. HAMMEL:  Good morning.  Jeff Hammel, your
14 Honor, for the defendants.  And just do you prefer we
15 sit, stand?

16        THE COURT:  I prefer that you are about 12
17 inches from the microphone when you're speaking which
18 probably implies sitting down.  But beyond that, it's up
19 to you.

20        MR. HAMMEL:  Fair enough.  Thank you.

21        THE COURT:  All right.  So good morning,
22 everyone.  We're here for oral argument on the defendant,
23 the metals company's motion to dismiss the case.  And why
24 don't we begin with defense counsel this morning?

25        MR. HAMMEL:  Thank you, your Honor.  This is a

3

Proceedings

1   motion to dismiss against the metals company and two

2   senior executives.

3          Just briefly, TMC is a new emerging company

4   trying to do what's never been done before which is

5   commercially develop a metallic deposit in the sea floor

6   to make batteries primarily for electric vehicles.

7          This necessarily entail risks including

8   environmental risks which were disclosed to investors.

9   The complaint here is based mainly on a short seller

10  report and I think can be fairly characterized as long on

11  generalities and speculation and short on facts.  It's

12  also short on law.  Plaintiffs have not presented one

13  case allowing similarly generic allegations to proceed

14  past the motion to dismiss.

15         THE COURT:  So you mention the environmental

16  risks.  Your client says in its disclosure we leave

17  behind zero tailings and zero waste.  And I don't think,

18  plaintiffs will correct me if I'm wrong, but I don't

19  think they argue that that statement was literally

20  untrue.  It may be that you leave behind zero tailings

21  and zero waste but that in the process of picking up

22  these nodules from the seabed you're ripping up and

23  destroying complicated ecosystems in a way that's going

24  to cause harm and maybe cause regulators not to allow you

25  to do this.

4

Proceedings

1    Why isn't it a material omission to both say
2  affirmatively we're leaving behind zero tailings and zero
3  waste but not also cabin that statement by saying at the
4  same time this is not a clean operation?
5    MR. HAMMEL:  So it's a fair question, your
6  Honor.  I think the statement you're referring to was in
7  an interview.  And the company's disclosures really could
8  hardly have been more complete around the environmental
9  risks.  I mean just again briefly, and this is at page 5
10 of our opening brief, we disclosed that there is
11 significant uncertainty regarding the impact of
12 polymetallic nodule collection on biodiversity and the
13 CCZ and recovery rates.
14    Another disclosure, it may not be possible to
15 definitively say whether the impact of nodule collection
16 on global biodiversity will be less significant than
17 those estimated for land-based mining.  It says we may
18 also be subject to potential risks and liabilities
19 associated with pollution of the environment that could
20 occur as a result of our activities.  And so that was in
21 our disclosures.  That's just a small sampling.  There
22 were many more.
23    And so in describing what the company's goal
24 was, because the company was also clear that it hadn't
25 done this yet, this was a planned business proposal, that

5

Proceedings

1  its goal was to create a system with zero tailings and

2  zero waste.  But no investor could have been misled to

3  think that that was a guarantee or even a likelihood that

4  there would be no environmental risk.

5          THE COURT:  When you purchase these licenses,

6  what are you getting and what you not getting?  Because

7  it sounds like you may have some strain of property right

8  in that section of the ocean floor but that doesn't mean

9  you can just start mining.  You need environmental

10 permission.  So who issues these licenses and what do you

11 actually get with them and what do you not get?

12         MR. HAMMEL:  So I believe the way it works,

13 your Honor, is that a company like the metals company

14 needs to team with a local government.  This is in

15 primarily the South Pacific.

16         THE COURT:  So in between Mexico and Hawaii

17 we're talking about?

18         MR. HAMMEL:  Precisely.

19         THE COURT:  So who's the local government?

20         MR. HAMMEL:  I think it's some of the countries

21 in the islands there like Nauru and Tonga which are some

22 of the issues here.

23         THE COURT:  Okay.

24         MR. HAMMEL:  There is an arm of the United

25 Nations I believe, the ISA, that I think is responsible

Transcriptions Plus II, Inc.1

6

Proceedings

1  for the licensing.  And I think you do need to overcome

2  some environmental hurdles and other criteria in order to

3  actually be permitted to do it is my understanding of how

4  it works.

5          THE COURT:  So when you get the license, you

6  pay $42 million or whatever you pay for the license.

7  What does that mean?  That you have the -- it doesn't

8  mean you can start mining tomorrow.

9          MR. HAMMEL:  It does not mean you can start

10  mining tomorrow.  First, the technology needs to be

11  developed to let you mine it.  And I think the technology

12  needs to be done.

13          THE COURT:  But what does the license give you?

14  I'm just speaking from a regulatory perspective.

15          MR. HAMMEL:  I think it gives you the right,

16  once you're allowed to do it, to a certain territory, a

17  certain square mileage or square kilometers in the ocean

18  floor to access these nodules.

19          THE COURT:  It gives you the right once you're

20  allowed to do it but isn't that the same as saying it

21  gives you nothing because you still -- I mean --

22          MR. HAMMEL:  No, because no one else can do it.

23          THE COURT:  Okay.

24          MR. HAMMEL:  It's like, you know, if you were

25  to buy a piece of, you know, two acres --

7

Proceedings

1        THE COURT:  Right.

2        MR. HAMMEL:  -- in upstate New York --

3        THE COURT:  That I understand because you're

4  buying the land or leasing the land from a private

5  landowner and then you still need environmental permits

6  to go fracking or whatever you're going to do.  There is

7  no private landowner in this equation.  There's only

8  these international bodies.  So you know, when they issue

9  you the license I guess all they're saying is that you're

10 going to be the person we're talking to about whether

11 this process is going to be permitted or not permitted.

12 We're not talking to anybody else about this piece of

13 land because you reserved it but --

14        MR. HAMMEL:  I think that's right, I think

15 that's right.  And obviously different pieces of land or

16 seabed, you know, may be more or less likely to have a

17 rich amount of these metallic nodules that can be

18 harvested.

19        THE COURT:  Okay.  Can we talk about -- so the

20 way I am looking at the alleged misstatements here is

21 that I've grouped them into three categories which may or

22 may not be a blunt instrument.

23            (Pause in proceedings)

24        THE COURT:  So let's go misstatement by

25 misstatement.  And my rough categorization has me focused

8

Proceedings

1   on five alleged misstatements that relate to the pipe

2   financing and the extent to which it was fully committed

3   and TMC's valuation and cash flows.

4           Statement one is from a March 4, 2021 press

5   release which is I think issued by both parties for the

6   merger, right?  The SPAC and the target.

7           MR. HAMMEL:  That's right.  I think

8   technically, if I'm looking at the SEC filing, it was

9   from the SPAC, SAOC.

10          THE COURT:  The press release was?

11          MR. HAMMEL:  I'm sorry, I was looking at the

12  different document.  I think you're right, your Honor.

13          THE COURT:  Okay.  So *Frutarom* tells us we have

14  to ask not only who's speaking but which security are

15  they talking about, the key word being about.

16          MR. HAMMEL:  Right.

17          THE COURT:  They say the transaction represents

18  a pro forma equity value of U.S. 2.9 billion for the

19  combined company which will be renamed and operate under

20  the name TMC upon closing.

21          So put aside the truth or falsity of that

22  statement for the moment.  What company and what security

23  are they talking about?

24          MR. HAMMEL:  So this is certainly pre-merger.

25  This is with the announcement.  And I think it is the

9

Proceedings

1    pre-SPAC, the pre-De-SPAC TMC which is, you know,

2    Sustainable Opportunities and DeepGreen, talking about

3    what they expect will happen once the merger is

4    consummated.

5              THE COURT:  So are they talking about the

6    publicly traded stock?  That's what pro forma means to

7    me, right?

8              MR. HAMMEL:  I mean I think they're talking

9    about the valuation at that time.  You know, the closing

10   doesn't happen until September.  This is in March 2021.

11             THE COURT:  Right.

12             MR. HAMMEL:  You know, I think they're talking

13   about the --

14             THE COURT:  Well, what does pro forma mean to

15   you or to the reasonable listener?

16             MR. HAMMEL:  I mean the value of the company,

17   the equity value, the pro forma equity.  I think they're

18   projecting out what TMC is going to be.

19             THE COURT:  Upon consummation of the merger.

20             MR. HAMMEL:  Upon consummation of the merger.

21             THE COURT:  So that's a concession I think that

22   they're talking about, the post merger publicly traded

23   stock of TMC.

