UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

POINT12 DIVERSIFIED FUND, LP and KYLE     **MEMORANDUM & ORDER**
AUTRY, individually and on behalf of      21-CV-5991(EK)(PK)
all others similarly situated,[1]

                Plaintiffs,

     -against-


 TMC The Metals Company, et al.,

                    Defendants.


------------------------------------x
ERIC KOMITEE, United States District Judge:

        The corporate defendant in this case touted its

ability to mine the deep seafloor for the metals used in

batteries for electric vehicles and other products.  Formerly

known as DeepGreen Metals, the company merged with a special

purpose acquisition company, or SPAC, and began trading on the

NASDAQ under a new name — The Metals Company, ticker symbol TMC

— in September 2021.  The stock opened at $12.45 on its initial

public offering.  But it declined substantially in the following

weeks when the market began questioning, among other things,

TMC's cash position and the environmental repercussions of

seafloor mining.

---
        [1] Since the filing of the original complaint, Point12 Diversified Fund,
LP and Kyle Autry have replaced Bruce Carper as the named plaintiffs.  The
Clerk of the Court is respectfully directed to amend the caption of this case
accordingly.

Lead plaintiffs Point12 Diversified Fund, LP and Kyle Autry bring this action on behalf of a putative class of individuals who purchased, or otherwise acquired, the publicly traded securities of TMC between March 4, 2021 and October 5, 2021. They contend that TMC and its predecessor violated the Securities Exchange Act of 1934 by, among other things:

- Falsely claiming that certain private funds had "fully committed" to invest $330 million in TMC's public equity (via a private investment in public equity, or "PIPE," transaction), even though only about one-third of that money ultimately materialized;

- Overstating the fair market value of assets on its balance sheet, including a license to prospect a portion of the Clarion-Clipperton Zone ("CCZ"), a region in the central Pacific Ocean; and

- Understating the environmental risks associated with deep seafloor mining.

In addition to TMC, the plaintiffs name as defendants Gerard Barron, the CEO of DeepGreen and then TMC, and Scott Leonard, the former CEO of the SPAC with which DeepGreen merged. Leonard also served on TMC's Board of Directors during the class period.

The complaint asserts two causes of action, both under the Exchange Act: first, a claim under Section 10(b) and Rule 10b-5 against all defendants, and second, a claim under Section 20(a) against Barron and Leonard. The defendants now move to dismiss the complaint, contending that it does not adequately

2

allege the falsity of the alleged misrepresentations and omissions, the scienter of the individual defendants, or loss causation.  The defendants also argue that the plaintiffs lack statutory and Article III standing to challenge certain alleged misstatements.

For the reasons set out below, the motion to dismiss is granted.  The plaintiffs lack statutory standing to challenge certain of the alleged misstatements.  And the complaint does not adequately allege falsity or scienter as to any of the alleged misstatements.

## I.    Background

The facts described here are taken from the amended complaint, as well as "statements or documents incorporated into the complaint by reference" and "legally required public disclosure documents filed with the SEC," which are properly considered at the motion to dismiss stage.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).[2]  The Court also considers other documents when the complaint "relies heavily upon [their] terms and effect, which renders the document[s] integral to the complaint."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 & n.3 (2d Cir. 2002).  Finally,

---

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

the Court takes judicial notice of publicly filed court documents. *See Global Net. Comm'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

The complaint in this case relies heavily on a *Bloomberg* article and the published report of an investment firm with a short position in TMC's stock (the "Bonitas Report"). A court may consider a document "integral" to the complaint even if the complaint "contains only limited quotation from that document." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 808 (2d Cir. 1996) (treating as integral the "press releases, wire service reports, newspaper articles, and annual company reports" from which plaintiff "culled" alleged misstatements). A court need not "limit its consideration to [the plaintiff's] selected quotations," and may consider the "full text" of the outside documents to contextualize the plaintiff's quotations. *Id.* at 808-09. A court may also consider short-seller reports as integral to the complaint and will generally, at the motion-to-dismiss stage, "accept the factual allegations contained in the [short-seller report] as sufficiently reliable as a factual source for [p]laintiffs' allegations." *McIntire v. China MediaExpress Hldgs, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013).[3]

---

[3] Some courts have accepted short-seller allegations only after concluding that that they are "reliable as opposed to fabricated based on

**A.    March 2021: Announcement of DeepGreen-SPAC Merger**

Sustainable Opportunities Acquisition Corporation ("Sustainable Opportunities") was founded as a special purpose acquisition company ("SPAC").  Am. Compl. ¶ 2, ECF No. 43.  Its stated focus was the acquisition of an "ESG" focused enterprise — that is, a company focused on environmental or social goals alongside its drive to provide shareholders a financial return.  *Id.*  On March 4, 2021, Sustainable Opportunities announced that it would merge with DeepGreen to form The Metals Company.  *Id.* ¶ 84.

That day, Sustainable Opportunities filed a Form 8-K with the SEC to report the merger agreement.  *See* Form 8-K, ECF No. 46-3.  The filing stated that the deal was expected to close in the second quarter of 2021.  *Id.* at 3.  It also noted that certain investors had committed to purchase — at closing — $330.3 million of Sustainable Opportunities' shares in a PIPE transaction.  Am. Compl. ¶ 89.  As the SPAC's CEO, Scott Leonard signed the 8-K.  Form 8-K, at 9.

In a joint press release attached to the 8-K, the companies touted the merger's promise.  The release highlighted

---

self-interest."  *In re EHang Hldgs. Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 459 (S.D.N.Y. 2022).  But because it is generally inappropriate to resolve factual disputes at the motion-to-dismiss stage, courts "frequently accept [factual] allegations based on short-seller reports" at this stage.  *In re Longwei Petroleum Inv. Hldg. Ltd. Sec. Litig.*, No. 13-CV-214, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014)

that the transaction included $330 million in "fully committed" PIPE funding, and it noted that the combined entity had a "pro forma equity value of US$2.9 billion." Am. Compl. ¶¶ 84-85. The release also contained statements from both companies' CEOs explaining the rationale for the merger, with a particular focus on the purported environmental benefits of deep seafloor mining. Leonard stated that DeepGreen offered "a real, scalable solution to the raw materials problem, at a low production cost and with a significant reduction in the ESG footprint of metals." *Id.* ¶ 86. Barron emphasized that "[s]eafloor nodules offer a way to dramatically reduce the environmental bill of [metal] extraction." *Id.* ¶ 87.

Roughly six weeks after the merger announcement, Barron sat for an interview with Kitco News, a media outlet focused on the metals industry. *Id.* ¶ 91. During that interview, Barron touched on several aspects of seafloor mining and explained how TMC — which he said was "formerly known as DeepGreen," though the merger had not yet closed — intended to exploit those metals to power the transition to electrification. *See* Kitco News Interview Tr. 2, ECF No. 46-8. As in the March 4 press release, Barron underscored the environmental benefits of

TMC's mining operations, asserting that TMC's extraction process would "generate zero tailings and zero waste."  Am. Compl. ¶ 91.[4]

## B.    August 2021: Sustainable Opportunities Files a Revised Prospectus and a Proxy Statement with the SEC

On August 5, 2021, Sustainable Opportunities filed an amended registration statement in contemplation of the issuance of TMC shares.  *See* Form S-4A, ECF No. 46-4.  That filing reported, among other things, DeepGreen's 2019 exploration expenditures relating to two licenses that gave the company the rights to prospect certain regions of the Clarion-Clipperton Zone in the Pacific Ocean.  Am. Compl. ¶ 96.[5]  Those licenses were held by two DeepGreen subsidiaries: Nauru Ocean Resources Inc. ("NORI") and Marawa Research and Exploration Limited ("Marawa").  *Id.* ¶¶ 8, 96.  DeepGreen reported its NORI exploration expenses at $35.4 million, and its Marawa expenditures at just $3.4 million.  *Id.* ¶ 96.  As discussed below, the plaintiffs contend that these expenditures were inflated to suggest that the company was farther along in its mining efforts than it really was.

---

[4] According to TMC's website, "[t]ailings are the materials left over after the process of separating the valuable fraction [of the polymetallic nodule — *i.e.*, the valuable minerals] from the uneconomic fraction of an ore."  TMC, *Frequently Asked Questions*, https://metals.co/frequently-asked-questions/ (last accessed July 10, 2025).

[5] The International Seabed Authority, "an intergovernmental body that oversees the development of mineral related operations in the international seabed," issued those licenses.  Am. Compl. ¶ 8.

The new filing also included valuations of the NORI license, the Marawa license, and a third exploration license that DeepGreen obtained in 2020.  Specifically, DeepGreen had acquired several subsidiaries from Deep Sea Mining Finance Limited.  *Id.* ¶ 93.  One of those subsidiaries, Tonga Offshore Mining Limited ("TOML"), held an exploration license to another section of the Clarion-Clipperton Zone.  *Id.*  That license was included in the transaction.  *Id.*  The S-4 showed that, as of the end of 2020, DeepGreen valued the TOML license at $42,701,464.  *Id.* ¶ 95.  This was markedly higher than the valuations of the NORI license ($250,000) or the Marawa license ($198,855).  *Id.*

About a week after the August 5 filing, Sustainable Opportunities filed a proxy statement with the SEC on Form 424(b)(3) to solicit votes ahead of the merger.  Among other things, it stated that DeepGreen had paid "a total purchase price of $32 million" in cash and shares to acquire the Deep Sea Mining subsidiaries (e.g., TOML).  *Id.* ¶ 93.  Plaintiffs contend that DeepGreen purchased the TOML license at an inflated price from unspecified "insiders," and that the proxy statement materially omitted to acknowledge this conflict of interest.