24             MR. HAMMEL:  I mean I don't think it's

25   completely clear.  I would also say, your Honor, that on

Proceedings

1    this one, I know you didn't want to talk about the truth

2    or falsity of it, I don't think this one is --

3           THE COURT:  Put that aside for now.

4           MR. HAMMEL:  -- even really contested as true

5    or -- they don't even challenge this one as false.

6           THE COURT:  Well, I think they're saying 2.9

7    billion is not a reasonable valuation if you are looking

8    with clear eyes at the environmental risks and cash flow

9    problems and other -- and we can debate that.  I

10   understand you disagree.

11          MR. HAMMEL:  There's nothing in the complaint

12   that --

13          THE COURT:  I'm just trying to assess this from

14   a *Frutarom* perspective.  I don't think you're disputing

15   that this statement at least relates to the company that

16   is going to emerge.

17          MR. HAMMEL:  That may be right, your Honor.

18   And look, I think that if you read *CarLotz*, which is the

19   case that applies *Frutarom* to the SPAC --

20          THE COURT:  I have.

21          MR. HAMMEL:  -- I think that the statements in

22   that case that were held to be inactionable under the

23   purchaser-seller rule are essentially the same as the

24   statements 1 through 9 in this case.  They really are.

25   They're either pre-SPAC, pre-De-SPAC entity pre-TMC

11

Proceedings

1   about --

2            THE COURT:  But was there a statement that was

3   challenged there that was a statement of pro forma equity

4   value of the combined entity?

5            MR. HAMMEL:  I don't know that there was that

6   particular statement, your Honor, but there were

7   statements in *CarLotz* about the operations of the SPAC

8   company, the acquisition, the company acquired by the

9   SPAC company just as there are here statements about

10  DeepGreen, which is the acquired SPAC company here.

11           THE COURT:  So is it your position that that's

12  the right reading of *Frutarom* that any time you've got a

13  literal change in the security, new CUSIP number issued,

14  whatever it is, that wipes the slate clean entirely.  For

15  every statement you made about the pre-change company,

16  you get a pass because the CUSIP number has changed?

17           MR. HAMMEL:  I wouldn't look at it that way,

18  your Honor.  And I think the way to read *Frutarom*, I

19  would defer to Judge Abrams how she read *Frutarom* in the

20  SPAC context because what she found is that, you know,

21  and I'm reading, you know, "Plaintiffs thus lack standing

22  to challenge any statement by pre-merger CarLotz about

23  pre-merger CarLotz."

24           THE COURT:  But it's that last phrase that I'm

25  hung up on a little bit.

Proceedings

1          MR. HAMMEL:  I appreciate that, yeah.  I

2   appreciate that.  But here, just to finish the standing

3   point and to I think answer your question about, you

4   know, a free pass, you know, here I don't think there's

5   any question that the two plaintiffs that are bringing

6   this case purchased securities in post merger TMC, you

7   know --

8          THE COURT:  Right.

9          MR. HAMMEL:  -- post De-SPAC.  And so --

10         THE COURT:  But could they rely then in an

11  actionable way on a pre-merger statement about the pro

12  forma equity value of TMC?

13         MR. HAMMEL:  I mean perhaps.  And you know, if

14  we want to get focused just on that statement one, I

15  would want to talk about whether it's true or false.

16         THE COURT:  Okay.

17         MR. HAMMEL:  But I think the statements

18  generally pre-SPAC, you know, statements truth or not are

19  all about DeepGreen, which is clearly the pre-merger TMC

20  which as Judge Abrams found, you know, is not subject to

21  that.

22         THE COURT:  Okay.  So then moving on to the

23  second statement I'm looking at, and I think this is

24  maybe the heart of the matter because the plaintiffs put

25  a lot of weight on the failure of two-thirds of the

13

Proceedings

1   committed private capital to materialize, a statement
2   cited in paragraph 85 of the complaint that, "The
3   transaction includes an upsized 330 million fully
4   committed common stock Private Investment in Public
5   Equity at $10.00 a share."  I understand you don't see
6   anything literally false in that statement and I'm not
7   sure I do either.  But what company and what security are
8   they talking about there?  There has to be about the post
9   merger entity, right?  Because that's what the PIPE
10  investors are investing in.
11          MR. HAMMEL:  I mean I think they're talking
12  about the SPAC, sustainable SAOC which is the company
13  that needed that funding in order to acquire DeepGreen
14  and do the De-SPAC.
15          THE COURT:  Okay.  Because the literal order of
16  operations here is that the capital call to invest in the
17  private, to make a private investment in public equity
18  comes on September 3rd.  It's due on September 3rd in the
19  first instance.
20          MR. HAMMEL:  I believe that's right.
21          THE COURT:  And that's a little hard to call
22  that a PIPE because on September 3rd there is no public
23  equity -- well, I guess --
24          MR. HAMMEL:  There is of the SOAC entity.
25          THE COURT:  Okay.  So the purchase, if you're a

14

Proceedings

1   private investor participating in the PIPE silo of this

2   transaction, what you are buying is publicly traded

3   shares of the SPAC pre-De-SPAC because the De-SPAC is

4   going to happen the next day I think.  Or when is the De-

5   SPAC date?

6               MR. HAMMEL:  The De-SPAC closes on September

7   9th.

8               THE COURT:  The De-SPAC closes -- so can you

9   just walk me through in a very remedial way the equity

10  starts trading publicly on September 4th?  No.  What date

11  does the equity start training publicly again?

12              MR. HAMMEL:  The equity of the new TMC --

13              THE COURT:  Yes.

14              MR. HAMMEL:  -- De-SPAC entity?  I'm actually

15  not sure which date it begins trading on.  The SPAC

16  closes, the De-SPAC closes on September 9th.  But again,

17  your Honor, I would just --

18              THE COURT:  Do you have the chronology?

19  Actually, let me just pull this up in my -- I'm sorry.

20              MR. HAMMEL:  And I know we're talking about

21  *Frutarom* and *CarLotz*, but I would just emphasize there's

22  no fact in the complaint --

23              THE COURT:  Not false.

24              MR. HAMMEL:  -- that shows that this is false

25  which is kind of a predicate to any of this.

15

Proceedings

1      THE COURT:  So there are two ways you can win
2  this case, right?  You can win on the *Frutarom* ground
3  which is sort of hypertechnical and criticized by a large
4  amount of securities law professors in their amicus brief
5  to the en banc Second Circuit.  Or you can just win in
6  the traditional kind of PSLRA way of, you know, they
7  haven't alleged falsity with the requisite specificity.
8      MR. HAMMEL:  I would say, your Honor, that this
9  complaint is a target rich environment for dismissal.
10  There is any number of grounds to dismiss it.  I would
11  say the simplest and most straightforward is the
12  traditional PSLRA ground of scienter which I'd be happy
13  to talk about.  But there's also a lack of facts
14  establishing falsity.  There is a separate standing
15  question of --
16      THE COURT:  And there's no order of operations
17  that's incumbent on me to follow like the Second Circuit
18  would want me to resolve the *Frutarom* question before
19  the --
20      MR. HAMMEL:  No.
21      THE COURT:  Okay.
22      MR. HAMMEL:  You can choose any or all.  And
23  so, you know, I would say, your Honor, just on scienter
24  if we can talk about it for a moment, there is nothing in
25  the -- I think as your Honor knows, you know, in the

16

Proceedings

1  Second Circuit there are two general prongs in which a

2  plaintiff can establish a strong inference and it must be

3  a strong inference under the PSLRA of scienter.  One is

4  specific facts showing a motive and opportunity to commit

5  fraud.  And the other is specific facts showing a level

6  of recklessness that must approximate actual intent.

7          Here there's nothing, your Honor, in the

8  complaint even remotely smacking of scienter.  There are

9  no insider sales of securities.  In fact, the opposite

10 happened.

11         THE COURT:  I'm sorry to derail you.  I just

12 want to make sure I can understand the time line as best

13 I can while I have you.  Oh, I see.

14         So I think my understanding of the record we

15 have is that the PIPE investors are called to fund their

16 capital commitment by September 3rd.  And September 3rd

17 comes and goes.  So as of the end of that day, the

18 company now knows two-thirds of this private capital has

19 not materialized on schedule.  The merger closes on

20 September --

21         MR. HAMMEL:  9th I believe.

22         THE COURT:  9th.

23         MR. HAMMEL:  Yeah.

24         THE COURT:  And I think the stock starts

25 publicly trading at 9:30 a.m. on September 10th, but I

17

Proceedings

1    could be wrong.