**C.    September - October 2021: TMC's IPO and Subsequent Stock Price Decline**

The shareholders of Sustainable Opportunities approved the merger on September 3, 2021.  *See* Form 8-K, at 3, ECF No. 46-10.  In a September 7 press release announcing that approval, Sustainable Opportunities disclosed that it had received "only approximately $110.1 million" in PIPE funding — a third of the $330.3 million contemplated by the subscription agreements.  *Id.* at 7.  Despite this shortfall, the merger closed on September 9, and TMC's stock began trading on September 10.  Am. Compl. ¶ 9; *see also* Sept. 9, 2021 Form 8-K.[6]

1.    The *Bloomberg* Article and PIPE Complaints

On September 13 (the following Monday), TMC filed breach-of-contract actions in federal court against the two PIPE investors who had withheld their funding.  *See* Am. Compl. ¶ 98; Federal PIPE Complaints, ECF No. 46-11.  TMC voluntarily dismissed those actions one week later, filing new suits in New York state court the same day.  *See* Voluntary Dismissals in Federal PIPE Lawsuits, ECF No. 46-12; State Court PIPE Complaints, ECF No. 46-13; *see also* Am. Compl. ¶ 102 (alleging that the federal actions were dismissed "for failure to properly allege diversity jurisdiction").

---

[6] https://www.sec.gov/Archives/edgar/data/1798562/000121390021048263/ea147369-8ka1_tmcthemet.htm.

On the same day that TMC filed the federal lawsuits, *Bloomberg* published a column stating that TMC was off to a "rocky start after investors withheld almost $500 million in funding," including "two-thirds of TMC's $330 million PIPE." Am. Compl. ¶ 99; *Bloomberg* Article, ECF No. 46-6. The columnist also noted concerns about the environmental risks of deep-sea mining. He pointed to a public letter signed by hundreds of scientists calling for a deep-sea mining "moratorium," as well as a recent article in *Time* magazine criticizing the practice. *See* Am. Compl. ¶¶ 99-100; *Bloomberg* Article 4-5. Over the next two trading days, TMC's shares fell almost twenty percent, closing at $10 on September 15. Am. Compl. ¶ 101. A few days later, two plaintiffs — Point12 Diversified Fund and Kyle Autry — first purchased TMC shares (on September 21 and 22, respectively). *See* Pl. Stock Purchase Certifications 4, 7-8, ECF No. 11-4.

Notwithstanding these developments, TMC CEO Barron projected confidence at a September 23 investor conference. He touted the potential mining yield from the seafloor areas for which TMC held exploration rights, specifically noting that the density of nickel deposits in those areas made it "possible for [TMC to] become one of the lowest cost nickel producers on the planet." Am. Compl. ¶ 103. He also stated that, based on its then-existing cash reserves, TMC "expect[ed] to fully fund [its]

operations through Q3 of 2023." *Id.* He said the funds raised in connection with the merger would allow TMC to reach several key operational milestones during the following two years, including applying to the International Seabed Authority ("ISA") for a contract to exploit the NORI area of the Clarion-Clipperton Zone. *Id.* ¶¶ 5, 54, 103. Barron also took questions from conference attendees. When an analyst asked about the PIPE funding shortfall, Barron declared — in another statement that the plaintiffs now challenge — that TMC had "filed an action against both of those [investors]" and would "pursu[e] all our remedies to recover" the funding. *Id.* ¶ 104.

    2.   The Bonitas Report

        Several weeks later, a "market research" firm called Bonitas Research published a report on TMC. The Bonitas Report, dated October 6, sharply criticized TMC's prospects. Bonitas disclosed that it had "a short interest in TMC" and stood "to realize significant gains in the event that the price of [TMC's stock] decline[d]." Bonitas Report 2, ECF No. 46-7. The report claimed that DeepGreen had overpaid to acquire the TOML license, that the proceeds went to certain "undisclosed insiders," and that TMC's balance sheet substantially overvalued the TOML license as a result. *Id.*; Am. Compl. ¶ 106. The report also alleged that DeepGreen had "overstated its [2019] NORI exploration expenditures in its SEC filing to give investors a

false scale of its operations," citing ISA records showing a substantially lower expense total. *Id.* ¶ 108; Bonitas Report 7-8. Following the Bonitas Report's release, TMC's stock price declined by approximately seven percent from the previous trading day, closing at $4.14 per share. Am. Compl. ¶ 110.

Barron responded to the Bonitas Report during TMC's third-quarter earnings call (held in November 2021). He disputed the allegations relating to the TOML license acquisition and the NORI expense reporting. *See id.* ¶ 112. He stated that TMC had purchased the TOML license from an unrelated third party. *Id.* He also defended the company's valuation of the TOML license, citing the company's beliefs that "nearly all of the good ground has already been claimed in the [Clarion-Clipperton Zone]" and that the resources in the licensed territory were (based on an initial assessment) worth $6.8 billion. *Id.* He acknowledged that the ISA's estimate of DeepGreen's 2019 NORI exploration expenses was different than the company's own. *Id.* But he attributed this discrepancy to a change in accounting standards that resulted from the SPAC merger. *Id.* According to Barron, TMC had "adjust[ed] [its] accounting from IFRS to U.S. GAAP" after the merger. *Id.* As a result, the company had to "fair value" shares paid to Maersk, an operational partner in the company's NORI exploration efforts. *Id.* This accounting change, Barron said, resulted in

an "increase from $14.9 million to $35.4 million" in NORI-related exploration expenses.  *Id.*

D.    **October 2021: The Plaintiffs File the Instant Action**

Three weeks after the Bonitas Report was published, the plaintiffs filed this lawsuit.  They filed an amended complaint on May 13, 2022, which remains the operative complaint.  The amended complaint alleges that the defendants made twelve false or misleading statements.  These statements fall into five categories.

*First*, the plaintiffs challenge the following statements relating to TMC's cash position:

- The March 4 press release statement that the merger included $330 million in "fully committed" PIPE investment.  *Id.* ¶ 85.

- The March 4 statement on Form 8-K that Sustainable Opportunities had "entered into subscription agreements" with investors for around $330 million in PIPE financing, contingent on the merger's closing.  *Id.* ¶ 89.

- Barron's statement at the September 23 investment conference that TMC expected to "fully fund [its] operations through Q3 of 2023," including by completing a "module [sic?] processing and refining pilot plant" and applying for an "exploitation contract of the NORI area."[7]  *Id.* ¶ 103.  He also suggested that TMC could become one of the "lowest-cost nickel producers" in the world.  *Id.*

- Barron's statement at the September 23 investment conference that the company was "pursuing all

---

[7]    The word "module" may be a typographical error in the complaint, with the intended reference being to a "*nodule* processing and refining pilot plant."

[its] remedies to recover" the missing PIPE
funding. *Id.* ¶ 104.

The plaintiffs claim that these statements were false or misleading because two PIPE investors had declined to fund TMC, and the company had dismissed the federal lawsuits to recover the promised money. *Id.* ¶¶ 88, 99, 102, 104. So, according to the plaintiffs, the PIPE financing was not truly committed, TMC was not pursuing all available remedies, and the company lacked the "cash necessary for large scale commercial production." *Id.* ¶¶ 99, 105.

**Second**, the plaintiffs challenge several statements about the environmental effects of seabed mining:

- The March 4 press release statement that DeepGreen's mining practices offered a "scalable solution to the raw materials problem . . . with a significant reduction in the ESG footprint of metals." *Id.* ¶ 86.

- The March 4 press release statement that "[s]eafloor nodules offer a way to dramatically reduce the bill of [metals] extraction." *Id.* ¶ 87.

- Barron's April 22 statement to Kitco News that mining polymetallic nodules would "generate zero tailings and zero waste." *Id.* ¶ 91.

The plaintiffs allege that these statements were false or misleading because they overstated TMC's exploitation capabilities, *id.* ¶ 34, while "significantly downplay[ing] the environmental risks" (such as those highlighted in the *Bloomberg* article) of mining polymetallic nodules. *Id.* ¶ 88.

14

*Third*, the plaintiffs challenge the following statements about the value of TMC's mineral exploitation licenses.

- The August 5 statement in DeepGreen's Form S-4 valuing the TOML license at more than $42 million. *Id.* ¶ 95.

- The August 13 proxy statement on Form 424(b)(3) stating that TMC purchased the TOML license for $32 million. *Id.* ¶ 93.

- The November 11 earnings call statement that TMC purchased the TOML license from an unrelated third party for a fair market price of $32 million. *Id.* ¶ 112.

The plaintiffs allege that these statements were false or misleading because they vastly overvalued the TOML license and concealed the nature of TMC's relationship with the license seller. In plaintiffs' version of events, the original owner of the TOML license — Nautilus Minerals ("NMI") — had valued the license at zero until its bankruptcy. *Id.* ¶¶ 43-44. PricewaterhouseCoopers then "shopped [the license] around to approximately 300 prospective investors," but generated "almost no interest." *Id.* ¶¶ 45-46. The license eventually ended up with Deep Sea Mining, an NMI creditor from whom TMC eventually purchased the license for $32 million in cash and shares, even though TMC valued the NORI and Marawa licenses at just $250,000. *Id.* ¶¶ 47-48, 51, 93. The plaintiffs therefore suggest that the original $32 million purchase price was not fixed at arm's

15

length.  Instead, they allege that "Canadian court documents revealed an ongoing relationship between NMI and DeepGreen since 2013 via a 'Minerals Royalty Deed'," *id.* ¶ 53, though the plaintiffs provide no further detail on the nature of that relationship.  They also allege that TMC's subsequent $43 million valuation was inflated.  *Id.* ¶ 54.

*Fourth*, the plaintiffs allege that the August 5 Form S—4 falsely reported DeepGreen's NORI exploration expenses at around $35 million.  *Id.* ¶ 96.  They also challenge Barron's statement defending this figure during the November earnings call.  *Id.* ¶ 112-13.  They assert that the Bonitas Report revealed the $35 million figure to be false by finding (based data possessed by the International Seabed Authority) that DeepGreen spent only $15 million exploring the NORI territory in 2019.  *Id.* ¶ 108.

*Fifth*, the plaintiffs challenge TMC's March 4 press release statement valuing the combined company at $2.9 billion. *Id.* ¶ 84.  Here, the plaintiffs effectively roll up their allegations into an overarching claim about a false representation of enterprise value.  If TMC inflated the value of its licenses, misrepresented the nature of its financing, exaggerated its exploration expenditures to suggest progress toward eventual extraction, and downplayed the environmental risks of its mining efforts, then the company's valuation would

16

have been "significantly less than [the defendants] disclosed to investors." *Id.* ¶ 88.