2              The first disclosure -- what is the disclosure

3    to the public that the called capital has not

4    materialized.  Is that also on September 9th?

5              MR. HAMMEL:  No, that's earlier, your Honor.

6    The company issued an 8-K on September 7th announcing

7    that some of the PIPE funders did not follow through.

8              THE COURT:  Does it say the proportion?

9              MR. HAMMEL:  Yes.  That's at Exhibit 8 that we

10   submitted and it says, if I can just find it here --

11             THE COURT:  Can we print the 8-K?  Oh, I have

12   it.  I have it, I'm sorry.

13             MR. HAMMEL:  On page 7 of Exhibit 8.  And after

14   describing the funding it says however -- I'm reading

15   here from that page.

16             THE COURT:  Hold on just a second.  Let me get

17   to the page.  Page 6, 7, 8.  What lettered paragraph are

18   you in?

19             MR. HAMMEL:  So this is our Exhibit 8, the

20   defendant's Exhibit 8.  And there aren't lettered

21   paragraphs on that page.

22             THE COURT:  Oh, I'm sorry.  I'm looking at the

23   wrong 8-K.  Your Exhibit 8.  Okay, I don't have that.

24   We're going to print a copy.

25             MR. HAMMEL:  Okay.  I'll just read it through

18

Proceedings

1    for the record and your Honor's benefit.  It says that,

2    SOAC, and just part of it, "SOAC entered into

3    subscription agreements with a number of strategic and

4    institutional investors for a $330.3 million private

5    placement of SOAC Class A ordinary shares.  However, only

6    approximately 110.1 million of proceeds from the private

7    placement were received as of the date hereof, September

8    7th.  SOAC intends to continue to seek to enforce the

9    funding obligations of the non-performing investors under

10   the subscription agreements, but there can be no

11   assurances that it will be successful in those efforts."

12            THE COURT:  Okay.  So I'm going to put the

13   following question to the plaintiffs but I'll give you a

14   chance to address it preemptively.  That suggests a four-

15   day window roughly between the time when the executives

16   know, the company knows, that two-thirds of the private

17   capital as not materialized and when they tell the public

18   that fact.  Is anybody making investment decisions during

19   that roughly four-day period without the benefit of that

20   information?  I think the answer is no.  I think the

21   decision -- I might call, I'm not sure about this, but I

22   might call the decision -- you know, the investors in the

23   SPAC have a redemption right essentially.  If they don't

24   like the acquisition, they can get back their capital at

25   their up front cost.

19

Proceedings

1    But that decision has to be made by September

2  1st if I remember correctly.

3    MR. HAMMEL:  I think that's right.  I'll

4  confess you may be more familiar with the intricacies of

5  the De-SPAC than I am.

6    THE COURT:  I know that I may be wrong but

7  that's I think my understanding.  So they've had to make

8  that decision even before the company knows that

9  two-thirds of the private capital is not going to

10  materialize.

11    But I think this might be the best fact for the

12  plaintiffs if there is somebody, anybody who's forced to

13  make an investment decision purchase, redeem, whatever,

14  not redeem, in between September 3rd and September 7th.

15    MR. HAMMEL:  So that's not the case that

16  they've alleged.

17    THE COURT:  Yes.

18    MR. HAMMEL:  The case that they've alleged in

19  fact, and I just think it's important for the record to

20  be very clear on this because they've said it in their

21  complaint and they've said it in their brief that

22  Bloomberg was the one, the Bloomberg article on September

23  13 supposedly quote blew the whistle on this funding

24  issue.

25    THE COURT:  On September --

Transcriptions Plus II, Inc.1

                                                                        20
                              Proceedings

1            MR. HAMMEL:  13th.  That was --

2            THE COURT:  So the 8-K, like nobody notices it

3    basically until --

4            MR. HAMMEL:  I think that's the plaintiff's

5    theory.

6            THE COURT:  Okay.

7            MR. HAMMEL:  That's not our theory.  Our theory

8    is that the company promptly disclosed, you know, this

9    funding issue on September 7th.  And so I just don't want

10   that to be lost in the shuffle here.

11           THE COURT:  Yes.  Let me actually add that to

12   my timeline right now.  The SPAC issues the 8-K.

13           MR. HAMMEL:  And just to underscore it, your

14   Honor, while your Honor is typing, this is a fraud case.

15   The notion that anybody here was trying to deceive

16   anybody when they disclosed it, you know, this PIPE issue

17   was disclosed, you know, we can debate whether it should

18   have been one, two, three days earlier --

19           THE COURT:  Promptly, yes.

20           MR. HAMMEL:  -- it was disclosed.  I believe

21   what was going on was they were trying to figure out

22   whether it was really not being funded or just delayed

23   and they took a little bit of time to do that.

24           THE COURT:  Well, when an institutional

25   investor has missed a capital call, that's a pretty good

21

                          Proceedings

1   sign that something is amiss.

2            MR. HAMMEL:  Not a good sign, correct.  And

3   there's obviously litigation about that now.

4            THE COURT:  Yeah.

5            MR. HAMMEL:  But your Honor, just to maybe go

6   back to where we were, and I'm happy to talk about the

7   purchaser-seller or the De-SPAC, but you know, the

8   traditional bases for dismissal in this case sort of cry

9   out for dismissal.  On scienter, there's no insider

10  sales.  The insiders increased their holdings

11  dramatically during the period, didn't sell during the

12  period.  You know, the case law is very clear that when

13  that happens, it is contrary to an inference of fraud.

14           The only allegations of motive they had have to

15  do with attracting investors and needing capital, but

16  that's true of every early stage company.  And the Second

17  Circuit has been abundantly clear that general

18  allegations of motive aren't enough.

19           THE COURT:  What are the statements as to which

20  you're relying on the short seller report as an alleged

21  corrective disclosure?

22           MR. HAMMEL:  We don't believe the short seller

23  report is a corrective disclosure.  We believe the

24  short -- in order to be a corrective disclosure, a

25  corrective disclosure is something the plaintiff needs to

22

Proceedings

1    establish to show that the alleged misstatements that

2    they are asserting happened were eventually correct that

3    it impacted the stock price.  So the quote/unquote truth

4    came out.

5             THE COURT:  Right.  I thought that you had said

6    look, by the time one of the more of the plaintiffs have

7    made their investment decisions there has already been a

8    corrective disclosure and therefore they can be relying

9    on the --

10            MR. HAMMEL:  So on the standing argument, the

11   first standing argument -- the *Frutarom* one is the second

12   standing argument.  The first standing argument is that

13   these plaintiffs purchased on September 21 and 22 of

14   2021.  That's when they bought their stock.  They --

15            THE COURT:  September 21 and 22?

16            MR. HAMMEL:  September 21 and 22.  The two

17   plaintiffs purchased on those dates.

18            THE COURT:  Hold on.  Okay.

19            MR. HAMMEL:  So that's when they bought for the

20   very first time.  They allege that a number of

21   statements, what we've called statements two through six,

22   were revealed to have been false a week earlier on

23   September 13th with the Bloomberg article.

24            THE COURT:  So you're saying in their framing

25   this would serve as a corrective disclosure but you're

23

Proceedings

1  not --

2          MR. HAMMEL:  In their framing.  And of course

3  you don't have a fraud claim if you know the truth when

4  you bought.  Like that's just common sense.  Of course

5  the law follows from that.

6          THE COURT:  Okay.

7          MR. HAMMEL:  But you can't have a claim, you

8  can't claim that you were defrauded if you've been told

9  the truth.

10         THE COURT:  All right.  So you're not saying

11 this was a corrective disclosure.  You're just saying by

12 their logic this would have --

13         MR. HAMMEL:  Right.  On their pleading they do

14 not have standing to bring a claim on statements two

15 through six.

16         And just to pause on that, your Honor, because

17 they obviously address that in their briefing, they've

18 got an argument and they cite a few cases around the idea

19 that if statements are in interrelated there can be

20 standing.  All of their --

21         THE COURT:  If statements are?  Say that again?

22         MR. HAMMEL:  The plaintiffs make an argument,

23 Mr. Ludwig will make it for himself I'm sure, but the

24 plaintiffs make an argument that they do have standing

25 because they say that the statements that they are

24

Proceedings

1  challenging as false our all into related and so courts

2  give them sort of leeway to be able to have standing.

3  That's what they say.

4           I just want to point out that the cases that

5  they cite do not have this fact pattern.  None of them

6  involve a plaintiff who purchased after the truth was

7  known.  They all involve plaintiffs who purchase before

8  the truth was known and could legitimately claim that

9  they were misled.