## II.  Legal Standards

To overcome a Rule 12(b)(6) motion, a plaintiff must plead factual allegations sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013).

Securities fraud cases are also subject to the "heightened pleading requirements" of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166 (2d Cir. 2021).  Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.  The PSLRA further requires a plaintiff to "specify each statement alleged to have been misleading, the reason or

reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Thus, plaintiffs "must do more than say that the statements were false and misleading; they must demonstrate with specificity why and how that is so." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).

### III. The Section 10(b) Claim

Under Rule 10b-5, promulgated pursuant to Section 10(b) of the Exchange Act, it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R § 240.10b-5.

To state a Rule 10b-5 claim, a plaintiff must demonstrate: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

**A.    Standing Issues**

At the outset, the defendants assert that the named plaintiffs lack both constitutional and statutory standing to challenge certain alleged misstatements.  The Court concurs in part: while the named plaintiffs have constitutional standing to challenge all twelve statements, they lack statutory standing to challenge three of them.

The analysis here proceeds in three parts.  First, we assess the nature and scope of the named plaintiffs' alleged injury.  Second, we must determine if that injury confers both individual Article III standing and "class standing" upon the named plaintiffs.  Third, we must evaluate whether the named plaintiffs have statutory standing — under the "purchaser-seller" rule, as discussed below — to challenge the alleged misstatements.

1.    The Alleged Corrective Disclosures

To analyze the named plaintiffs' standing, we start with the nature of their alleged injury.  The defendants contend that only certain alleged misstatements could have plausibly injured the named plaintiffs.  The Court agrees in part.

The defendants' argument, which they say is predicated entirely on the complaint's allegations, proceeds as follows. Point12 and Autry first purchased shares of TMC on (respectively) September 21 and 22, 2021.  *See* Pl. Stock

Purchase Certifications 4, 7-8.  These purchases post-dated the
alleged corrective disclosures of September 13 — that is, the
*Bloomberg* article and the federal PIPE-related lawsuits.  *See*
Am. Compl. ¶¶ 98-99.  Those disclosures, according to the
defendants, corrected any alleged misstatements concerning the
commitment of PIPE financing and the environmental effects of
deep-sea mining.  So, the argument goes, TMC's price could no
longer have reflected misstatements about those topics when the
named plaintiffs purchased their shares, meaning misstatements
about those topics cannot have injured the named plaintiffs.
*See Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 205-06
(S.D.N.Y. 2020); *see also Basic Inc. v. Levinson*, 485 U.S. 224,
246 (1988) ("[T]he market price of shares traded on
well-developed markets reflects all publicly available
information, and, hence, any material misrepresentations.").  In
the defendants' view, the only alleged corrective disclosure
that *post*-dates the named plaintiffs' stock purchases is the
Bonitas Report, which came out on October 6 (two weeks after the
named plaintiffs' first purchases).  Because that Report
allegedly corrected the defendants' statements about the value
of TMC's exploration licenses and the volume of its exploration

expenditures, the named plaintiffs can still challenge statements about those topics.[8]

The named plaintiffs disagree that they lack standing to challenge statements made before the alleged September 13 disclosures. Among other things, they assert that none of TMC's alleged misrepresentations were "*fully* corrected until the end of the Class Period." Pl.'s Br. in Opp'n to Mot. to Dismiss 11, ECF No. 48 (emphasis added). So, they argue, the defendants' pre-September 13 statements about PIPE financing and environmental degradation were still (at least) partially inflating TMC's share price when Point12 and Autry purchased, meaning those statements still plausibly injured the two named plaintiffs. *Id.*

It is true that the complaint describes the three alleged corrective disclosures as partial. *See* Am. Compl. ¶¶ 98-109 (describing a "series of partial disclosures"). And this form of pleading is permissible. *See In Re Moody's Corp. Sec. Lit.*, 599 F. Supp. 2d 493, 512 (S.D.N.Y. 2009) (loss causation may be established via a "series of partial disclosures"). Indeed, a plaintiff bringing a Rule 10b-5 claim need not allege a corrective disclosure *at all. See In re*

---

[8] Purely for purposes of the standing analysis, the Court grants the (dubious) premise that the *Bloomberg* article, PIPE-related complaints, and Bonitas Report qualified as corrective disclosures under Second Circuit law. *See FEC v. Cruz*, 596 U.S. 289, 290 (2022) ("For standing purposes, [a court] accept[s] as valid the merits of [a plaintiff's] legal claims.").

*Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305 (S.D.N.Y. 2005) ("An allegation that a corrective disclosure caused the plaintiff's loss may be sufficient to satisfy the loss causation requirement.  It is not, however, necessary.").

Moreover, the complaint does plausibly allege that certain misstatements were only partially corrected.  For example, the complaint says the *Bloomberg* article "revealed" that TMC's environmental claims, such as the assertion that the company's mining practices produced "zero tailings and zero waste," were "overstated."  *See* Am. Compl. ¶¶ 91, 100.  But *Bloomberg* never said that TMC's practices *would* produce tailings or waste.  The article simply cast general doubt on the environmental bona fides of deep-sea mining, stating that "[e]nvironmentalists claim that TMC's activities will damage sensitive ecosystems and destroy vital biodiversity."  *Id.* ¶ 100.  Thus, assuming *arguendo* that the *Bloomberg* article was a corrective disclosure in the first place, it remains plausible that it was not fully corrective, because it did not specifically refute some of TMC's environmental claims.  *Cf. Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 80-81 (2d Cir. 2023) (disclosure is less likely to be corrective when there is a mismatch in specificity between the alleged disclosure and the alleged misstatement).

However, the complaint does not plausibly allege that two of the alleged misstatements were partially (rather than fully) corrected. These are (1) the March 4 press release statement that $330 million in PIPE funding was "fully committed," and (2) the March 4 statement on Form 8-K that TMC had "entered into subscription agreements" for $330 million in PIPE funding. Am. Compl. ¶¶ 85, 89. Even granting the plaintiffs' questionable premise that these statements were false because certain PIPE investors eventually refused to fund TMC,[9] *id.* ¶¶ 88, 90, the federal lawsuits filed on September 13 would have fully and unambiguously revealed these statements' falsity: TMC said the funding was "fully committed," and then filed lawsuits acknowledging that the funding had not materialized. Thus, the named plaintiffs cannot plausibly allege that these statements were only partially corrected on September 13, and therefore cannot plausibly allege that the statements injured them. *See Abengoa*, 481 F. Supp. 3d at 206 (rejecting allegation of partial disclosure that "fl[ew] in the face of [the] [p]laintiffs' own allegations").

In sum, the named plaintiffs can plausibly claim to have been injured by ten of the twelve alleged misstatements.

---

[9] Below, the Court rejects this theory on the merits. The fact that a party reneged on a valid contract does not mean that any prior representation as to the binding nature of that contract was false. *See* Restatement (Second) of Contracts § 1, cmt. g (1981) ("A promise which is a contract *is said to be 'binding.'*" (emphasis added)).

With this in mind, we now proceed to Article III and statutory standing in turn.

    2.   <u>Article III Standing: Individual and "Class"</u>

        Standing in the class action context "requires a bifurcated inquiry." *Gold v. Eva Nats., Inc.*, 586 F. Supp. 3d 158, 160 (E.D.N.Y. 2022). The named plaintiff must first demonstrate that he has Article III standing to bring a claim on his own. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012) ("*NECA*"). That is, the named plaintiff must plausibly allege (1) that he has suffered an injury-in-fact, (2) that the injury is "fairly traceable" to the defendants' actions, and (3) that "the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The Second Circuit has since referred to this — in the class action context — as the "traditional" Article III standing analysis. *Retirement Bd. of the Policemen's Annuity & Ben. Fund of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 160-61 (2d Cir. 2014) ("*Retirement Board*").

        In putative class actions, the standing analysis does not stop there. After "traditional" Article III standing has been established, we consider "class standing" — that is, the named plaintiffs' ability (and incentive) to press the claims of absent class members. *See NECA*, 693 F.3d at 158-59. A lead

plaintiff has class standing "if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *Id.* at 162.  Although class standing is distinct from traditional Article III standing, it nevertheless stems from constitutional standing principles. *See Retirement Board*, 775 F.3d at 160-61.  Just as Article III standing ensures that a named plaintiff has a "personal stake" in proving his own claim, *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983), class standing ensures that a named plaintiff has a "personal . . . stake in proving . . . related claims" brought by the absent class members he proposes to represent. *Retirement Board*, 775 F.3d at 163.[10]

a.   "Traditional" Article III Standing

The named plaintiffs have traditional Article III standing to bring their claims.  As noted, they plausibly allege that defendants made misstatements that were not fully corrected

_____

[10] Several courts in this circuit have held that class standing should be analyzed at the class certification stage, not the motion to dismiss stage. *See Buonasera v. Honest Co.*, 208 F. Supp. 3d 555, 562 (S.D.N.Y. 2016) (collecting cases); *but see Holve v. McCormick & Co.*, 334 F. Supp. 3d 535, 550 n.7 (W.D.N.Y. 2018) (describing this approach as "dubious at best").  But the plaintiffs have not raised this argument here, and the Second Circuit has affirmed dismissals for want of class standing at the Rule 12 stage. *See, e.g.*, *DiMuro v. Clinique Labs, LLC*, 572 F. App'x 27 (2d Cir. 2014).  Given the overlap between the "traditional" and class standing analyses, it is efficient to consider the issue now.

until the end of the class period.  These statements allegedly inflated the price at which the named plaintiffs purchased TMC stock, meaning they were injured when the stock price later dropped.  And this injury is plausibly redressable by an award of damages.  Thus, the named plaintiffs' allegations satisfy *Lujan*.  504 U.S. at 560-61.