10          THE COURT:  I mean I don't understand precisely

11  how a short seller report or a Bloomberg article can

12  function here as a corrective disclosure but we'll hear

13  from the plaintiffs --

14          MR. HAMMEL:  We would agree with that, your

15  Honor.

16          THE COURT:  -- on that subject.

17          MR. HAMMEL:  Yeah.  So just on scienter because

18  it is I believe the clearest way for your Honor to

19  dismiss.  I've talked about there being no motive.

20  Plaintiffs cite I think one case in their mode of

21  argument, this case by the name of *Shanawaz,*

22  *S-H-A-N-A-W-A-Z* for the idea of attracting investors

23  being enough to have scienter.  That case doesn't

24  actually say that.  That case had confidential witnesses,

25  that case had a lot of other things around scienter.

25

Proceedings

1      And I would just point your honor to another
2  case, a recent Second Circuit case.  I can put this in
3  writing if you'd like.  But I'll spell it just for the
4  record because again, it's a complicated name.  It's
5  *Nandkumar* N-A-N-D-K-U-M-A-R *v. AstraZeneca*.  The cite's
6  2013 WL 3477164.  The plaintiffs there alleged that there
7  was a motive, AstraZeneca had a motive to artificially
8  increase its stock price in order to fund the specific
9  acquisition.  You know, so there was, even more than
10 here, a specific reason to artificially increase the
11 stock price.  And the Second Circuit said that's not
12 enough which is just consistent with long-standing Second
13 Circuit law.
14      THE COURT:  So what was sufficient as a motive?
15      MR. HAMMEL:  You know, in theory a sufficient
16 motive could be an executive selling a substantial
17 number, an unusual number of shares during the class
18 period in advance of a negative disclosure that causes
19 the stock to decline.
20      THE COURT:  You're saying, and I don't think
21 anybody would seriously dispute this, that the general
22 incentive that every CEO has to see his stock price
23 appreciate is insufficient --
24      MR. HAMMEL:  Right, because everybody would
25 have scienter.

Proceedings

1          THE COURT:  Right.

2          MR. HAMMEL:  That can't be the law and it's not

3    the law.

4          And then just moving away from motive and into

5    the other prong of scienter, your Honor, you know, the

6    sort of extreme recklessness, they talk about general

7    access to documents and information.  That's not enough.

8    They talk about signing SEC filings.  That's not enough.

9    And I think they make maybe their most significant

10   scienter argument on this core operations idea.  The idea

11   in core operations being the theory.  It's never been

12   accepted by the Second Circuit I would emphasize.  But

13   the theory that plaintiff sometimes used say if you're a

14   company that sort of just has one business, like you're a

15   single product company, and there's something

16   dramatically wrong with that product, the CEO and CFO and

17   the senior executive must have known, right?  Because

18   what else do they do.  It's a core operation of the

19   company.  How can they not have known?  So it's a

20   presumption that at times gets applied in the scienter

21   area.

22         Again, the Second Circuit's never embraced it

23   and district courts in the Second Circuit, even when

24   they've sort of relied on it a little bit, it's never

25   been the sole basis on which they've found scienter.  And

27

Proceedings

1    that's even true in the cases that the plaintiffs cite on

2    page 19 of their opposition brief.  They cite this *Agean*

3    case where core operations was the secondary basis for

4    finding scienter.  The primary basis was the CFO sold $1

5    million worth of shares.  The *Salix* case provided quote

6    cooperations, provided quote supplemental support for

7    scienter.  There were other bases.  The *Avon* case, core

8    operations was quote additional support.

9          All of which is a long way of saying, your

10   Honor, that they don't have anything for scienter here.

11   And under *Tellabs*, the Supreme Court's decision in the

12   *Tellabs* case which is its most recent teaching how courts

13   are supposed to evaluate scienter.  The district court in

14   assessing complaints is supposed to be required to assess

15   not just the fraudulent inferences that the plaintiffs

16   ask them to take, but the non-fraudulent inferences and

17   determine which is more compelling.

18         And here I think the only reasonable, much less

19   compelling, inference is that TMC was a startup company

20   trying to do what's never been done before with sea floor

21   mining and was targeted by a short seller and its

22   financing didn't come through and its stock dropped.

23   That's not securities fraud.

24         THE COURT:  What's the date of the short sale

25   report again?

28

Proceedings

1           MR. HAMMEL:  The date of the short sale report

2   I think is --

3           MR. LUDWIG:  October the 6th, your Honor.

4           MR. HAMMEL:  October 6, 2021.  Thank you.

5           THE COURT:  October 6th?

6           MR. HAMMEL:  Yes.  And just to wind up on

7   scienter, this isn't even in the ballpark of the sort of

8   complaint that would survive a motion to dismiss on

9   scienter grounds under the PSLRA.

10          I can turn to falsity if your Honor would like

11  briefly because we talked about it a little.

12          THE COURT:  Can you just talk about falsity on

13  the asset valuation, the value at which TMC is carrying

14  the licenses?

15          MR. HAMMEL:  Sure so I think this is the TOML

16  assets valuation which pertains to statements seven and

17  eight.  So plaintiffs allege that we paid $43 million for

18  it.  Sorry, we valued it at $43 million on the TMC S4 in

19  2021.  And plaintiffs claim that that's 10 times the

20  purchase price.  That's at paragraph 54 of the complaint.

21  In fact, and they acknowledged it elsewhere, we paid $32

22  million for it.  That's I think at paragraph 93 of the

23  complaint.  And I think it's also on their opposition

24  brief at page 6.  They acknowledge they were paid 32

25  million.

29

Proceedings

1    THE COURT:  Paid 32 million.

2    MR. HAMMEL:  Yes.

3    THE COURT:  Valued it at 42?

4    MR. HAMMEL:  43.

5    THE COURT:  43?

6    MR. HAMMEL:  Yes.

7    THE COURT:  How do you get from 32 to 43?

8    MR. HAMMEL:  So a year past and it was done --

9   it's actually an accounting judgment comparing it to

10  other properties in the CCZ.  Even the complaint

11  acknowledges that the TOML has more than doubled the

12  resources of other areas, that other areas were taken.

13  And so, you know, it's an accounting judgment and I would

14  say a couple of things about that, your Honor.  You know,

15  plaintiffs have alleged nothing to show that 43 million

16  was improper other than saying it>

17    THE COURT:  Well, they're saying they think

18  it's worth zero.

19    MR. HAMMEL:  Right.  And I would point out that

20  these are audited financial statements.

21    THE COURT:  That's a question I have.  What do

22  the auditors actually do and not do with respect to the

23  valuation?

24    MR. HAMMEL:  I mean I don't know what they do

25  in terms of their ticking and tying on the accounting but

30

Proceedings

1    it's part of the audit.  Ernstein audited the financial

2    statements and --

3            THE COURT:  But you don't know -- I would have

4    suspected that the auditor's audit letter would carve out

5    the valuation of this license or maybe say something very

6    limited like we looked at the process by which they've

7    valued this and their process is generally sound, but

8    not -- the auditors are not saying we think this is worth

9    $43 million.

10           MR. HAMMEL:  No, and our --

11           THE COURT:  And I think they're probably being

12   affirmatively direct in saying that that's not what we're

13   saying.

14           MR. HAMMEL:  I don't know what that level of

15   granularity, what the audit letter says, your Honor.  But

16   one thing that is clear is that valuations in the law is

17   clear in the Second Circuit.  Valuations are opinions,

18   not an exact science.  And pleading they're false

19   requires facts showing that they're both objectively

20   wrong.  Like it's just wrong, but also subjectively

21   wrong.

22           THE COURT:  We're going to given the

23   plaintiffs, but they say something like the party from

24   whom TMC bought these licenses, or TMC's precursor bought

25   these licenses, had shopped them for some long period of

31

Proceedings

1   time and there were no bidders and TMC knew it.  I don't

2   know how the say TMC new it exactly.  We'll hear that

3   part from them.  But why wouldn't that be sufficient if

4   they know like this thing was on the market for years and

5   then literally nobody else showed up with any interest in

6   it besides us.

7           MR. HAMMEL:  I mean why one party values

8   something higher than another party, you know, is

9   anybody's guess.  At the time when that was being

10  shopped, and it's not clear to me how far in the past

11  that was happening, you know, maybe companies didn't

12  believe, unlike TMC who does believe, that they're going

13  to have the technology and wherewithal to actually value

14  this or make use out of it.