The fact that the named plaintiffs were not plausibly injured by two of the alleged misstatements does not alter the Article III analysis.  Whether *every* challenged misstatement injured the named plaintiffs "raise[s] issues of class standing, not Article III standing."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 585 (S.D.N.Y. 2018) ("*LIBOR*").  This is because Article III standing is assessed on a claim-by-claim, not fact-by-fact, basis.  *Id.*; *see also Lower East Side People's Fed. Credit Union v. Trump*, 289 F. Supp. 3d 568, 577 (E.D.N.Y. 2018).  Here, the named plaintiffs have brought a single claim under Rule 10b-5, which is supported by a dozen distinct alleged misstatements.  *See* Am. Compl. ¶¶ 127-36.  If *any* of those alleged misstatements plausibly injured the named plaintiffs, then they have Article III standing to bring the claim.  *See NECA*, 693 F.3d at 158 (finding Article III standing where NECA plausibly alleged an injury stemming from some, but not all, of the defendants' alleged misstatements); *LIBOR*, 299 F. Supp. 3d at 585 ("[N]amed plaintiffs need only

establish some injury from LIBOR manipulation, irrespective of the specific type of financial instrument on which that injury was incurred, to establish Article III standing."). Because they have alleged at least one misstatement that plausibly injured them, the plaintiffs have Article III standing.

> b.  Class Standing: The Ability to Represent Absent Class Members

We thus turn to the two-part test for class standing. This is an assessment of the named plaintiffs' ability and incentive to pursue the full class's interests. *Retirement Board*, 775 F.3d at 163. The named plaintiffs have class standing with respect to every alleged misstatement.

The named plaintiffs satisfy the first *NECA* prong. Again, that prong asks if a named plaintiff has suffered "some actual injury as a result of the putatively illegal conduct of the defendant." *NECA*, 693 F.3d at 162. Courts typically look to the Article III standing analysis to determine if this prong has been satisfied. *See, e.g.*, *id.* at 158, 162; *LIBOR*, 299 F. Supp. 3d at 585. So, for the same reasons discussed in the preceding analysis of Article III standing, the named plaintiffs clear the first *NECA* hurdle.

The named plaintiffs also satisfy the second *NECA* prong. To determine if the conduct challenged by the named plaintiffs implicates the "same set of concerns" as the conduct

challenged by absent class members, *NECA*, 693 F.3d at 162, the Second Circuit has focused on evidentiary overlap.  So, the "proof contemplated" for the named plaintiff's claims must be "sufficiently similar" to that contemplated for the claims of absent class members.  *Retirement Board,* 775 F.3d at 161; *see also DiMuro*, 572 Fed. App'x at 29 (class standing lacking because proving claims of absent class members required "unique evidence").  The question of sufficient similarity "will depend on the nature and content of the specific misrepresentation." *NECA*, 693 F.3d at 162.

        At this stage, we can expect — based solely on the allegations in the complaint — that the named plaintiffs and the absent class members will rely on sufficiently similar proof. They will, of course, rely on identical evidence with respect to the alleged misstatements that plausibly injured all plaintiffs. So, the only potential class standing issues relate to the two March 4 PIPE-related statements that did not plausibly injure the named plaintiffs.  And at this stage, we can expect evidentiary overlap between those statements and another alleged statement that is, in fact, plausibly pled to have injured the named plaintiffs.  Recall Barron's September 23 statement that the company was pursuing "all our remedies" to recover funds from two delinquent PIPE creditors.  Am. Compl. ¶ 104.  Whether such "remedies" existed (and how far they reached) will hinge on

(1) whether the PIPE funding was indeed "fully committed," and (2) whether TMC had indeed "entered into subscription agreements" with PIPE creditors.  Put simply, the evidence necessary to evaluate the falsity of the September 23 statement is also necessary to evaluate the falsity of the two March 4 statements.  Accordingly, the named plaintiffs also have class standing to prosecute claims predicated on the March 4 statements.

> 3. Statutory Standing: Applying the Purchaser-Seller Rule to Pre-Merger Statements

Finally, the defendants assert that the named plaintiffs lack statutory standing under the purchaser-seller rule to challenge the nine statements made before consummation of the DeepGreen-Sustainable Opportunities merger.[11]  Unlike constitutional standing, statutory standing is assessed on a statement-by-statement basis.  *See, e.g.*, *In re CarLotz, Inc. Sec. Litig.*, No. 21-CV-5906, 2024 WL 1348749, at *4-7 (S.D.N.Y. Mar. 29, 2024) (plaintiff lacked statutory standing to challenge

---

[11] The Court follows the lead of the Second Circuit in referring to this rule as one of "statutory standing." *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 84 (2d Cir. 2022).  There are indications, however, that the Supreme Court would use different language. *See Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014).  The question here is whether the plaintiffs "ha[ve] a cause of action under [Rule 10b-5]." *Id.* at 128.  And "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case." *Id.* at 128 n.4.

pre-merger, but not post-merger, statements).[12]  This includes every statement made between the March 4 press release and August 13 proxy statement on Form 424(b)(3).

The purchaser-seller rule "limit[s] the class of plaintiffs who [may] sue under Rule 10b-5 to those who purchased or sold the securities about which a material misstatement was made." *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 85 (2d Cir. 2022).  In the merger context, the rule bars "purchasers of a security of an acquiring company" from suing the target company for "alleged misstatements the target company made about itself prior to the merger." *Id.* at 88.  At least two district courts in this circuit have held that *Frutarom*'s rule applies to SPAC mergers.  *See, e.g.*, Order Dismissing Second Am. Compl. 11-17, *Kusnier v. Virgin Galactic Holdings*, No. 21-CV-3070 (E.D.N.Y. Aug. 16, 2023), ECF No. 90 ("*Kusnier*") (*Frutarom* challenge to statements made by and about Virgin Galactic before merger with SPAC); *In re CarLotz, Inc. Sec. Litig.*, 667 F. Supp. 3d 71, 77-79 (S.D.N.Y. 2023) (*Frutarom* barred shareholders of combined entity and SPAC from challenging statements made by and about CarLotz before merger with SPAC).

---

[12] This is because statutory standing concerns the "*scope* of the cause of action," not the Court's ability to hear the cause of action in the first place. *Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 311 n.19 (S.D.N.Y. 2024) (emphasis added); *accord Lexmark*, 572 U.S. at 128 n.4.

Defendants claim that *Frutarom*'s rule applies here, because the nine pre-merger statements were about DeepGreen, not TMC. Def.'s Not. of Supp. Auth. 1-2, ECF No. 50; *see also Frutarom*, 54 F.4th at 88. For their part, the plaintiffs do not dispute that the purchaser-seller rule, as articulated in *Frutarom*, applies. Rather, they argue that the statements at issue were about post-merger TMC, even if they pre-dated the closing. Pl.'s Resp. to Not. of Supp. Auth. 1-2, ECF No. 51.

Under *Frutarom*, the central question is "whether the plaintiff bought or sold the securities about which the misstatements were made." 54 F.4th at 88.[13] Here, it is plausible that some of the pre-merger statements concerned post-merger TMC. The March 4 press release was styled as a joint statement, in which the defendants described the valuation of the "combined company"; stated that the merger "transaction" included $330 million in PIPE funding; and said that TMC was "the ultimate answer to [Sustainable Opportunities'] thorough search for meaningful ESG impacts combined with tremendous

---

[13] It is therefore not relevant to the analysis here that some of the statements about post-merger TMC were made by DeepGreen or Sustainable Opportunities executives. In *Frutarom*, the Second Circuit made clear that the applicability of the purchaser-seller rule hinges on a statement's *subject*, not its speaker. *See* 54 F.4th at 88 ("Plaintiffs may be able to sue entities other than the issuer of a security if those entities made material misstatements about the security, as long as the plaintiffs purchased or sold the securities *about which the misstatements were made*." (emphasis added)).

financial upside."[14]   Am. Compl. ¶¶ 84-87.  Similarly, the March 4 Form 8-K stated that PIPE financing was contingent on "the substantially concurrent closing of the [merger]."  *Id.* ¶ 89. And in his April 22 Kitco News interview, Barron indicated that his statements concerned "The Metals Company . . . formerly known as DeepGreen," even though TMC had not technically been formed yet.  *See* Kitco News Interview Trans. 2.

    However, three of the pre-merger statements plainly concerned DeepGreen, not TMC.  The two statements in Sustainable Opportunities' Form S-4, which concerned the value of the TOML license and the size of DeepGreen's NORI-related exploration expenses, were about the assets and expenditures of pre-merger DeepGreen.  *See* Am. Compl. ¶¶ 93-96.  They never mentioned TMC. The same goes for the Sustainable Opportunities' August 13 proxy statement describing DeepGreen's TOML acquisition, which also omitted any mention of TMC or the merger.  *Id.* ¶ 93.  To be sure, DeepGreen did not make these statements itself: Sustainable Opportunities made them in its SEC filings, incorporating information from DeepGreen.  But "[t]he fact that . . . [Sustainable Opportunities] incorporated some of [DeepGreen's alleged] misstatements in its SEC

---

[14] This context makes clear that the press release's other references to a "significant reduction in the ESG footprint of metals" and a "reduce[d] environmental bill of [metals] extraction" referred to TMC's eventual capabilities, not DeepGreen's past endeavors.

filings . . . does not change the [purchaser-seller] analysis here." *Frutarom*, 54 F.4th at 89.  What matters is that the alleged misstatements were *about* DeepGreen, not about Sustainable Opportunities or TMC.  *Id.*

Because these three statements were about DeepGreen, none of the plaintiffs (who owned TMC stock, not DeepGreen stock) have statutory standing to challenge them.  Accordingly, those claims cannot form the basis of the named plaintiffs' Rule 10b-5 claims, or of similar claims brought by any of the absent putative class members*.*

**B.    Falsity**

Even if the named plaintiffs had statutory standing to challenge all twelve misstatements, none of them were false or misleading within the meaning of Rule 10b-5.  Accordingly, the Rule 10b-5 claim must be dismissed.