15          But one thing I would just point out, your

16  Honor --

17          THE COURT:  Sorry, but so they -- the thing

18  that you know is that they bought this thing at 32 and

19  they had it marked a year or so later at $43 million.

20  There's nothing in the record I take it one way or the

21  other to suggest the basis for that increase in their

22  carrying?

23          MR. HAMMEL:  Not quite, your Honor.  I think

24  that there is no basis in the record other than, you

25  know, what you pointed out about at some earlier point in

Proceedings

1    time people not -- that it being shopped around.  But

2    there aren't --

3              THE COURT:  No, but now I'm saying like no

4    basis to support the increase.  It's not like you're

5    saying, Judge, look at this other transaction that

6    happened a year later that shows -- marking something

7    from 32 to 43, that's $11 million on a $32 million base,

8    so 35 or so percent increase in one year.  That's a

9    pretty nice return on your investment.  Where does that

10   come from?

11             MR. HAMMEL:  So I would say, your Honor, a

12   couple of things.  One, you know, just to step back, in

13   this context it's not our burden to show that it was

14   right.

15             THE COURT:  I know.

16             MR. HAMMEL:  It's their burden to show it was

17   wrong.  So I just want to be sure we're clear about who

18   has to --

19             THE COURT:  Well, but to say they marked this

20   thing up 35 percent --

21             MR. HAMMEL:  Right.  And of course, you know,

22   on a 12(b)(6) motion, you know, we're limited to the

23   complaint and some other documents.  But I would say if

24   you read paragraph 112 of the complaint, paragraph 112,

25   they quote extensive, or they quote a couple of

33

Proceedings

1  paragraphs from a call with the defendant Barron, you

2  know, TMC's CEO, where he's explaining it.  And he does

3  explain that some of the bases for the $43 million

4  valuation and the $32 million valuation.  Plaintiffs of

5  course won't agree with that.  But I would say that

6  they've not alleged that those reasons are false.  And so

7  on this context, the fact that the other good ground and

8  the CCZ has already been taken so that by the time they

9  bought it for 32 and over time it was more exclusive, you

10  know.

11        And so anyway, I would just point out that they

12  have been shown that the $43 million is objectively

13  wrong.  But even if they did, your Honor, and this is

14  important, even if they did show that $43 million cannot

15  be justified as a matter of accounting or mathematics,

16  which they've not done, but if did, even that's not

17  enough because it's clear that it's an opinion and that

18  has to be subjectively false.  The defendants have to be

19  shown to have actually not believed it's true.

20        And you don't have to take my word for it.

21  It's the Supreme Court that has said it in *Omnicare*.  And

22  I'm just going to read briefly from 575 U.S. 194.  The

23  Supreme Court said, "To be specific, the investor

24  must --"  In order to show an opinion is false.  "To be

25  specific, the investor must identify particular and

34

Proceedings

1  material facts going to the basis for the issuer's

2  opinion, facts about the inquiry the issuer did or didn't

3  conduct or the knowledge it did or did not have.  That is

4  no small task for the investor."  That's what the Supreme

5  Court has said.

6          They haven't come close.  Even if we could

7  entertain an objective falsity argument, which I would

8  submit they haven't provided a basis for, there's nothing

9  on the subject of falsity so they can't base a claim on

10  that valuation.

11          THE COURT:  Okay.

12          MR. HAMMEL:  So your Honor, I would just say,

13  you know, I think we talked about the PIPE funding, you

14  know, statements two and five, statement 11, this idea

15  that we were lying to the market when TMC said it would

16  be pursuing a litigation.  You know, I would submit that

17  that one is kind of silly.  You know, there was federal

18  litigation.  It turned into state court litigation.

19          You know, the environmental impact statements,

20  we talked about the disclosures.  Here I would just say

21  that they've got no specific facts showing that any of

22  our environmental disclosures was wrong.  You know, they

23  have of course statements in the Bloomberg article which

24  was on its face an opinion piece.  They've got statements

25  from the, you know, some statements I think in the short

35

Proceedings

1   seller report about what environmentalists claim.  But we
2   never promised that there would be environmental
3   consensus on sea floor mining.  We were quite clear that
4   there were environmental risks.  And the securities laws
5   don't require a company to only pursue noncontroversial
6   businesses.  It requires us to disclose what the business
7   does and the risks, and we did that.  But the fact that
8   some environmentalists were opposed to sea floor mining
9   doesn't show that anything we said was false.
10          Briefly, your Honor, they have statement nine
11   on the exploration expenses.  I think it's fair to say
12   that they have dropped that one.  It only gets a mention
13   in a footnote in their opposition brief.  And what they
14   say there is that we didn't publish out $35 million
15   expense number until after the short seller report.
16   That's not true.  It was published in our S4 in August of
17   2021. That's at Exhibit 2 at page F-61.
18          THE COURT:  All right.  Let me ask you to pause
19   there.  Let's hear from the plaintiffs who've been
20   waiting patiently and we'll save some time for you in
21   rebuttal.
22          MR. HAMMEL:  Thank you.
23          MR. LUDWIG:  Well, your Honor, I'll start off
24   with the statements regarding the funding.
25          So the statement fully committed by defendants

Proceedings

1    we think is fairly self-explanatory.  It's something an

2    investor would rely on.

3              THE COURT:  But why is it false?

4              MR. LUDWIG:  Because defendants did not do

5    their due diligence and in effect --

6              THE COURT:  What due diligence?

7              MR. LUDWIG:  I'm referring to prior to the

8    reneging by the funder.  So --

9              THE COURT:  What due diligence do you say they

10   had some legal obligation to do but didn't?

11             MR. LUDWIG:  So your Honor, I know that this

12   came up in the complaint.  There's a state court case

13   that's currently pending.  What happened was defendant

14   said that he funding was fully committed.  When the

15   funding didn't come through, they said they would recover

16   it.

17             THE COURT:  Can I just stop you and make sure I

18   understand the baseline allegation?  And then we can get

19   into the question of what to make of them.  The defendant

20   says in addition to the SPAC financing, which is

21   relatively unstable because the investors have a

22   redemption right that they may or may not exercise, we

23   also have this PIPE transaction which is fully committed.

24   We've got binding -- I take fully committed to mean we

25   have a binding and enforceable contract obligating

37

Proceedings

1   private investors to put this money in.  You're not

2   disputing that that was true that they had binding

3   contracts?

4           MR. LUDWIG:  I'm not disputing that the

5   contract itself was binding but --

6           THE COURT:  You're saying they should have done

7   some due diligence that would have revealed that these

8   investors were not going to come through with the capital

9   they were committing?

10          MR. LUDWIG:  Well, your Honor, there have been

11  state court litigation and there's a recent opinion that

12  came out in March 2023 after we submitted all of our

13  filings in this case and so it could not be included

14  either in our complaint or in the brief.  I would like to

15  hand up a copy if possible.

16          THE COURT:  You can hand up a copy but I'm not

17  going to read it here.

18          MR. LUDWIG:  Certainly not.

19          THE COURT:  Tell me what the significance is.

20          MR. LUDWIG:  But there's litigation against

21  some of these funders and in ruling on their motion to

22  dismiss the state court said, and I'm quoting here from

23  the opinion, "Your client had the ability to engage in

24  some kind of due diligence to determine whether or not

25  they needed guarantees, personal guarantees, or to

38

Proceedings

1   determine whether they need a letter of credit but chose

2   not to do so.  This Court is not he place to come in and

3   say we messed up before, we didn't take due diligence

4   steps, appropriate steps and due diligence and then to

5   say now we need the Court to assist us because of our

6   prior failures."

7          THE COURT:  Sorry, what is the Court holding

8   here?  They're dismissing the state court complaint?

9          MR. LUDWIG:  They're not dismissing it.

10  They're allowing certain of the allegations against the

11  funders to proceed into discovery on a breach of contract

12  hearing but rejecting a tortious interference theory.

13  But this is a discussion about the underlying

14  arrangements between TMC and the funder.

15         THE COURT:  But aren't you arguing that when

16  TMC says this money is fully committed, that somehow

17  implies that they have letters of credit that they don't

18  have or that they have personal guarantees they don't

19  have?  I don't understand.  You said a minute ago they

20  should have done some due diligence that they didn't do.