1.    <u>Statements Regarding TMC's Cash Position</u>

Plaintiffs claim that the defendants made four false statements about TMC's cash position.  As discussed above, these statements were (1) the press release statement about a "fully committed" PIPE investment; (2) the Form 8-K statement about "subscription agreements" for PIPE funding; (3) Barron's statements that TMC would have "sufficient cash" to fund its operations through Q3 2023; and (4) Barron's statement that the

company was pursuing "all our remedies" to recover missing PIPE investment.  Am. Compl. ¶¶ 85, 88, 89-90, 103-05.

They allege that the first two statements were false because TMC's PIPE financing was never "fully committed."  Given this, TMC "would not have the cash necessary for large scale commercial production," ostensibly rendering the third statement false.  *Id.* ¶¶ 99, 105.  And they allege that the fourth statement was false because TMC had dropped its federal lawsuits against the PIPE funders.  *Id.* ¶ 105.  The Court disagrees on all fronts.

a.  The PIPE Financing as "Fully Committed"

Plaintiffs' challenge to the first two statements boils down to a semantic dispute about the meaning of the words "fully" and "committed."  They contend that the $330 million in PIPE funding was "not fully committed," Am. Compl. ¶ 88, because two would-be PIPE investors never provided approximately $220 million of the promised funding.  *Id.* ¶¶ 98-99.  By the plaintiffs' logic, an investment that fails to materialize cannot (by definition) have been "fully committed."

The plaintiffs never explain, however, why the comprehensive written contracts that TMC executed with the PIPE investors were not binding commitments.  The most they could muster at oral argument was that, *in addition* to those written

34

contracts, TMC should have secured personal guarantees or letters of credit before they trumpeted the binding nature of the PIPE investors' commitment.  Oral Arg. Tr. 37:23-38:6, ECF No. 53.

This argument is inconsistent with both the plain meaning of the phrase "fully committed" and basic contract law. Per the Oxford English Dictionary, "fully" means "in (its) entirety or totality," while "committed" means "pledged or bound to a certain course of action."[15]  Other dictionaries agree.[16] So, financing is "fully committed" when the intended recipient has obtained binding contractual commitments to provide the total amount in question.  *See, e.g.*, *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 748-49, 809 (Bankr. S.D.N.Y. 2020) (initial $900 million in post-petition financing was "fully committed" when debtor's board approved term sheet for that amount).

This aligns with foundational contract principles.  A contract is a binding commitment to undertake some specified

---

[15] *Fully*, Oxford English Dictionary, https://www.oed.com/dictionary/fully_adv (last visited July 11, 2025); *Committed*, *id.*, https://www.oed.com/dictionary/committed_adj (last visited July 11, 2025).

[16] The Cambridge Dictionary defines fully as "completely," and committed (in the finance context) as "money that has been committed to a particular project, investment, etc." *Fully*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/fully (last visited July 11, 2025); *Committed*, *id.*, https://dictionary.cambridge.org/us/dictionary/english/committed (last visited July 11, 2025).  Black's Law Dictionary defines the related term "loan commitment" to mean "[a] lender's *binding* promise to a borrower to lend a specified amount of money at a certain interest rate." *See* Loan Commitment, *Black's Law Dictionary* (12th ed. 2024).

course of action.  *See* Restatement (Second) of Contracts § 1, cmt. g (1981) ("A promise which is a contract is said to be 'binding.'").  A counterparty's later breach of its commitment does not render the agreement any less binding — on the contrary, the binding nature of the agreement is why the non-breaching party may seek a remedy.  *See id.* § 1 ("A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."); *see also Newco Energy Acquisitions Holdings, LLC v. Shulgen*, No. 12-CV-81249, 2013 WL 12149763, at *4 (S.D. Fla. Mar. 28, 2013) (the fact that a "party breaches a contract does not mean that [the] party was never bound by an enforceable contract").

In sum, the plaintiffs have not plausibly alleged that TMC's statements that PIPE financing was "fully committed" were false when made.

b.   TMC's Attempts to Recover the PIPE Financing

Relatedly, the plaintiffs have not plausibly alleged the falsity of Barron's statement that TMC was "pursuing all [its] remedies to recover" the withheld PIPE financing.  Am. Compl. ¶ 104.

They argue that TMC's lawsuits "had already been dismissed on September 20, 2021," so TMC was not pursuing any remedies as of September 23.  *Id.* ¶ 105.  But this

36

mischaracterizes TMC's litigation efforts, which are subject to judicial notice. *See Global Net. Comm'ns,* 458 F.3d at 157. Although TMC voluntarily dismissed its *federal* actions against the two non-performing PIPE investors on September 20, 2021, the company filed new *state* lawsuits that same day. *See* Notices of Voluntary Dismissal, ECF No. 46-12; State Court Complaints, ECF No. 46-13.  Those state actions were pending when Barron made the challenged statement. *See Sustainable Opportunities Acquisition Corp. vs. Ethos Fund I, LP*, No. 655527/2021 (N.Y. Sup. Ct.); *Sustainable Opportunities Acquisition Corp. vs. Ramas Cap. Mgmt., LLC*, No. 655528/2021 (N.Y. Sup. Ct.).  Accordingly, Barron's statement about remedies was not false when made.

        c.   Availability of Sufficient Cash to Reach Operational Milestones

Plaintiffs also challenge Barron's statements at the September 23 investor conference that TMC had sufficient cash to achieve certain goals.  As relevant here, Barron said that TMC "expect[ed]" to have sufficient cash to fund its operations through the third quarter of 2023.  Am. Compl. ¶ 103.  He also flagged several production milestones that TMC "expect[ed]" to reach, such as the completion of a "module [sic?] processing and refining pilot plant."  *Id.*

According to plaintiffs, the September 23 statements were false or misleading because TMC "would not have the cash

necessary for large s[c]ale commercial production." *Id.* ¶ 105.
The complaint parrots *Bloomberg*'s claim that TMC had suffered a
roughly $500 million funding shortfall in connection with its
September 10 launch, between the missing PIPE funding and the
redemptions from Sustainable Opportunities investors opting to
withdraw money before the merger. *Id.* ¶ 99. So, in the
plaintiffs' eyes, TMC's cash reserves were insufficient to fund
operations for the projected period or, for example, build a
processing plant. *Id.* ¶¶ 99, 105.

Barron's September 23 statements about achieving
certain milestones were opinion. They concerned his expectations
for TMC's growth, and statements of expectation about a
company's future revenues and performance are "quintessential
opinion statements." *In Re Shanda Games Ltd. Sec. Litig.*, 128
F.4th 26, 46 (2d Cir. 2025) (quoting *Shreiber v. Synacor, Inc.*,
832 F. App'x 54, 57 (2d Cir. 2020)); *see also In re Pretium Res.
Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 476-77 (S.D.N.Y. 2017)
(projection that mine would become "high-grade, high-production
mine . . . produc[ing] 425,700 ounces of gold annually for the
first ten years" was an opinion statement). Furthermore,
Barron's remarks included "qualifying language" that "convey[ed]
a lack of certainty about the thing being expressed." *See New
England Carpenters Guaranteed Annuity & Pension Funds v.
DeCarlo*, 122 F.4th 28, 40 (2d Cir. 2024). Barron said that TMC

"expect[ed]" to reach certain operational milestones, but never guaranteed that it would.  Am. Compl. ¶ 103.

Opinion statements are actionably false only if (1) "the supporting fact[s] [the speaker] supplied were untrue," (2) "the speaker did not hold the belief she professed," or (3) "the speaker omit[ted] information whose omission [made] the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).  While Barron did provide supporting facts for his assertions — he noted, for example, that TMC had $138 million in cash reserves — the complaint does not allege that any such predicate fact was untrue.  Am. Compl. ¶¶ 103, 105.  Nor does it allege — at least explicitly — that Barron believed his September 23 remarks to be false.

Instead, the plaintiffs allege that the opinions at issue were false or misleading by omission, because Barron "failed to disclose" TMC's $500 million shortfall.  *See* Am. Compl. ¶ 105.  The Supreme Court and Second Circuit have explained when a statement of opinion is misleading for what it omits.  A reasonable investor would expect an opinion statement to "fairly align[] with the information in the [speaker's] possession at the time." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). So, an opinion statement is actionable if it "omits information

whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor." *New England Carpenters*, 122 F.4th at 42; *accord Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020).

    The plaintiffs' argument runs into two clear obstacles.  First, the allegedly omitted information had already been disclosed.  That is, the news about TMC's $500 million shortfall had been published by *Bloomberg*, and was therefore in the public domain for more than a week before the September 23 conference.  *Id.* ¶ 99; *Bloomberg* Article 3-5.  So, Barron had no duty to disclose it.  *See Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 254-55 (S.D.N.Y. 2019) (no duty to disclose information about the "state of the Japanese solar market" where such information had already been published in the "news media"); *Monroe Cnty. Empl. Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 349 (S.D.N.Y. 2014) ("[T]here is no duty to disclose information that has been widely reported in readily available media."); *see generally Rodman v. Grant Found.*, 608 F.2d 64, 70 (2d Cir. 1979) (when assessing proxy disclosure, district court "properly took into account information already in the public domain and facts known or reasonably available to the shareholders").  This alone is dispositive.

Second, the plaintiffs never specifically explain how the alleged omission rendered Barron's remarks false. Barron said that "with the cash [TMC had] in the bank today" — that is, even without the funding that failed to materialize — the company (1) "expect[ed] to fully fund [its] operations through Q3 of 2023," and (2) "expect[ed] to achieve" several other "milestones," including the "completion of [its] module [sic?] processing and refining pilot plant" and the "construction and deployment of [its] pilot module [sic?] collection system." Am. Compl. ¶ 103. Thus, he explicitly based the projections for TMC's performance through the third quarter of 2023 on the company's then-current cash reserves. *Id.*

When expressing that opinion, Barron was not obligated to disclose every "fact cutting the other way." *Omnicare*, 575 U.S. at 189. His obligation was, instead, to ensure that his statements "fairly align[ed] with the information in [the company's] possession at the time." *Id.* And plaintiffs do not explain — plausibly or otherwise — why the $138 million that TMC had on hand was insufficient to fund operations through the third quarter of 2023 or to meet TMC's other milestones. (For example, they do not tell us what it would have cost to construct a processing plant.) This lack of specificity is fatal to their claim. *See* 15 U.S.C. § 78u-4(b)(1) (plaintiff must "specify . . . the reason or reasons why the statement was

41

misleading"); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (a Rule 10b-5 plaintiff must "explain why the [challenged] statements were fraudulent"); *cf. Baker v. Twitter, Inc.*, No. 22-CV-6525, 2023 WL 6932568, at *7 (C.D. Cal. Aug. 25, 2023) (plaintiff may not rely on a "litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false").