21  Now by reading the state court opinion I think you're

22  suggesting they should have gotten additional contractual

23  assurances that they didn't get.  But what is the problem

24  with them saying --

25         MR. LUDWIG:  It seems they didn't have

39

Proceedings

1   assurances from the outset.  And you know, paragraph 103,

2   defendant Barron said -- sorry, paragraph 104, defendant

3   Barron says, "It wasn't that they chose not to fund, they

4   couldn't fund, they didn't have the money."  And this is

5   a fact that comes up repeatedly in the state court case

6   as well but --

7             THE COURT:  The investors are private funds.

8   Right?  You pulled the --

9             MR. LUDWIG:  There's an individual -- are you

10   talking about my clients?

11            THE COURT:  No, the private investors who don't

12   follow through on their --

13            MR. LUDWIG:  They're private investors, yes.

14            THE COURT:  Have those funds failed?  Like what

15   makes you think they really didn't have the funds/

16            MR. LUDWIG:  I'm not saying what the facts were

17   on their side.  I'm saying what --

18            THE COURT:  Well here's what I recommend to you

19   by way of sort of ordering your oral argument.  You can

20   take this recommendation or not.  Start with what you

21   think are the most objectively demonstrably false

22   statements and tell me here's how we know that this

23   statement was false.  Do you think that the claim that

24   the private funding was fully committed is the most

25   objectively and provably false statement they made?

40

Proceedings

1          MR. LUDWIG:  I do, your Honor.

2          THE COURT:  Okay.  So that's why we're starting

3    with that.

4          MR. LUDWIG:  Right.  We do think that.  We

5    think that's substantiated not only be the state court

6    case but also the sequence of events after that funding

7    failed.

8          THE COURT:  What should I as a judge, if I were

9    to understand how to think about the phrase fully

10   committed, what does it mean when defendant's executive

11   says this money is fully committed and what does it not

12   mean?  Where should I look to understand that.  To the

13   dictionary definition of the word committed?

14         MR. LUDWIG:  I think we should look to what a

15   reasonable investor would understand under the

16   circumstances which is really the touchstone of the PSLRA

17   and --

18         THE COURT:  My intuition, which may or may not

19   be worthwhile here is that a reasonable investor would

20   think fully committed means contractually bound.

21         MR. LUDWIG:  Right.

22         THE COURT:  Tesla, we all know just from

23   reading the newspapers, has some SEC problems when the

24   CEO said in a tweet I think something like thinking about

25   taking --

41

Proceedings

1          MR. LUDWIG:  It was a tweet, your Honor.

2          THE COURT:  -- company private funding secured.

3   Right?   Something like the phrase funding secured was

4   the phrase alleged to be problematic.  And the argument

5   from the plaintiffs in that case, and I don't remember

6   what the courts had to say about it one way or the other,

7   but the argument from the plaintiffs was your funding was

8   not fully secured because you didn't have a contract with

9   anybody.  You had a conversation with somebody at some

10  investment fund.  That's not secured funding.

11         This is different, right?  They had a binding

12  contract.  You don't dispute that.  They made it past the

13  motion to dismiss phase in state court on their breach of

14  contract action.  You know, help me help you.  What is

15  the source of authority for the proposition that the

16  reasonable investor would understand fully committed to

17  mean something more than we have a binding contract and

18  include things like we have a personal guarantee or we

19  have a letter of credit.  If they had a letter of credit,

20  they would have said we have a letter of credit.

21  Instead, they said this funding is fully committed.

22         MR. LUDWIG:  And as it turned out, your Honor,

23  that funding was not fully committed in the sense that --

24         THE COURT:  People breach contracts every day

25  but that doesn't mean that somebody hadn't made a

42

Proceedings

1  commitment.  They did make a commitment.

2          MR. LUDWIG:  I think what we've alleged in the

3  complaint and what's come out in the subsequent years is

4  that there really wasn't a mechanism for defendants to

5  secure that funding once there was a failure by the

6  funders to tender.  You know, they initially --

7          THE COURT:  The mechanism to secure after a

8  failure is litigation.  You have a binding contract.

9  You've got to sue somebody for breach of contract.

10         What's your second most objectively provably

11  false representation here?

12         MR. LUDWIG:  I think this statements regarding

13  the environmental impact would be our second most

14  provably set of false statements.  Now, I know the

15  defendants have attempted to re-characterize those as

16  opinions, but the statements that they've made here are

17  about the immediate impact of what the technology will

18  do.  And there really wasn't a way for investors to fact

19  check that.  They had to rely on the company's

20  misrepresentations.  And as it turned out, it really

21  wasn't an issue with a few environmentalists.

22         THE COURT:  Am I right on that statement that

23  you kind of put front and center in the complaint that

24  where they're saying their process leaves no tailings and

25  no waste, are you contending that that statement is

43

Proceedings

1  literally false or that they omitted to say something

2  else that they should have said alongside it?

3          MR. LUDWIG:  I think that statement, we're not

4  alleging that that statement was literally false.  We're

5  alleging that what they did there was to present a

6  misleading picture for investors.  And I think that has

7  to be considered.

8          THE COURT:  Misleading because they omitted to

9  say what alongside it?

10          MR. LUDWIG:  That there's this substantial

11  problem of environmental damage and risk that prompted

12  500 scientists to come out against deep-sea mining that

13  prompted the large corporations --

14          THE COURT:  And why is the disclosure -- the

15  risk factor disclosure says look, we don't really know

16  how much we're going to rip up the seabed here and cause

17  harm.  It doesn't use that informal phrasing, but

18  something to that effect.  Why isn't that the context

19  that you say has been materially omitted?

20          MR. LUDWIG:  There's a case, your Honor, a

21  Supreme Court case called the *Matrixx* case which we do --

22          THE COURT:  Called?  I'm sorry, I didn't hear

23  you.

24          MR. LUDWIG:  The *Matrixx v Siracusano* case.  A

25  company essentially tried to say, as defendants do here,

44

Proceedings

1  that whatever the quality of their statements, they

2  really couldn't be verified.  They really weren't

3  objective in any sense.  And the Supreme Court rejected

4  that.  When a company comes out and makes statements

5  about their environmental impact, they can simply fall

6  back and say these are not actually, they're not true and

7  they're not false.  They occupy some nebulous ground in

8  between.

9        THE COURT:  Is the fact pattern of *Matrixx* -- I

10  think I may be remembering the case you're talking about.

11  Is the fact pattern there that the company is actually

12  destroying the environment at the same time they say

13  we're not sure, we might have some negative environmental

14  impact?

15        MR. LUDWIG:  Well, it had to do with the

16  effects of a pharmaceutical --

17        THE COURT:  Oh, no.

18        MR. LUDWIG:  It's not an environmental case.

19  My point is that the same logic that defendants are using

20  where they can make these statements about, for example,

21  that deep-sea mining will lead to a significant reduction

22  in the ESG footprint of metals and will dramatically

23  reduce the environmental bill of the transition to green

24  energy.  We itemized these statements here and they're

25  not statements that say well we'll see what happens, we

Proceedings

1    don't know.  We're speculating that that might happen.

2    And what they're doing is presenting a series of factual

3    statements to investors and then attempting to hedge with

4    separate risks statements well you know, maybe that's not

5    going to be the case.  Maybe it's not going to work out

6    that way.

7              But that's not the way that their statements

8    are phrased.  And so what we contend is that they don't

9    deserve the benefit of the doubt as uttering opinions

10   when that's not what these statements are regardless of

11   whether the operations themselves have already occurred

12   or whether they're going to occur in the future.  The

13   nature of the environmental effect of deep-sea mining are

14   statements that the company is quite comfortable in

15   making in the here and now including defendant Barron.

16             THE COURT:  What's the answer to my question

17   about whether anybody is making purchase decisions

18   September 3rd when the company knows that the committed

19   capital has not shown up and pre-September 7th when I

20   understand the 8-K disclosing that is filed?  Is there

21   anybody making any investment decisions during that

22   period?  I think the answer is no because the deadline to

23   say I'm redeeming, I want out of this deal, is September

24   1st.  Right?  So at that point the company is not lying

25   about anything because they don't know yet that the

46

                              Proceedings

1   committed capital has vaporized.

2            MR. LUDWIG:  My inclination, your Honor, is to

3   say no but I think we also say that the problems with the

4   funding and the way that it was represented as fully

5   committed, those issues stem back before September 3rd.

6   I think it's defendant's framing that they want to say

7   there was no problem, there was no issue here until

8   suddenly something happened on September 3rd.  And I

9   think that's where the state court opinion is instructive

10  in that it goes into the fact that defendants really

11  didn't have a mechanism to deal with the possibility of

12  the funding not coming through and as we've alleged --

13           THE COURT:  Again, the mechanism is you sue the

14  person who breached that contract and that's what they

15  did.