The investor conference statements are also not actionable because they fall within the PSLRA's "safe harbor" provision, which precludes liability for certain forward-looking statements. *See* 15 U.S.C. § 78u-5(c). A statement is forward-looking when it "contain[s] a projection" of "capital expenditures" and "other financial items," discusses "the plans and objectives of management for future operations," or projects "future economic performance." *Id.* § 78u-5(i)(1). The safe harbor applies when a forward-looking statement is "accompanied by meaningful cautionary statements" indicating that "actual results [could] differ materially from those in the forward-looking statement," or "if the plaintiff fails to prove that the forward-looking statement was made or approved by an executive officer with actual knowledge by that officer that the statement was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 762 (2d Cir. 2010).

The challenged remarks are forward-looking statements. Barron used the words "possible" and "expect," which are "cautionary" accompaniments. *See Slayton*, 604 F.3d at 769 (explaining that "words such as 'expect' identify forward-looking statements"). Moreover, for the reasons discussed above, the plaintiffs have not shown that those statements were actually false. Thus, they also have not shown that Barron made them with *actual knowledge* of their falsity. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 574 n.12 (S.D.N.Y. 2014) ("When a plaintiff alleges that a defendant had knowledge of facts or access to information contradicting their public statements, the falsity and scienter pleading requirements are essentially combined."). Therefore, the cash-reserve statements are not actionable as pleaded.

        d.   TMC's Ability to Become One of The Lowest-Cost Nickel Producers

At the same September 23 conference, Barron said the density of high-quality nickel in polymetallic nodules made it "possible for [TMC to] become one of the lowest cost nickel producers on the planet." Am. Compl. ¶ 103. The plaintiffs challenge this statement for the same reason they challenge the statements discussed above: they assert that TMC did not actually have sufficient cash on hand to achieve this lowest-cost goal. *Id.* ¶ 105.

43

This statement, too, was opinion, for the reasons discussed above. *See supra* at Section III.B.1.c. And plaintiffs' challenges to this statement run into the same two obstacles outlined above: (1) TMC's cash position was already disclosed, and (2) the plaintiffs do not plausibly explain why Barron's statement was false. *See id.* The reader of the complaint is left to wonder: how much expenditure *would* be required to achieve this low-cost production goal? We simply are provided with no facts suggesting *why* this statement is false. Indeed, it is difficult to imagine factual allegations that could plausibly falsify this statement. For one thing, Barron never set a precise timeline for TMC become a lowest-cost nickel producer. Instead, he merely stated that the high grade of the deposit made it "possible" for TMC to achieve such status. Am. Compl. ¶ 103; For another, Barron spoke of the possibility of becoming "one of" the lowest-cost producers. *Id.* But one of how many? Barron did not say if he was contemplating top three lowest-cost status, top five, or a group of any other size.

Accordingly, the plaintiffs have not plausibly alleged that Barron's "lowest-cost nickel producer" statement was false or misleading.

2.    Statements Regarding the Environmental Impact of Seafloor Mining

Plaintiffs also challenge three statements relating to the environmental impact of harvesting nodules from the ocean floor.  Two of those appeared in the March 4 press release: (1) Leonard's statement that DeepGreen "offers a real, scalable solution to the raw materials problem, at a low production cost and with a significant reduction in the ESG footprint of metals," and (2) Barron's statement that "[s]eafloor nodules offers a way to dramatically reduce the environmental bill" of extracting "billions of tons of metal from the planet."  Am. Compl. ¶¶ 86-87.  The third alleged misrepresentation is Barron's statement to Kitco News that DeepGreen / TMC's mining process would produce "zero tailings and zero waste."  *Id.* ¶ 91.

Plaintiffs contend that these statements misleadingly "downplayed the environmental risks of deep-sea mining" and failed to adequately warn of the "regulatory risks" to TMC's exploitation plans.  *Id.* ¶¶ 88, 92.  Specifically, the plaintiffs claim that Barron "failed to disclose" opposition to deep-sea mining from environmental groups and metals purchasers, the potential for such mining to disturb the ocean floor, and the risk that mining operations will pollute delicate marine ecosystems.  *Id.* ¶¶ 75-83, 92.  For two reasons, however, these statements were not misleading by omission.

First, to state an omission-based claim, a plaintiff must allege that the speaker omitted specific facts that are inconsistent with the challenged statement. *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153-55 (2d Cir. 2013) (allegedly omitted statements were not actionable because, among other things, they were not inconsistent with language of defendant's press release); *Hawaii Structural Ironworkers Pension Trust Fund v. AMC Ent. Holdings*, 422 F. Supp. 3d 821, 841 (S.D.N.Y. 2019) (statement in annual report that AMC's *global* revenues increased in summer months not rendered misleading merely by omitting fact that *European* revenues dipped during those months).  The plaintiffs have not done so here.  Start with Leonard's statement that deep-sea mining will work a "significant reduction in the ESG footprint of metals."  Am. Compl. ¶ 86.  This is a comparative statement: it speaks to the environmental effects of deep-sea mining relative to other forms of metal extraction.  Put differently, it is eminently possible that (1) deep-sea mining causes meaningful environmental harm, and yet (2) such harm is significantly less than the harm caused by existing methods.  Thus, the facts that the plaintiffs say Leonard omitted — for example, that scientists have called for a "moratorium" on deep-sea mining — are not necessarily inconsistent with his statement.  The same logic applies to

Barron's statement that polymetallic nodules "dramatically reduce the environmental bill" of metal extraction.  *Id.* ¶ 87.

Similarly, plaintiffs identify no specific omitted facts that undercut Barron's statement about "zero tailings and zero waste."  At the most basic level, they do not plausibly allege that deep-sea mining does, in fact, produce tailings or waste.  They simply claim that Barron failed to mention generic concerns about the practice's environmental effects.  That omission is not enough to render Barron's statement misleading.

In the end, the plaintiffs have not plausibly alleged the misleading nature of any understatement concerning the environmental risks of TMC's practices, because they identify no specific facts omitted from those statements.  *See Lachman v. Revlon*, 487 F. Supp. 3d 111, 132 (E.D.N.Y. 2020) (earnings call statement that company had "taken immediate actions" to address flaws in new resource planning tool was not misleading, where plaintiffs alleged no omitted facts inconsistent with that statement).

Second, it should go without saying that a defendant may not be held liable when an issuer's disclosures "warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed."  *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).  In its August 5, 2021 prospectus, TMC cautioned that its seafloor mining activities "involve many hazards and

uncertainties, including . . . unexpected environmental conditions," such as "contamination or leakage," that "could result in . . . environmental damage."  ECF No. 46-4, at 29. Further, in its August 2021 proxy statement, the company warned that "[t]here is significant uncertainty" about seafloor mining's impact on "biodiversity" and "impacted ecosystems," and that the company "is subject to numerous regulatory uncertainties" and could face "environmental liabilities as a result of noncompliance" with regulations.  ECF No. 46-5, at 17, 20; *see also In re Adobe Inc. Sec. Litig.*, No. 23-CV-9260, 2025 WL 936416, at *7 (S.D.N.Y. Mar. 27, 2025) (statements that Adobe was a "market leader" with a "big tailwind" did not misleadingly downplay competition because, among other things, regulatory filings disclosed risk of "intense competition" that could drive down margins and customer acquisition).

Thus, none of the challenged environmental statements are actionably false or misleading under Rule 10b-5.

3.    Statements Regarding the Value of TOML License

The plaintiffs also challenge statements relating to the value of the TOML license.  Specifically, they object to the statement in the August 5, 2021 prospectus valuing the TOML license at just over $42 million, and to Barron's November statements (on the TMC earnings call) defending that valuation. Am. Compl. ¶¶ 95, 112.

The plaintiffs argue that these statements were materially false or misleading because Barron and the prospectus failed to disclose that DeepGreen had "significantly overpaid for the TOML [license] acquisition" to begin with; because that acquisition payment was made "to undisclosed insiders"; and because other data show that the valuation TMC later applied was too high. *Id.* ¶¶ 10, 14, 54-56, 97, 107.  The plaintiffs do not dispute that DeepGreen bought the TOML license from Deep Sea Mining in March 2020 for $32 million in cash and shares.  *Id.* ¶ 93.  Instead, they contend that DeepGreen overpaid for the license as part of a conflicted transaction.  Citing the valuation that TMC had assigned other licenses in its portfolio, plaintiffs contend that the true value of the TOML license is at most $250,000.  *Id.* ¶ 107.

**Allegation of Conflicted Transaction.**  To support their assertion that DeepGreen acquired the TOML license in a related-party transaction, plaintiffs rely almost entirely on the Bonitas Report.  Bonitas framed its conclusion in the language of "belief," stating: "We believe TMC siphoned US$ 43 million in cash and stock to undisclosed insiders by overpaying for [the TOML license]."  Bonitas Report 1.

In support, Bonitas asserted that a prior owner of the license — Nautilus Minerals, Inc., or NMI — had "valued the TOML exploration license in its historical annual reports at zero."

49

*Id.*  Bonitas goes on to say that NMI went through a "restructuring process" in 2019 in the "Canadian Courts," in which PricewaterhouseCoopers "tried to find a buyer for NMI's assets" but met with limited success: "none of the approximately 300 potential bidders valued the entirety of NMI's assets above US\$ 23 million," and "at least three final qualified bidders had *little to no interest in [NMI's] intellectual property, resource licenses, or contracts*."  *Id.* at 1, 3 (emphasis in original).