16           MR. LUDWIG:  Well, they misrepresented that as

17  well, your Honor, as we went into in the complaint.  They

18  initially filed the case in federal court that was

19  summarily --

20           THE COURT:  Yes.  Invoking the court's

21  diversity jurisdiction.

22           MR. LUDWIG:  So that was dismissed.

23           THE COURT:  Did the court dismiss or did the

24  court just order the parties to show cause why the case

25  shouldn't be dismissed?

47

Proceedings

1    MR. LUDWIG:  They ordered the parties to show
2 cause and then the case was subsequently dismissed.
3    THE COURT:  Dismissed by the court or
4 voluntarily dismissed by the plaintiff?
5    MR. LUDWIG:  I believe it was voluntarily
6 dismissed by the plaintiff after --
7    THE COURT:  Okay.  So the court's not
8 dismissing.  Either way, that's a diversity problem when
9 it turns out you got plaintiffs and defendants from the
10 same state.  So they re-file in state court and then the
11 case is up and running.
12    MR. LUDWIG:  Well the court here takes pains to
13 stress that there's a very low bar for overcoming the
14 motion to dismiss and says that on summary judgment the
15 Court won't be as forgiving.  That's a very low standard
16 at the motion to dismiss stage, that summary judgment is
17 another question, and that the Court won't be as
18 forgiving.  And so this is a very --
19        THE COURT:  Won't be as forgiving with what?
20    MR. LUDWIG:  What they perceive is the issue
21 with the plaintiff's allegations.  But I think for
22 purposes of our complaint not to substitute ourselves for
23 the plaintiffs in that case is that defendants are sort
24 of flailing in an attempt to recapture some of these
25 funds and at the same time they're not telling the market

48

Proceedings

1   the truth.  So for example, on March 25, 2022 they say

2   that this case, the one we're in court in right now, is

3   the only material litigation that the company's involved

4   in.  And I would say that a case involving $20 million is

5   material litigation.  It's treated as such by the state

6   court.  That isn't corrected until after we file our

7   papers.  And then TMC begins to reveal that they have a

8   case pending but they don't tell investors that they

9   already had a federal case dismissed and that they had to

10  re-file in the state court. So there were additional ups

11  obfuscations regarding the remedy for this breach and,

12  you know, very little reporting on what the sequence of

13  events has been since they had to file a case, what the

14  Court said other than the case is proceeding into

15  discovery so investors have consistently been kept in the

16  dark on this.

17          THE COURT:  Okay.

18          MR. LUDWIG:  I think on the issue of the TOML

19  license, we're seeing defendants claim that there's no

20  basis to contest the valuation that they've made yet

21  counsel he admitted that the auditors haven't explained

22  the process.  Opposing counsel doesn't know.  Yet we've

23  alleged that there's an extremely low value attached to

24  this license, that there is an inexplicable increase in

25  the price paid for it compared to what it was valued at

49

Proceedings

1  before, compared to comparable prices, and that has not

2  been explained by defendants.  So when they say there's

3  no facts alleged as to why that was overvalued, that's

4  really projecting because they're not able to tell us --

5          THE COURT:  If they had really paid $32 million

6  in a truly arm's length transaction, that would be a

7  pretty good indicator that that's a reasonable valuation.

8  You sort of allude to the idea that this was really not

9  an arm's length transaction and that there is some

10 affiliation or some aspect of self-dealing in the initial

11 purchase.  But I don't think I understand the precise

12 nature of that.

13         MR. LUDWIG:  That's correct, your Honor.  And I

14 think you asked opposing counsel that, why was there a --

15         THE COURT:  You may need to get a little closer

16 to the microphone.

17         MR. LUDWIG:  I'm sorry.  Why would DeepGreen

18 have known what the correct valuation was?  And I think

19 that's answered --

20         THE COURT:  Well, what is it you're saying

21 about why this was not a truly arm's length transaction?

22         MR. LUDWIG:  We're saying that there was a pre-

23 existing relationship.

24         THE COURT:  What is the nature of that pre-

25 existing relationship?

50

Proceedings

1           MR. LUDWIG:  It's at paragraph --

2           THE COURT:  I think it's paragraph 53 of the

3    complaint.

4           MR. LUDWIG:  Right.  We allege that there was a

5    previous relationship between, pre-existing relationship

6    between DeepGreen and NMI, which was the previous holder

7    of the license.

8           THE COURT:  You cite "Canadian court

9    documents," that in your view revealed an existing

10   ongoing relationship between the seller of this license

11   and DeepGreen since 2013 and you say that this

12   relationship was via a mineral royalty deed which

13   included both TOML and ORI and DeepGreen.  And I could

14   understand that in a lot of different ways.  One is just

15   as a suggestion that they own some asset in common.

16   Right?  Whatever this mineral royalty deed was that's

17   revealed in these Canadian court documents, the deed

18   shows them as co-owners.  But I can own things in common.

19   It doesn't really render this kind of self-dealing on its

20   face.  Right?  Two investors might come together and by

21   license just because it's more expensive than either of

22   them can afford.  So they're joint venture partners in

23   respect of that license.  But they're not then affiliated

24   in some way that would give either or both of them an

25   incentive to overpay the other in a totally unrelated

51

Proceedings

1   transaction.  It's not like you did a transaction with

2   your brother-in-law or something weird beers some reason

3   on the face of the transaction to believe that you were

4   lining your own pockets when you were paying somebody

5   else an inflated price.

6           MR. LUDWIG:  What we're saying, your Honor, is

7   that there's reason to believe that TMC understood the

8   true value of the license based on their previous

9   relationship with the previous license holder, the holder

10  of that license.  And so your question to opposing

11  counsel was well why would they know that?

12          THE COURT:  I think you're skipping some steps

13  in the logic there.  So they have this pre-existing

14  relationship, whatever it is, that they own a mineral

15  royalty in common.  You're saying that that relationship

16  somehow gives rise to knowledge -- you're not saying --

17  is the mineral royalty deed that we're talking about in

18  paragraph 53 the same license for which TMC pays $32

19  million or is that something else, or we don't know?

20          MR. LUDWIG:  No, that's a different document.

21          THE COURT:  Okay.  So they own this mineral

22  royalty deed in common and you say that gives TMC a basis

23  to know that the true value of the TOML license that they

24  later pay 32 million for, the true value of that is zero.

25  How?

52

Proceedings

1          MR. LUDWIG:  We said that it was previously

2   valued at zero and we said that comparable licenses are

3   valued at $250,000.

4          THE COURT:  How do they know that somebody else

5   is carrying it at zero?  And why would it be valued at

6   zero?  Like if there's really -- well, start with the one

7   discrete question of who's valuing it at zero and what

8   evidence is there that the defendant knew of that

9   valuation?

10          MR. LUDWIG:  We're saying that NMI, the

11   previous holder, valued it at zero and we're saying that

12   the evidence that defendant knew of that valuation was

13   the previous relationship between the two companies that

14   went back to 2013.  And these are not large complex

15   companies.  These are both small entities focused on the

16   exact same planned operation of deep-sea mining.

17          THE COURT:  I just don't understand the logic.

18   Like let's say you and I are two parties engaged in real

19   estate investing and we buy house A in common fifty-

20   fifty.  Years later I say to you hey, I have this other

21   property, do you want to buy it from me?  And you say

22   yes, I'll pay you $1 million for that house.  And

23   assuming for the purposes of this analogy that for

24   whatever reason I'm carrying this house on my books at

25   zero.  Maybe I know it has a termite problem or

53

Proceedings

1   something.  You're saying that the fact that we own house

2   A in common is a logical reason why you would know that

3   on my balance sheet on carrying house B and zero?  I

4   don't understand.  We're not affiliates.  We're not privy

5   to -- if I'm a private company and I don't have to

6   publish my balance sheet in SEC filings, why would the

7   fact of our owning some other asset in common give you

8   access to my private financials?

9           MR. LUDWIG:  I don't think I'm saying that I

10  would have access to your private financials.  I'm saying

11  that it's difficult for me to characterize myself as an

12  unwitting buyer from you when I know that we've had a

13  previous relationship, previous commercial relationship.

14          THE COURT:  We're still arm's length parties

15  though.  There's nothing in your allegations that really

16  suggest an affiliate relationship other than that we've

17  owned one asset in common in the past.  Okay.

18          How do we know, even as we sit here today, that

19  the prior owner carried this at zero?  We know that from

20  the short sellers report?