Sometime after the auction process (the Report does not say how long after), "DeepGreen acquired the TOML license from Deep Sea Mining Finance Limited . . . for US\$ 4 million cash plus 7.8 million TMC shares."  *Id.* at 3.  The Report asks (rhetorically) why DeepGreen paid this high a price, and answers that question with a bald accusation: DeepGreen bought the license from "undisclosed insiders with a history of ripping off minority shareholders."  *Id.* at 3.  The Report does not, however, go on to identify these insiders or explain their history of "ripping off" anyone.

The Report points to a 2013 "minerals royalty deed," which Bonitas says "reveal[s] an ongoing relationship between NMI and DeepGreen."  *Id.* at 4.  But the Report provides no detail about this deed.  (Bonitas makes no suggestion, for example, that the deed relates to minerals in the same CCZ plot as the one covered by the TOML license.)  The plaintiffs'

complaint similarly provides no meaningful description of this ongoing relationship, and plaintiffs' counsel struggled to fill that gap at oral argument. *See* Oral Arg. Tr. 50-56.  Though plaintiffs' counsel reiterated that the deed demonstrated a "previous relationship" between NMI and DeepGreen, *see, e.g.*, *id.* at 51:8-9, 52:13, they have not explained the nature or degree of this relationship.[17]  And to the extent the deed suggests past common ownership of a mineral asset by DeepGreen and NMI, plaintiffs do not explain why prior ownership of an unspecified common asset necessarily means that two parties are affiliates or related parties for purposes of an unrelated transaction.  *Id.* at 53:14-17.

    ***Overvaluation Allegations.***  The plaintiffs' overvaluation allegations fare no better.  For starters, the challenged valuations are opinion.  Accounting decisions often "involve subjective judgments." *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 243 (S.D.N.Y. 2015), *aff'd sub nom. Cox v. Blackberry Ltd.*, 660 F. App'x 23 (2d Cir. 2016).  Asset valuation, in particular, may "depend so heavily on . . . discretionary choices" about methodology, appropriate "comparables," and other assumptions that the results "can only

---

[17] The Bonitas Report references a person named David Heydon, and describes him as both the founder of NMI and the "self-proclaimed" founder of DeepGreen.  *See* Bonitas Report 11.  But Heydon is never referenced in the complaint.

fairly be characterized as subjective opinions." *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251 (S.D.N.Y. 2005). This is the case here: the valuation of an illiquid, nonfungible asset like the TOML license is clearly a statement of opinion under the securities laws. Thus, once again, the plaintiffs must plead that the valuation contained "embedded statements of fact" that were untrue, that it excluded information "whose omission convey[ed] false facts about the speaker's basis for holding that view," or that TMC did not believe in the valuation's accuracy. *See New England Carpenters*, 122 F.4th at 42.

The plaintiffs do not plausibly allege that the August 2021 TOML valuation was false or misleading. The complaint relies on four assertions in the Bonitas Report to show that TMC either omitted facts critical to its TOML valuation, or cannot have believed it in the first place: (1) that (as noted above) NMI had previously valued the TOML license at zero; (2) that Lockheed Martin had also valued two CCZ licenses at zero; (3) that TMC valued two other licenses (NORI and Marawa) at $250,000, not $42 million; and (4) that there was "widespread availability of [other] exploration contracts in the CCZ." Am. Compl. ¶¶ 107, 113; Bonitas Report 3-6.

These allegations are insufficient, even in combination. At the outset, the mere fact that two companies

value an asset differently does not necessarily mean that one of those valuations is false or misleading (absent any explanation as to why one valuation should be trusted over the other). *See In re Allied Cap. Corp. Sec. Litig.*, No. 02-CV-3812, 2003 WL 1964184, at *4 (S.D.N.Y. Apr. 25, 2003) ("That some other company reached a different valuation provides no reason to believe that its valuation was correct and Allied's wrong."); *cf. Epirus Cap. Mgmt., LLC v. Citigroup Inc.*, No. 09-CV-2594, 2010 WL 1779348, at *6 (S.D.N.Y. Apr. 29, 2010) ("Essentially, plaintiffs simply disagree with defendants' valuation methods, which does not equate to alleging fraud.").[18]

Further, and just as importantly, the complaint alleges no facts suggesting that other licenses in the CCZ (including the NORI and Marawa licenses) are actually comparable in value to the TOML license. The Bonitas Report states that "each parcel of the CCZ is roughly the same content *type*," but it does not state that each parcel contains the same *amount* of exploitable minerals.[19]  Bonitas Report 5. The Report also states that the "level of uniformity of mineralization [in the

---

[18] With respect to the licenses held by Lockheed Martin, a screenshot in the Bonitas Report states that those licenses were subject to a "full impairment charge . . . in 2013 as no revenue arising from the licenses ha[d] yet been agreed or forecast with sufficient levels of certainty." Bonitas Report 5. So, the Bonitas Report itself provides an explanation for the disparity in valuation between the TOML license and the Lockheed Martin licenses.

[19] Indeed, Barron noted in the November earnings call that the area covered by the NORI license contained "less than half of the TOML resource." Am. Compl. ¶ 112.

CCZ] is unmatched by any mineral deposit of similar value on land." *Id.* But, of course, this does not mean that minerals are uniformly dispersed across the CCZ. It simply means that dispersal is *more* uniform than in land-based deposits. Thus, because the complaint does not explain why the TOML plot is comparable to other plots in the CCZ, it does not plausibly allege that TMC must have disbelieved (or omitted facts contrary to) its relatively higher valuation of the TOML license.

Beyond that, the complaint does not allege that TMC transgressed any actual accounting rule or valuation principle. And the smattering of observations that plaintiffs have alleged are insufficient, both individually and in the aggregate, to meet their pleading obligations.

4. Statements Regarding Exploration Expenses

Plaintiffs also challenge two statements relating to the NORI exploration expenses reported in Sustainable Opportunities' August 2021 prospectus. They have not plausibly alleged that either statement was false or misleading.

The plaintiffs challenge the prospectus's statement that 2019 exploration "expenditures for NORI were over $35 million," Am. Compl. ¶ 96, as well as Barron's later statement defending that number. *Id.* ¶¶ 112-13. The plaintiffs contend that the expenditure figure was "artificially inflated . . . to give investors a false scale of [TMC's] operations," *id.* ¶ 97

54

(citing International Seabed Authority records that show DeepGreen's 2019 NORI expenditures at roughly $15 million). *Id.* ¶¶ 57-59.

But the plaintiffs do not plausibly allege that DeepGreen falsely reported its exploration expenses. To be sure, they allege that the ISA records contain a different number. But they do not explain — apart from one criticism that is addressed below — why the figure that appears in the ISA records is correct and the figure that appears in TMC's financials is wrong. As discussed above, Barron stated (and the plaintiffs do not dispute) that DeepGreen used International Financial Reporting Standards ("IFRS") accounting principles before the merger with Sustainable Opportunities, and U.S. GAAP thereafter. Am. Compl. ¶ 112. At most, then, the plaintiffs may be alleging that different accounting methods produced different results. This is not enough. *In re Frank B. Hall & Co.*, 693 F. Supp. 1460, 1466 (S.D.N.Y. 1988) ("That evaluations done under different accounting standards should yield different results is not surprising, and no inference of fraud . . . may be fairly drawn from that fact, standing alone.").

As evidence of inflated exploration expenses, the plaintiffs point to what they call a "material discrepancy" in one component of those expenditures — specifically, a payment to a shipping and logistics company called Maersk. Am. Compl.

¶ 113.   DeepGreen made most of that payment in common shares. *Id.* ¶ 93.   The discrepancy can be found, according to the complaint, by comparing (i) Barron's statements on the third-quarter earnings call in 2021, on which he attributed a $20 million increase in NORI expenditures to the Maersk share payments, and (ii) the August 2021 proxy statement, which (in a table entitled "Exploration expenses") reported "common share-based options payments" of "less than $1 million."   *Id.* ¶¶ 96, 113.

The complaint is opaque, at best, on what the payment to Maersk was for, but the proxy statement reported that "DeepGreen has a strategic partnership with Maersk" in which Maersk provided "marine vessel services."   *See* ECF No. 46-4, at 62.   On the earnings call, Barron explained that the "business combination" between Sustainable Opportunities and DeepGreen required TMC to "adjust [its] accounting from IFRS to U.S. GAAP" — that is, from international accounting standards to U.S. standards — and that the U.S. rules required TMC to "fair value" the "shares we paid to Maersk."   Am. Compl. ¶ 112.   We know this explanation was misleading, the plaintiffs contend, because of the sub-$1 million line item in the exploration expenses table. *Id.* ¶ 113.

It is entirely unclear why the plaintiffs regard this comparison as apples-to-apples.   The merger prospectus reports

that DeepGreen "settled the cost of marine vessel services provided by Maersk through the issuance of DeepGreen Common *Shares*" — not options.  ECF No. 46-4, at 62 (emphasis added).  The sub-$1 million expense line, in contrast, describes "Common Share *options*-based payments."  *Id.* at 83 (emphasis added).  There is, of course, no reason to expect equivalence in the value of a share of stock, on the one hand, and an option to purchase a share of that stock, on the other.

Indeed, the expense table the plaintiffs cite contains a clue regarding this mismatch.  In a line preceding the options-based payments expense, the table reports approximately $27 million in "Marine cruise" costs.  *Id.* (emphasis added).  The prospectus note that describes the "marine vessel services" Maersk provided also uses the phrase "marine cruises," suggesting that this line item, and not the "options-based payments" line item, captures the share payments to Maersk.  ECF No. 46-4, at 62.  The prospectus also noted that "the changes in [the common shares'] fair value have a significant impact on [DeepGreen's] exploration expenditures."  *Id.*  Thus, plaintiffs ignore language in the prospectus that explains the "material discrepancy" on which they rely.

Even setting this apparent oversight aside, it is the plaintiffs' burden to plausibly allege falsity, and their

unexplained suggestion of a "discrepancy" fails — by a significant margin — to do so.