21          MR. LUDWIG:  It did come out in the short

22  sellers report and then also we verified --

23          THE COURT:  What does the short seller say is

24  its source of that information?

25          MR. LUDWIG:  Court documents in Canada.

54

Proceedings

1          THE COURT:  Okay.  And what -- okay.

2          MR. LUDWIG:  There are public documents to that

3    effect.  And further, if you look at paragraph I believe

4    103 of the complaint, 104 --

5          THE COURT:  Do you know whether --

6          MR. LUDWIG:  -- where defend -- sorry.

7          THE COURT:  I don't think court documents in

8    Canada are really public within the SEC's very narrow

9    definition of what constitutes public information.  But

10   even if we were to assume that they are public, do you

11   know when those Canadian court documents appear on the

12   Canadian court's docket?

13         MR. LUDWIG:  Not the precise date, your Honor.

14         THE COURT:  Well, do you know if it's before

15   the purchase of the license here or after?

16         MR. LUDWIG:  My understanding is that it was

17   before, that those weren't -- that the information about

18   the zero valuation didn't come to light publicly after

19   DeepGreen had purchased the TOML license.

20         THE COURT:  So why would they paid $32 million

21   for something worth zero if the whole world knew because

22   of this Canadian litigation that the seller was carrying

23   it on its books at zero?  What's even your theory about

24   that?

25         MR. LUDWIG:  I think our theory is that they

55

Proceedings

1   overpaid for it through either a related party

2   transaction that we're not privy to at this point because

3   we're only at the pleading stage, or because they wanted

4   to enhance the perceived value of their operations and by

5   paying more for the license, you're able to go out and

6   say look, this is worth much more than a comparable

7   license and therefore TMC is able to attract more

8   investment on that basis.

9           THE COURT:  Okay.  But on the question of why

10  you think they're related parties, the most we can say is

11  that there's this mineral royalty deed that shows them as

12  co-owners.

13          MR. LUDWIG:  And I'd also emphasized, your

14  Honor, that this is a small world of companies that are

15  doing this.  This is not hundreds of companies that are

16  out there --

17          THE COURT:  Yes, but that doesn't -- a smaller

18  number of companies in the industry doesn't make them

19  more or less related to each other.  They might be more

20  aware of each other's existence, but the question is why

21  you think they're related parties.

22          MR. LUDWIG:  I said that that might be a

23  possibility for the transaction.  I'm not saying that

24  they were related parties necessarily in 2013 other than

25  having this arrangement between them.  But we haven't

56

Proceedings

1  been able to get an answer for why a company valued the

2  TOML license the way that it did.  It doesn't make sense

3  based on all of the objective facts.  We've had

4  defendant's counsel say that he doesn't really know

5  either.  And so we think that it's an improper and

6  inflated valuation based on what we know and based on the

7  facts that are pled in the complaint on it.

8          THE COURT:  Okay.  All right.  Let me give you

9  three minutes in which to wrap up and then the same

10  amount of time to the defendant's rebuttal.

11          MR. LUDWIG:  I'd like to emphasize defendant's

12  statements about scienter are incorrect in that they've

13  attempted to posit a theory to the Court that we're

14  required to plead motive which isn't necessarily the

15  case.  They've described cases in which motive wasn't

16  considered as a sole basis as though that was an outlier

17  when, you know, scienter allegations are supposed to be

18  considered holistically.  And we allege in the complaint

19  that defendant Barron spoke to --

20          THE COURT:  Why don't you have a Section 11

21  claim?  Just for my edification.  You're not bringing a

22  Section 11 claim?

23          MR. LUDWIG:  We don't have a Section 11 claim

24  at this point.  I'm not saying we wouldn't bring one.

25          THE COURT:  You're not saying you wouldn't or

57

Proceedings

1   you're not saying you would?

2            MR. LUDWIG:  Well, I don't want to foreclose it

3   here at the hearing that we would never plead a Section

4   11 claim.

5            THE COURT:  Because Section 11 obviously

6   requires you to prove falsity but not scienter.

7            MR. LUDWIG:  Well, we think scienter is pretty

8   readily available here.  Defendants have characterized us

9   as not having motive.  First of all, we do have a motive

10  in that TMC itself said is specifically needed $7 billion

11  to engage in large-scale production.  But more

12  importantly, there are specific allegations in the

13  complaint where defendant Barron speaks to the precise

14  issues that we've alleged to be false.  He holds himself

15  out as an authority.  He speaks to the funding of the

16  company.  In paragraph 104 he speaks to the issues

17  underlying the failure to receive funds.  Paragraph 91

18  and 92, he speaks to the environmental issues that we

19  alleged to be false.  And so this is the CEO of the

20  company holding himself out as having knowledge of these

21  issues that were the core operations of the company.

22            And by the way, there's no Second Circuit

23  decision ruling out application of the core operations

24  theory in the Second Circuit.  That certainly applies

25  here.  And I think defendants have mistaken the idea that

58

Proceedings

1   they're competing inference is held equally to the

2   allegations in the complaint.  And we did refer to their

3   judicial notice tactics, for example, introducing stock

4   purchases in Exhibit 7 that were not alleged in the

5   complaint including unauthenticated stock charts to

6   actually rebut the complaint allegation which is improper

7   at this phase.

8           THE COURT:  A stock chart?

9           MR. LUDWIG:  Right.

10          THE COURT:  Courts can't take judicial notice

11   of closing prices of publicly traded stocks?

12          MR. LUDWIG:  Your Honor, courts can certainly

13   take judicial notice of publicly traded prices of stock.

14   What defendants provided to the Court was an

15   unauthenticated document.  And the reason that they

16   provided it was not to say look at this, these purchases

17   happened when we say they did.  The reason they provided

18   it was to rebut our motive allegations.  And the point is

19   that that's not the way that the Court is supposed to

20   view scienter at this stage.

21          THE COURT:  Okay.  All right.  Three minutes or

22   so in rebuttal.

23          MR. HAMMEL:  Yeah.  Your Honor, I would just

24   say a couple of things.  One, counsel spent a bit of time

25   talking about statements in 2022.  I wasn't quite sure I

Proceedings

1    understood the relevance of them.  But as a matter of

2    law, post class period statements are irrelevant.  So I

3    think he was talking about the description's that the

4    company was making of litigation against the funders and

5    it had something to do with showing that back in 2021

6    they knew or should have known that the funders weren't

7    going to fund and follow it.  But it's after the class

8    period, so it just doesn't matter.  So that's one point.

9         I think the last point counsel made is that we

10   submitted Form 4s filed with the SEC showing that the two

11   individual defendants had acquired stock but never sold

12   stock.  And I think counsel just said that the Court's

13   not supposed to consider that.  That's just not correct

14   as a matter of law as I think your Honor has held in

15   other cases including the *HDFC Bank* case a couple of

16   months ago.  Public SEC filings are well within the

17   Court's discretion to consider.  And of course without

18   Form 4s which disclose shareholder or insider

19   transactions in company shares, without those courts

20   wouldn't have been able to make the kinds of rulings

21   they've made that we've cited showing a lack of scienter

22   where executives have acquired stock.

23        And then the last thing I would say is on this

24   question of whether a valuation of $43 million after a

25   purchase of $32 million, which I think is now fully

60

                         Proceedings

1   conceded that we paid $32 million, again, it's not our

2   obligation here to justify it.  But if your Honor wants

3   to understand the CEO's reasoning at least in the little

4   bit that the plaintiffs have provided you, I would point

5   you towards --

6            THE CLERK:  Microphone, counsel?

7            MR. HAMMEL:  Sorry.  If your Honor wants to

8   read the CEO's rationale around that, I would point your

9   Honor towards paragraph 112 of the complaint where

10  there's a quote.

11           And with that, your Honor, I would just say

12  this case cries out for dismissal on a number of grounds

13  and we urge your Honor to do that.

14           THE COURT:  Okay.  Thank you, all.

15           MR. LUDWIG:  Thank you.

16           MR. HAMMEL:  Thank you, your Honor.

17           THE COURT:  I'll take the case under

18  advisement.

19                    (Matter concluded)

20                         -oOo-

21

22

23

24

25

61

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the
foregoing transcript of the said proceedings is a true
and accurate transcript from the electronic sound-
recording of the proceedings reduced to typewriting in
the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or
employee or attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
or financially interested directly or indirectly in
this action.

IN WITNESS WHEREOF, I hereunto set my hand
this **14th** day of **July**, 2023.

_Mary Greco_
Transcriptions Plus II, Inc.