     5.  <u>Post-Merger Enterprise Valuation</u>

       Finally, the plaintiffs challenge a statement from the March 4 press release concerning the value of the post-merger entity.  The complaint disputes the press release's statement that the "transaction represents a pro forma equity value of US$2.9 billion."  Am. Compl. ¶ 84.  Like the disputed valuations of the TOML license, the pro forma valuation of post-merger TMC is a statement of opinion.  Indeed, the press release framed the pro forma estimate explicitly in the language of prediction, stating that the "[p]ro forma equity value of the combined company is *expected to be* approximately US $2.9 billion."  ECF No. 46-3, at 59.  And forward-looking financial projections are opinion statements.  *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th at 46.  As a result, the plaintiffs must plead that the valuation contained "embedded statements of fact" that were untrue, that the valuation omitted information "whose omission convey[ed] false facts about the speaker's basis for holding that view," or that DeepGreen did not believe in the valuation's accuracy, at the time the statement was made.  *See New England Carpenters*, 122 F.4th at 42.  The complaint does not do so.

       In this instance, too, the plaintiffs point to no accounting rule or valuation metric that the defendants

violated.  Instead, they contend that the $2.9 billion figure overstated the post-merger entity's value for the reasons set forth against the other alleged misstatements — specifically, that the PIPE funding was not fully committed; that the company downplayed the environmental and regulatory risks to its planned operations; that DeepGreen overpaid for and then overvalued the TOML license; and that TMC overstated its NORI exploration expenses.  *Id.* ¶ 88.  For the reasons discussed above, the plaintiffs have failed to allege the falsity of the challenged statements relating to those issues.  Those statements therefore cannot serve as a predicate for challenging the valuation for the merged entity.

The plaintiffs also argue that "TMC's initial valuation failed to factor in the possibility of the Company's initial investors withdrawing their capital."  *Id.* ¶ 73.  But the press release expressly stated that the $2.9-billion figure "assum[ed] no redemptions" of Sustainable Opportunities' stock prior to the deal's closing.  ECF No. 46-3, at 59.  And the plaintiffs do not allege that defendants were aware of any pending redemptions when the press release came out.  Nor do the plaintiffs allege any other facts showing that the valuation was objectively inaccurate, or that the defendants believed as much.

C.    Scienter

The Rule 10b-5 claim must be dismissed for the additional reason that the plaintiffs have failed to raise a "strong inference" of scienter. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007). An inference of scienter is strong only when it is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. To raise a strong inference of scienter, a complaint must "state with particularity facts" showing (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197-98 (2d Cir. 2009). The plaintiffs have not made either showing.

1.    <u>Motive</u>

The plaintiffs have not adequately alleged a specific motive to defraud investors. In general, plaintiffs may not rely on "motives possessed by virtually all corporate insiders," such as the desire to maintain a high stock price "in order to increase executive compensation or prolong the benefits of holding corporate office." *Novak*, 216 F.3d at 307. Rather, plaintiffs must "allege that the defendants benefitted in some

60

*concrete and personal* way from the purported fraud." *Id.* at 307-08 (emphasis added). The "ordinary" example of an adequate motive is the "desire to profit from extensive insider sales." *Id.* at 308.

The instant complaint is light on allegations of the individual defendants' personal motives. Plaintiffs' primary argument is that, because TMC had "itself said that it needed $7 billion for large-scale production," the company's survival was demonstrably "dependent on serial capital raises (including three during the Class Period)." Pl.'s Br. in Opp'n to Mot. to Dismiss 17 (citing Am. Compl. ¶¶ 99, 130-36). In this predicament, according to the plaintiffs, "TMC was existentially threatened" by the possibility that those capital-raising efforts would fail. *Id.* at 18.

The need to raise additional capital to finance operations, however, constitutes the kind of generalized motive, "possessed by virtually all corporate insiders," *Novak*, 216 F.3d at 307, that does not suffice to establish scienter. The Second Circuit has counseled that "a desire to raise capital . . . is insufficient" to establish motive and opportunity. *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 28 (2d Cir. 2013); *see also S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (the "desire to maintain a high credit rating" is not sufficient to establish scienter).

Furthermore, the plaintiffs do not allege that the individual defendants sought to increase the price of TMC shares so they could personally benefit from later stock sales. That is, they do not allege the "ordinary" motive that underlies a plausible claim of scienter. *Novak*, 216 F.3d at 308.[20]

Plaintiffs cite *Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 326 (S.D.N.Y. 2018), for the proposition that a company's dependence on stock sales to cover operating losses is sufficient to establish motive. Pl.'s Br. in Opp'n to Mot. to Dismiss 17. But *Shanawaz* does not stand for so stark a proposition. In *Shanawaz*, dependence on stock sales was only one factor alleged in support of motive. *See* 348 F. Supp. 3d at 326. Other factors marshalled in *Shanawaz* are not alleged here, such as the specific ties between the *Shanawaz*

---

[20] Many SPACs — including Sustainable Opportunities, *see* Am. Compl. ¶ 74 — grant their investors a right of redemption, exercisable upon the SPAC's identification of a target for merger or acquisition. Because the acquisition may constitute the SPAC's entire reason for being, and because an excessive number of redemption requests may preclude the acquisition's consummation, that redemption right surely *can*, in the right circumstances, contribute powerfully to an executive's motive for purposes of the scienter analysis. An executive may, for example, be set to receive a given payout when the acquisition is consummated, or to receive an offer of employment from the post-merger or post-acquisition entity. But the plaintiffs in this case do not make such specific allegations or arguments in support of scienter. In that respect, this case resembles *Swanson v. Danimer Scientific, Inc.*, 2024 WL 4315109 (2d Cir. Sept. 27, 2024). There, the Court of Appeals affirmed the district court's holding that the plaintiffs had inadequately pleaded scienter despite their general invocation of the "pressure to consummate [a SPAC merger] transaction" to "avoid having to return investors' capital." *Id.* at *3. The *Swanson* plaintiffs had failed to allege (or argue persuasively) why these motives were "personal" to the specific executives at issue. *Id.* Here, too, the Court will not hypothesize specific personal motives that the plaintiffs are not alleging themselves (at all, let alone with particularity).

defendants' incentive packages, on the one hand, and the stock price and other metrics, on the other. *Id.* And the district court in *Shanawaz* emphasized that it was relying on "all of the facts alleged, taken collectively." *Id.* (quoting *Tellabs*, 551 U.S. at 324). *Shanawaz* is therefore inapposite here, and the plaintiffs have failed to allege a strong inference of scienter based on motive and opportunity.

## 2. Recklessness

Nor have the plaintiffs adequately alleged that the individual defendants' actions constituted recklessness.[21] When a complaint has "failed to demonstrate" an adequate motive to defraud, it "must produce a stronger inference of recklessness," and "the strength of the circumstantial allegations must be correspondingly stronger." *Kalnit v. Eichler*, 264 F.3d 131, 142–43 (2d Cir. 2001). This standard requires showing that the defendants acted with "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).

---

[21] While the applicable standard refers to "conscious misbehavior *or* recklessness," *ECA*, 553 F.3d at 198, the case law appears to treat the two phrases as synonymous. *See, e.g., Honeyman v. Hoyt (In Re Carter-Wallace, Inc. Secs. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000) ("To survive dismissal under the 'conscious misbehavior' theory, the appellants must show that they alleged *reckless conduct* by the appellees . . . ." (emphasis added)); *Kalnit v. Eicher*, 85 F. Supp. 2d 232, 243 n.5 (S.D.N.Y. 1999) ("Although courts often refer to 'conscious misbehavior' or 'recklessness," the terms appear to be legally interchangeable.").

The plaintiffs allege that "[b]ecause of their senior positions," the individual defendants "knew the adverse non-public information regarding the Company's business practices." Am. Compl. ¶ 138; *see also id.* ¶¶ 27, 131-32, 138, 141. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309 (2d Cir. 2000). But the plaintiffs plead no facts describing the alleged adverse, non-public information, or when and how the individual defendants came to know it. "[C]onclusory allegations that a corporate officer had access to information that contradicted the alleged misstatements are insufficient to raise a strong inference of recklessness." *Kinsey v. Cendant Corp.*, No. 04-CV-582, 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005); *see also In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97-CV-1865, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998).

In their brief, the plaintiffs invoke the "core operations" theory, pursuant to which "a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 174 (S.D.N.Y. 2021). The plaintiffs argue that this theory applies here because the defendants' alleged misstatements "plainly

64

concern TMC's . . . most important business initiative during the Class Period."  Pl.'s Br. in Opp'n to Mot. to Dismiss 19.  But the core operations theory may provide only "supplemental support for an inference of scienter."  *Aegean*, 529 F. Supp. 3d at 174.  It is not "independently sufficient to raise a strong inference of scienter."  *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019).  The plaintiffs still must "have adequately alleged facts indicating that defendants might have known their statements were false or inaccurate."  *Id.*  They have not done so here.

## IV.  The Section 20 Claim

The plaintiffs also bring claims against Barron and Leonard under Section 20 of the Exchange Act, which establishes liability for individuals exercising control over "any person liable" under that statute or any rule or regulation promulgated thereunder.  15 U.S.C. § 78t(a).  To establish a *prima facie* case of "controlling person liability" under Section 20(a), a plaintiff must show: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation."  *Boguslavsky v. Kaplan*, 159 F.3d 715, 720-21 (2d Cir. 1998).

Because the plaintiffs have failed to allege any misstatements or omissions by TMC or the individual defendants

that survive a motion to dismiss — and therefore have not alleged a primary violation — the Section 20 claims against Barron and Leonard must also be dismissed.  *See ECA*, 553 F.3d at 206-07 (affirming dismissal of Section 20 claims "for want of a primary violation").

## V. Conclusion

For the foregoing reasons, the defendants' motion to dismiss the complaint in its entirety is granted.  The Clerk of Court is respectfully directed to enter judgment and close this case.


SO ORDERED.


/s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated:    July 11, 2025
          Brooklyn, New York